KESSNER UMEBAYASHI BAIN & MATSUNAGA
Attorneys at Law – A Law Corporation

ELTON JOHN BAIN           2443-0
E. MASON MARTIN III       7295-0
MARIE A. SHELDON          5964-0
BRADFORD K. CHUN          9426-0
19th Floor, Central Pacific Plaza
220 South King Street
Honolulu, Hawaii 96813
Telephone: (808) 536-1900

Attorneys for Defendant,
WARREN PUMPS, LLC

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF HAWAI'I

| | |
|---|---|
| ROGER E. NELSON and ROSALIE J. NELSON,<br><br>        Plaintiffs,<br><br>vs.<br><br>CRANE COMPANY, etc., et al.,<br><br>        Defendants. | CIVIL NO. 11-1-0998-05 (RAN)<br>(Toxic Tort/Asbestos Personal Injury)<br><br>**AFFIDAVIT OF<br>SAMUEL A. FORMAN, M.D.**<br><br><br>(Not Assigned Trial Date)<br><br>Judge: |

## AFFIDAVIT OF SAMUEL A. FORMAN, M.D.

1.    I am a medical doctor specializing in preventive medicine and occupational medicine. I received a B.A. degree from the University of Pennsylvania majoring in history and biology, graduating magna cum laude in 1973. I attended Cornell Medical School, graduating with a M.D. degree in 1977. I also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, I became board certified in occupational medicine after attending a residency at the Harvard School of Public Health.

2.     In 1977, I went on active duty in the United States Navy, and I performed my internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978. I remained on active duty in the Navy until 1983. Thereafter, I continued to work for the Navy as a civilian employee until 1986. My qualifications and credentials are more fully described in my curriculum vitae (attached as Exhibit A).

3.     While on active duty in the Navy, I ran an occupational health clinic at the Naval Weapons Station at Seal Beach, California, and assisted in the medical programs at the Long Beach Naval Shipyard. Among other responsibilities, I assisted in the asbestos medical surveillance program for over 2,000 Federal Civil Service employees and uniformed sailors. At any one time, I was following 200 cases of asbestos disease.

4.     In 1982, I was assigned to the Naval Environmental Health Center at Norfolk, Virginia. While stationed there, I designed occupational medicine programs with regard to Navy-specific occupational diseases, performed health hazard evaluations, inspected the occupational health programs of government facilities as part of the NOVOSH program, carried out epidemiologic studies, and trained Navy doctors and nurses in occupational medicine.

5.     In 1983, a Navy Judge Advocate General ("JAG") officer for the Naval Medical Command requested that I join of a team to locate, digest and organize government documents for production in asbestos litigation. Over the next year and a half, I investigated the Navy's historical handling and knowledge of various industrial hygiene issues, including asbestos disease.

6.     In 1985, pursuant to Navy orders, a copy of which is attached as Exhibit B, I completed my review of Navy knowledge and practice in industrial hygiene, including its awareness of and response to health hazards of asbestos, as a formal assignment. My search for documents took me to the National Archives, other warehouses and storage facilities for records of the Navy's Bureau of Medicine and Surgery. I was given full security clearances for and access to these facilities. I also conducted research at private facilities such as Harvard University's Countway Library of Medicine's section for rare books and manuscripts.

7.     Following my research, and with the approval of the U.S. Navy's Bureau of Medicine and Surgery, I published an article entitled "U.S. Navy Shipyard Occupational Medicine Through World War II" in the Journal of Occupational Medicine, Vol. 30, No. 1 (Jan. 1988). A copy of that article is attached as Exhibit C.

8.     On the basis of my research for and regarding the Navy, I concluded that the Navy's occupational health programs have paralleled, and at times led, the development of occupational medicine and industrial hygiene with respect to asbestos-related disease. From my review of countless Navy documents and my studies while employed by the Navy, I acquired extensive knowledge as to the state of Navy knowledge and awareness regarding the hazards of asbestos. Based upon that review, I conclude that the Navy's knowledge in these areas was quite complete when compared to available knowledge at the time, and that by the early 1940s the Navy was a leader in the field of occupational medicine relating to, among other things, asbestos exposure.

9.      Based upon my review, I am aware that the Navy knew by 1922 that asbestos exposure was a potential health hazard, and that special protective measures were appropriate to prevent or control potential exposure, and that its knowledge and awareness continued to develop throughout the following decades. A number of the documents evidencing this are described below.

10.      For example, a 1922 Navy Medical Bulletin originating from the Division of Preventive Medicine of the Navy Medical Corps and entitled "Instructions to Medical Officers" listed "Asbestos workers" under a listing of "Hazardous Occupations." The document, attached as Exhibit D, also recommended use of various protective measures to prevent asbestos exposure, including use of water to dampen dust, exhaust systems to remove dust, enclosed chambers to prevent escape of dust and respirators.

11.      The 1939 Handbook of the Navy Hospital Corps listed ten questions to be asked in reviewing occupational health conditions at Navy facilities. They included, "What precautions are exercised to prevent damage from pipe covering compounds? What asbestos hazards exist?" The document emphasized that "[p]roper working places must be maintained," including "masks for asbestos workers" and "[s]pecial medical examinations . . . of all . . . asbestos handlers . . . to prevent the occurrence of the diseases associated with those trades from injuring the men." A copy of this document is attached as Exhibit E.

12.      Similarly, the 1939 Annual Report of the Surgeon General of the Navy described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods" and noting risk from "continued exposure to present occupational conditions" at Navy facilities. The document also discussed appropriate methods for preventing such exposures in the future. A copy of this document is attached as Exhibit F.

13.      In 1943, the Navy and the U.S. Maritime Commission jointly issued "Minimum Requirements for Safety and Industrial Health in Contract Shipyards," attached as Exhibit G. Those requirements governed all work at Navy and private shipyards. An introduction to the document was co-signed by Secretary of the Navy Frank Knox. The requirements listed asbestosis as a disease potentially resulting from shipyard work, specifying that exposure could result from handling, sawing, cutting, molding and welding rod salvage around asbestos or asbestos mixtures. The document also provided that

Job can be done safely with:

1.      Segregation of dusty work and,

2.      (a)      Special ventilation: Hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or

(b)      Wearing of special respirators.

3.      Periodic medical examination.

14.    Following the conclusion of World War II, an article in the January 1947 issue of the Navy's Safety Review publication again noted that "[e]xposure to asbestos dust is a health hazard which cannot be overlooked in maintaining an effective industrial hygiene program." This article is attached as Exhibit H.

15.    Also in the later 1940s, the American Conference of Governmental Industrial Hygienists ("ACGIH") evaluated the issue of asbestos exposures. This entity comprised entirely of industrial hygienists with links to the government and academia, published threshold limit values for acceptable exposures to asbestos dust in the workplace. These standards were periodically updated over the years. Various representatives of the Navy, trained as industrial hygienists participated in the ACGIH. In recognition of the potential hazards associated with exposure to asbestos dust, a 1955 Navy Bureau of Medicine instruction adopted the ACGIH's threshold limit value for exposure to asbestos dust. A copy of this instruction is attached as Exhibit I.

16.    During the 1950s, the Navy continued to pursue safe work practices, consistent with then-current knowledge, with respect to potential shipyard hazards associated with exposure to asbestos dust. For example, in 1957, the Navy convened a shipyard pipefitters' conference. In attendance at the conference were personnel from all Navy shipyards and its Bureau of Ships in Washington, DC. The minutes of the conference, which are attached as Exhibit J, reflect, among others, the following discussions by Navy personnel in attendance at the conference:

> Asbestos, when handled dry, produces vast amounts of silica dust. . . . [T]he material can be dampened to reduce the amount of dust liberated. However, the specified type of amosite [asbestos] for use on cold water piping is water repellent. Also material which must be removed from an existing installation is dry and powdery, being an excellent dust producer. . . .

> [D]uring 1956 eleven deaths from asbestosis were reported on the Pacific Coast alone. . . .

> I know that two of my insulators are now afflicted with this condition. How many more will become afflicted is something which I hesitate to predict.

> Again the solution is obvious. Remove the cause by substituting other products. . .

> In the meantime, the answer is the wearing of respirators by all who handle asbestos products.

> . . .

> [A] couple of years ago this Asbestosis in the workers was quite a scare.

> This was brought to the attention of union leaders.

> . . . Fourteen out of one hundred and twenty-six had Asbestosis, and possibly now a higher percentage have it. Attention was brought some time ago to the high rate of sick leave for lung and throat trouble, and the Hygiene Officer, said there was nothing to it. Then we had a letter from the Bureau. The order is for them to wear masks, because fourteen people have brought suit against the Government. Now, if you haven't told these people to put on masks, you are more or less the cause of their trouble.

17.     The October 1962 issue of the Navy's internal Safety Review publication contained an article entitled "Asbestosis" written by a Navy physician and an industrial hygienist from the Long Beach Naval Shipyard. That article discussed the potential for exposure to asbestos aboard ships:

> Aboard ship, a great variety of insulation is performed. Insulation blocks are shaped with a saw, pads are supplied to fittings, insulation cement is applied to blocks and covered with asbestos cloth. These and other operations take place in nearly all compartments; however, most work is done in the machinery spaces. By far the greatest potential exposure to asbestos fibers occurs during ripout of old insulation for ship overhaul or reconversions.

The article concluded that:

> [t]he worker's best protection is to avoid careless creation of dusty conditions, use damp material when possible, and wear respiratory protection constantly.

A copy of this article is attached as Exhibit K.

18.     A December 9, 1968 Department of the Navy memorandum was issued regarding "Hazards of Asbestos." Attached to the memorandum was a Navy Bureau of Ships "Analysis of Hazard." In it, Navy Commander Rosenwinkel wrote that "[t]he Navy is well aware of hazards of asbestos to its employees engaged in ship construction and repair." The document, which is attached as Exhibit L, made recommendations regarding appropriate measures to control asbestos exposure. Those recommendations essentially reiterated work practices described in Navy documents on the subject since before the onset of World War II.

19.     The development of the Navy's awareness of asbestos-related health issues, and of its program for controlling asbestos exposure to Navy personnel, continued into the 1970s. On February 9, 1971, the Commander of the Navy's Ship Systems Command issued to numerous Navy bureaus and commands its Instruction 5100.26. That document began by recognizing that

> [t]he most critical use of asbestos in the Navy from a safety viewpoint is in the fabrication, installation, repair or removal of pipe and boiler insulation materials. Some workers sustain accidental contacts either while employed in various capacities

> where asbestos products are processed or when working in plant
> areas in which an environmental pollution of the air exists due to
> asbestos.

In light of these concerns, the purpose of the document was "to prescribe appropriate safety

precautions during the use of asbestos," and it decreed that:

> [t]he following safety precautions will be observed by all
> supervisors and workers engaged in the fabrication, installation
> and/or removal (ripout) of asbestos-containing insulation material.
> The provisions of this instruction will effective as of this date. The
> provisions in this instruction are considered as minimum health
> and safety requirements. More stringent restrictions may be
> applied by local commanders.

The document then listed nearly fifty specific work practices to be employed to protect workers

from asbestos exposure in handling or working in the vicinity of asbestos-containing products.

A copy of the document is attached as Exhibit M.

20.     As of the 1970s progressed, the Navy issued additional instructions aimed at preventing exposure to asbestos and complying with various federal regulations and standards on the issue.

21.     I also am familiar with the development of the Navy's awareness of and familiarity with workplace controls and practices to prevent exposure of individuals to problematic levels of airborne asbestos, and of the Navy's practice and philosophy regarding hazard communication in the workplace.

22.     The Navy and Maritime Commission programs did not depend on advice or warning on longterm occupational health issues coming from suppliers of asbestos-containing products. For example, the Navy refused a manufacturer's asbestos-related warning statement in the face of health concerns related to asbestos insulation. The Navy took this position despite known health hazards associated with airborne asbestos dust. In this instance it reiterated the adequacy of existing military specifications with respect to asbestos-containing materials. The document reflecting this instance is attached as Exhibit N.

23.     In my research, I have not located a single instance in which the Navy, at any time period relevant to this case, instructed or permitted a supplier of equipment, such as valves, to a vessel or facility to affix or provide any asbestos-related warning with its equipment.

24.     All of my opinions set forth herein and/or to be offered at trial are held to a reasonable degree of scientific certainty.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on June, 20 2011.

Samuel A. Forman, M.D.

# SAMUEL A. FORMAN, M.D.

11 Clinton Road
Brookline, MA 02445-5812

(617)-306-2403 cell          sforman@hsph.harvard.edu

## EMPLOYMENT

| | |
|---|---|
| 2005 - present | **Oak and Ivy Health Systems, Inc.,** Brookline, MA<br>President<br>Consulting services encompassing, quality management, disease management, intensive case management, business strategy, health care operations, epidemiology and toxicology.<br><br>Management and teaching for the Initiative for Productivity and Health Management at the Occupational and Environmental Medicine Residency of Harvard School of Public Health (adjunct faculty). Co-director of *Leadership for Productivity and Health Management*<br><br>Knowledge development and dissemination concerning historical issues of relevance to society and to medicine. Current book project is the American Founders biography of Dr. Joseph Warren. |
| 2003 - 2004 | **Healthways, Inc.,** Westboro, MA<br>Senior VP and Medical Director<br>Medical direction for high-risk case management, comprising StatusOne services offered as a product line of Healthways, Inc. |
| 1997 - 2003 | **StatusOne Health Systems, Inc.,** Westboro, MA<br>Senior VP, Chief Medical Officer, Founder and Board Secretary<br>Consulting, software and Internet services helping risk-bearing health organizations care for their frailest members. Develop predictive models, consult on the organization and execution of medical management services, formulate client relationships, contribute professional papers and monographs, evaluate competitive offerings, and represent StatusOne to medical audiences.<br>Company acquired by Healthways, Inc., September 2003. |
| 1995 - 1997 | **Blue Cross and Blue Shield of Massachusetts**, Boston, MA<br>Medical Director, Clinical Improvement<br>General management responsibilities for pharmacy, home care, and several health care joint ventures. Lead clinical improvement projects involving all specialties in a 100,000 member integrated delivery system. Leadership of 150 people. Occupational medicine liaison with Raytheon Corporation. Provide general internal medicine care. |
| 1986 - 1993 | **Procter & Gamble Company**, Cincinnati, Ohio<br>Consultant, later Associate Director, Occupational Health<br>Manage U.S. self-insured health programs for 30,000 employees comprising the detergent, paper, pharmaceutical and food divisions. Build epidemiologic function, design, contract for, and execute studies. Model programs reapplied worldwide. Manage 5 physicians, 3 nurses plus support staff. Deliver clinical services to technical center staff and senior management. Direct 70 site clinics and 60 part-time physicians. |

EXHIBIT A

Samuel A. Forman, MD                                    Curriculum vitae

| | |
|---|---|
| 1984 - 1986 | **Coastal Emergency Services, Inc**.<br>Clinical services as emergency room physician and ambulatory family medicine at several Virginia community hospitals. |

## MILITARY SERVICE

| | |
|---|---|
| 1982 - 1986 | **Navy Environmental Health Center**<br>Norfolk, Virginia<br>Lieutenant Commander, later GS-14 Consultant in the occupational medicine division<br>Set standards, review complicated disability claims, apply statistical methods to health care delivery, inspect clinics for QA and UR, lecture on professional topics, perform epidemiologic studies and health hazard evaluations, represent naval occupational medicine on selected issues to outside organizations, manage development and implementation of clinical information management system. |
| 1980 - 1982 | **Naval Regional Medical Center**<br>Long Beach, California<br>Occupational Medicine Service; Head, Seal Beach Naval Weapons Station clinic.  General and occupational clinical and preventive programs for 2,200 workers and 250 military personnel at conventional, nuclear capable, and special weapons industrial base.  Manage asbestos medical surveillance program at Long Beach Naval Shipyard. |
| 1978 - 1979 | **USS St. Louis** (LKA-116) and **USS Duluth** (LPD-6)<br>Based at San Diego, California<br>Ship's physician<br>Western Pacific operations, general office and emergency practice. Vietnamese refugee assistance. |

## EDUCATION

| | |
|---|---|
| 1993 - 1995 | **Yale** University School of Management,<br>New Haven, Connecticut<br>**Master of Business Administration**<br>Concentration in Organizational Behavior and Operations.  Total quality management, health administration, finance, marketing, accounting and statistics.<br>Coordinator of Yale/Columbia Graduate School of Business Negotiation Colloquium. |
| 1979 - 1980 | **Harvard** University School of Public Health,<br>Boston, Massachusetts<br>**Master of Science**<br>Residency in Occupational Medicine |
| 1977 - 1978 | **National Naval Medical Center**,<br>Bethesda, Maryland<br>Internal medicine rotating internship<br>Assistant senior intern. |
| 1976 - 1977 | **Harvard** University School of Public Health,<br>Boston, Massachusetts<br>**Master of Public Health** |

Samuel A. Forman, MD                                          Curriculum vitae

1973 - 1977          **Cornell** University Medical College,
                     New York, New York
                     **Doctor of Medicine**
                     MD-MPH program.

1970 - 1973          **University of Pennsylvania**,
                     Philadelphia, Pennsylvania
                     **Bachelor of Arts** magna cum laude
                     Majors in American history, history of science and biology.

## PUBLICATIONS

(Book) Forman, SA: *Dr. Joseph Warren – On the Road to Bunker Hill*, Pelican Publishers, 2011, in preparation.

Coberley C, Hamar B, Gandy B, Orr P, Coberley S, McGinnis M, Hudson L, Forman S, Shurney D, Pope J: "Impact of Telephonic Interventions on Glycosylated Hemoglobin and Low-density Lipoprotein Cholesterol Testing" Am J Managed Care 13(4): 188-192, 2007.

Forman S: "Targeting the Highest Risk Population to Complement Disease Management" Health Management Technology 49-50, Jul 2004.

Forman SA, Lynch JP: "High Risk Geriatric Population Management" J Am Geriatric Assoc  S111, May 2001.

Lynch J, Forman SA, Graff S, Gunby M:  "High Risk Population Health Management: Achieving Improved Patient Outcomes and Near-Term Financial Results"  Am J Managed Care 6(7):781-791, 2000.

Forman S:  "Medicare Risk Plans and Disease Management Vendors" Disease Management and Health Outcomes 7(1):1-4, 2000.

(Book) Forman SA, Kelliher M: *Status One: Breakthroughs in High Risk Population Health Management,*  Medical Management Series, Jossey Bass Publishers, San Francisco 1999.

Borron SW, Forman SA, Lockey JE, Lemasters GK, Yee LM: "Dust and Mirrors or Corruption is in the Eye of the Beholder," American Journal of Industrial Medicine 34:409-410, 1998.

Forman SA, Kelliher M, Wood G:  "Clinical Improvement with Bottom Line Impact - Custom Care Planning for the Acutely, Chronically Ill in a Managed Care Setting," J Managed Care 3(7): 1039-1048, July 1997.

Borron SW, Forman, SA, Lockey JE, Lemasters GK, Yee LM:  "An Unpublished 1932 Study of Asbestosis Among Manufacturing Workers: Reconstruction of the Cohort and Original Findings," American Journal of Industrial Medicine 31: 324-334, 1997.

Ducatman AM, Forman SA, Teichman R, Gleason RE:  "Occupational Physician Staffing in Large U.S. Corporations," Journal of Occupational Medicine 33(5): 613-618, 1991.

Samuel A. Forman, MD                                    Curriculum vitae

Forman SA: "A Review of Propylene Glycol Dinitarate Toxicology and Epidemiology," Toxicology Letters 43: 51-65, 1988.

Ducatman AM, Yang WM, Forman SA: "B-Readers and Asbestos Medical Surveillance," Journal of Occupational Medicine 30(8): 644-647, 1988.

Forman SA: "Sublethal Exposure to Microwave Radiation (letter)," Journal of the American Medical Association 259(1): 3129, 1988.

Forman SA: "U.S. Navy Occupational Medicine Through World War Two," Journal of Occupational Medicine 31(1): 28-32, 1988.

Forman SA, Potter HG, Helmkamp JC: "Retrieval Methodology for Inpatient Records," Military Medicine 152: 190-193, 1987.

Forman SA, Helmkamp JC, Bone CM: "Cardiac Morbidity Associated With Occupational Exposure to 1,2 Propylene Glycol Dinitrate," Journal of Occupational Medicine 25(5): 445-450, 1987.

Forman SA: "Radiation-Induced Breast Cancer (letter)," Archives of Internal Medicine 145: 574-575, 1985.

Helmkamp JC, Forman SA, McNally MS, Bone CM: "Morbidity and Mortality Associated With Exposure to Otto Fuel II in the U.S. Navy 1966-1979," Naval Health Research Center Report 84-35, 1984.

Forman SA: "Industrial Hygiene Records - Will They Be Useful and IBM's Experience With ECHOES," American Conference of Governmental Industrial Hygienists Journal 6: 41,75, 1983.

Forman SA, Holmes CK, McManamon TV, Wedding C: "Psychological Symptoms and Intermittent Hypertension Following Acute Microwave Exposure," Journal of Occupational Medicine 24(11): 932-934, 1982.

Forman SA, Castell DO: "Food Intolerance and Peptic Ulcer Disease," Gastroenterology 75(1): 162, 1978.

Forman SA: "The Dynamic Interplay Between Photochemistry and Photography," Journal of Chemical Education 52(10): 629-631, Oct 1975

## ACADEMIC AFFILIATIONS

Harvard University, School of Public Health, Visiting Scientist in the Department of Environmental Health, 2007 – current.
Residency Advisory Council 2009 – current.

Yale University School of Management, annual health sector symposia 2005 – current.

University of Cincinnati, chairman of the post-graduate Occupational Medicine Advisory Committee, 1988-1990.

Samuel A. Forman, MD                                                    Curriculum vitae

Eastern Virginia Medical College, adjunct assistant professor of family practice and community medicine, 1983-1985.

## LICENSES and CERTIFICATIONS

Licensed to practice medicine in Massachusetts, Virginia, California and Ohio.
Board certified in Occupational Medicine.

## MEMBERSHIPS

Member, American Medical Association and Massachusetts Medical Society
Fellow, American College of Occupational and Environmental Medicine.
Member, Massachusetts Historical Society, Boston Athenaeum, Bostonian Society, New England Historical and Genealogical Society

## INTERESTS

General management within health related and other businesses. Innovations, strategy and leadership in the cost effective delivery of medical care and the maintenance of high patient functional status. Enjoy history, writing, sculling, numismatics, antiques. Company surgeon of the Lexington Minutemen historical reenactors.

UNCLASSIFIED

151825Z  AUG  85  RR      UUUU                    2271825

ADMIN

NAVENVIRHLTHCEN NORFOLK VA

COMNAVMEDCOM WASHINGTON DC

UNCLAS //N06260//

SUBJ: USE OF NAVAL MEDICAL COMMAND ARCHIVAL MATERIALS

1. PASS TO MEDCOM-OOD4 {MR. HERMAN}.

2. I HAVE ASSIGNED DR. SAMUEL A. FORMAN THE TASK OF REDISCOVERING HISTORY OF OCCUPATIONAL HEALTH WITHIN NAVY MEDICINE. EFFORT HAS IMPLICATIONS FOR CURRENT CONTINGENCY ROLES AND MORALE OF THE TWIN OCCUPATIONAL MEDICINE AND INDUSTRIAL HYGIENE OFFICER COMMUNITIES. WILL USE OLD BUMED RECORDS AT THE NATIONAL ARCHIVES AND NAVMEDCOM ARCHIVES FROM 20-23 AUG 85.

2. PLEASE ALLOW ACCESS TO APPROPRIATE MATERIALS. AS NATIONAL ARCHIVES MILITARY RECORDS OPEN ONLY DAYTIME HOURS, PLEASE ACCOMODATE WORK AT MEDCOM FROM 1630-2100, IF POSSIBLE.

# EXHIBIT B

DR. S. A. FORMAN, OCC MED CONSUL         326:SAF:HFC
COORDINATOR, 4-4657                      15 AUG 85

CDR J.P. WILKINSON, MSC, USN, 4-4657            MINIMIZE CONSIDERED



UNCLASSIFIED

This material may be protected by copyright law (Title 17 U.S. Code).

# US Navy Shipyard Occupational Medicine through World War II

Samuel A. Forman, MD, MPH

*For more than 60 years the US Navy has maintained occupational health programs for its civil service workers in shipyards, arsenals, and aircraft repair facilities. The early history of the organization, people, and professional activities dedicated to the health of this large federal industrial workforce is examined.*

*Early efforts were stimulated by increasingly complex naval technology and worker compensation law. During World War II training, clinical, and preventive programs were pursued vigorously. Navy occupational health paralleled and at times led the development of occupational medicine and industrial hygiene in America.*

The history of United States Navy occupational medicine encompasses health aspects of one of the largest federal industries during peace and war. It is a history paralleling, and at times leading, the development of occupation health in this country. This paper utilizes mostly primary sources to trace the origins of Navy occupational medicine through 1945, ending with the Second World War demobilization. The latter period marked a pause in professional progress and later activities are both within living memory and have been discussed elsewhere.[1]

In the late 19th century new seagoing technologies multiplied naval health hazards. Introduction of iron warships made naval construction and repair a diverse, heavy industry (Fig. 1). An array of occupational activities that were essentially unknown in the days of wooden ships and sail propulsion characterized work supporting the new fleets. In addition to the age-old injury problems of falls from scaffolding and rigging, there were hazards incident to riveting, welding, painting with rust-inhibiting lead paints, chipping, sandblasting, metal casting, ordnance loading, and electric wiring.

Several occupational health problems were recognized by 1900, but little preventive action was taken. For example, deafness among boilermakers and gunners mates was an accepted fact of life.[2] Toxic conditions gained attention only if they afflicted many people and compromised a ship crew's readiness for duty.[3] Greater preventive medical interest was shown in the prevalent and pressing problems of sailors such as infectious diseases and minimally adequate shipboard ventilation.[4,5]

The health of civil service workmen in many shipyards and arsenals received little attention. Injuries might be treated in the station military dispensary,[6] at the discretion of the commanding officer. There was no provision for disability benefits if a prolonged health problem occurred.

Worker compensation laws enacted in the first 2 decades of the 20th century placed financial responsibility for occupational injuries on the employer. The first comprehensive compensation plan for federal employees became law in 1916. Unlike state plans, which were most often administered by insurance companies, benefits for Navy civil service workers were administered directly by the government through its Employees Compensation Commission. The aggregate bill for benefits was served to the Secretary of the Navy each year. Financial losses resulting from civil service employees' worker compensation were deducted from the Navy budget. As dollar losses became a highly visible and painful reminder of occupational health issues, occupational health, previously an obscure topic, gained a measure of recognition.

The First World War witnessed a large increase of industrial activities in shipyards and supporting shore stations. More Navy physicians recognized that occu-

[right column partially cut off]

Fig. ...
...DC)

...pation...
care a
keep th
tions d
interes

Poor
dollars
ment fi
whose
Navy s
toxic in
priority
ards.[10]
belt dri
safely .
ments.

As W
program
effort t
Althoug
and the
end of t
ernmen
time lev

One l
advance
medicin
sation (
poor co
grams !
safety e
assigned
officers
occupat
Medicin
bilities .
From th

From the Occupational Medicine Division, Navy Environmental Health Center, Norfolk, VA 23511. Present address: Health and Safety Division, The Procter and Gamble Company, Ivorydale Technical Center, Cincinnati, OH 45217.

The views presented are those of the author and do not represent the official position of the Department of the Navy or the Naval Medical Command.

0096-1736/88/3001-0028$08.00/0
Copyright © by American Occupational Medical Association



Fig. 1. Introduction of iron warships made naval construction and repair a diverse, heavy industry. The crew of USS Monitor observes its riveted iron turret and rifled steel cannon following the battle with CSS Virginia in 1862. (Courtesy of US Navy Imaging Command, Washington, DC)

pational health services, then consisting mostly of injury care and employment physical examinations, helped keep the work force on the job.[7,8] Although a few locations developed rudimentary occupational clinics, such interest remained the exception.

Poor compensation experience, as measured by both dollars and lost-time injuries, attracted critical comment from the Federal worker compensation program, whose administrator requested inspections of several Navy shipyards in 1917.[9] Detection and correction of toxic industrial hazards initially received a secondary priority to control of numerous and evident safety hazards.[10] Even so, Navy workers were maimed by exposed belt drives long after these dangerous mechanisms were safely enclosed in most private industrial establishments.

As WW I progressed, ineffective occupational health programs came to be recognized as impairing the war effort through needless waste of industrial manpower. Although plans for better services within both the Navy and the private sector took shape in mid-1918,[11,12] the end of the war halted their implementation. Navy government industries were rapidly demobilized to peacetime levels.

One legacy of the war years remained to sustain and advance the nucleus of a full-time Navy occupational medicine function. Criticism by the Employee Compensation Commission and the Secretary of the Navy for poor compensation cost experience led to ongoing programs in both safety and industrial hygiene. In 1917, a safety engineer was appointed and others were later assigned to each shipyard. In 1922, full-time medical officers were assigned to assist each safety officer in occupational health matters.[13] At the Navy Bureau of Medicine and Surgery, occupational medicine responsibilities were added to its preventive medicine division. From the beginning, organized occupational health was focused on the civil servants laboring in Navy shipyards.

An early initiative came from Dr Robert Jones at the Navy Bureau of Medicine and Surgery, who recommended periodic physical examinations for a variety of occupations based on their potential toxic exposures. Of interest, screening of asbestos workers for pulmonary diseases was recommended along with examinations for more widely recognized conditions such as silicosis and lead poisoning.[14] Unfortunately, resources to provide such services were most often not obtainable from each base's commanding officer.

Nevertheless, a new vigor and purpose came to occupational health programs. Some performed excellent services for the Navy and workers at their locations. Boston Naval Shipyard Clinic sent one of its doctors in 1923 to complete postgraduate occupational medicine studies at the Harvard School of Public Health.[15] In 1925, Dr Ernest Brown completed a survey of lead poisoning in Philadelphia Naval Shipyard welders. He exhibited a disciplined and wide-ranging approach including clinical assessment, evaluation of work practices, and environmental sampling. Not content with passively describing the workplace, he devised hazard control strategies including altered work practices and adaptations of respiratory protection equipment.[16]

Other bases lagged in their occupational health and safety efforts. In some instances the occupational physician might retreat into the clinic to be exclusively occupied with acute injury treatment. Military base safety officers were often untrained and ineffective.[17]

There was a growing appreciation for the importance of job-specific pre-employment physical examinations.[18] Unlike active duty sailors who had to pass an induction "pre-employment" examination before donning the uniform, civilian employees were examined only when required by the base commanding officer and under general guidelines of the Civil Service Commission. Pre-

employment examinations comprised a significant enterprise for the 1920s work force numbering almost 60,000

Uniformed Navy personnel continued to receive variable occupational medical services. Almost from their introduction into the service, hazards inherent in aircraft and submarine environments gained the attention of dedicated medical professionals. When other occupational conditions were addressed at all, it was often in the context of a health problem severe enough to immediately impair health and fitness for duty. Examples include sailors' noise-induced hearing loss,[19,20] lead encephalopathy,[21] nitroglycerin poisoning,[22] and painting solvent intoxication.[23] These endeavors remained distinct from organized Navy occupational medicine, which remained oriented toward civil service worker health.

By the end of the 1930s, a small, full-time group of occupational health physicians had been in place for a number of years.[24] A few physicians, like Dr Ernest Brown, achieved superior competence in the practice of occupational medicine. Although all programs had not been uniformly successful, and adequate resources were hard to come by, the organization was poised to meet requirements arising from an anticipated industrial mobilization.[25]

As war clouds gathered, Rear Admiral Charles Stephenson (Fig. 2), in charge of preventive medicine at the Navy Bureau of Medicine and Surgery, faced the challenge of building upon the modest Navy occupational health program of the previous decades. The general approach to maritime industries was already being discussed. Navy yards, arsenals, and air stations would gear up to produce and maintain specific, often complex ships and weapons, yet remain flexible enough to accommodate anticipated battle repairs. Using an organizational model revived from WW I, the US Maritime Commission would give contracts to private companies to mass-produce vessels such as "Liberty" transport ships and landing assault craft.

Immediate challenges included defining the scope of Navy occupational health, obtaining the backing of the military hierarchy, and staffing the effort with trained individuals. A coherent blueprint for the content of military occupational health was provided by Dr Ernest Brown. He envisioned services to include clinical care for injuries, job placement medical certifications, surveillance examinations for noxious work exposures, and workplace hazard inspections and controls.[26,27]

The next challenge was providing skilled manpower at a time when large industries monopolized the few qualified people.[28] The most viable answer was a timely proposal from Philip Drinker at the Harvard School of Public Health for training military officers in short courses of instruction.[29] Professor Drinker was already a well-known authority who had invented the "iron lung" mechanical respirator in 1929,[30] devised means to quantify and control industrial dust exposures,[31] and pioneered concepts in permissible exposure limits. Stephenson sent two bright Navy physicians, Drs Otto Burton and Howard Karl Sessions, to complete the occupational medicine master's degree program at Harvard during 1941.

Concurrently, Stephenson worked to empower the organization to tackle expanded responsibilities without external interference. An unsolicited attempt by the Public Health Service to perform occupational health inspections of naval facilities was promptly declined,[32,33] reportedly with the support of President Roosevelt.[34] For industrial activities all occupational health services would be provided from within the Navy.

The new Navy program was adopted and announced with some fanfare[35] (Fig. 3). It included pre-employment examinations,[36] injury care, medical surveillance for known occupational health hazards, and industrial hygiene field surveys. Shipyards developed well-staffed occupational health services manned by professionals in uniform and comprising both clinical and industrial hygiene divisions. These were located at the largest industrial facility in each of the 12 naval districts and lent occupational health support to smaller naval facilities in their areas.[37]

Key manpower was to be provided by training uniformed officers in short courses as proposed by Philip Drinker. By the war's close some 111 naval officers had completed the courses, most classes having convened at Harvard[38] and a few at Columbia.[39] Schools of Public Health. Of interest, 29 officers, unlike their classmates, were non-physicians, a group comprising one of the first formal training programs in modern industrial hygiene. Both physicians and hygienists shared formal lectures but separated during laboratory periods. Doctors attended industrial clinics and hygienists learned sampling strategies, laboratory assays, and hazard-control techniques. An additional 16 hygienists were taken on active duty, having already gained experience in industrial settings.

The role of occupational health within the US Mari-



Fig. 2. Rear Admiral Charles S. Stephenson (1887–1965) was instrumental in designing and implementing the Navy occupational medicine program during WW II. (Courtesy of the Naval Medical Command, Washington, DC)




Fig. 3. As illustrated by contemporary poster art, injury care, physical examination, and protective measures were aspects of the Navy wartime occupational medicine program. (Courtesy of the National Archives, Washington, DC)

time Commission evolved in 1942. Philip Drinker was also active here.[40] As chief medical consultant he was instrumental in the adoption of joint Navy - Maritime Commission health and safety standards for contract shipyards.[41] The health guidelines were based largely on the experience of a traveling health team's findings in the course of inspections of representative shipyards. In August 1942, the team was professionally staffed with loaned Navy physicians and industrial hygienists.

Contract shipyards that the Maritime Commission supervised provided their own injury treatment measures, whereas industrial hygiene inspection services were provided by government personnel. Qualified people were unavailable to institute the inspection services, so arrangements were made with the Navy to provide uniformed men. They were assigned to four regional offices: one physician and two industrial hygienists each to Philadelphia and Oakland and one industrial hygienist each to the offices in New Orleans and Chicago.[42]

In contrast to the program of the Maritime Commission, the Navy occupational health program had no traveling consultants or inspectors. When occupational health issues of general importance to naval industries arose or when special expertise beyond that in each naval district was required, Drinker's team was consulted. Health questions related to welding[43,44] and asbestos insulation work were the subjects of health hazard evaluations by the Maritime Commission during the war.

Asbestos workplace field investigations have had long-term significance. There had been anecdotal case reports implicating asbestos in lung disease from naval shipyard clinics.[45–47] A Maritime Commission field survey at a civilian contract shipyard revealed two laggers with x-ray evidence of asbestosis among a small number of tradesmen.[48] Navy occupational health officers were concerned enough about such findings that they coop-

erated with Philip Drinker in his proposal to do a large-scale pulmonary survey of asbestos insulation workers and obtained permission to extend the survey to two naval shipyards.[49]

Only three asbestosis cases were identified among more than 1,000 asbestos insulation workers who participated in the chest x-ray screenings at four shipyards.[50,51] Disease prevalence appeared low, an artifact caused by the inadvertent dilution of the at-risk population with briefly exposed persons. Low asbestosis prevalence in shipyard workers was interpreted in the professional community to mean that asbestos lagging operations were relatively free of pneumoconiosis risk.[52] Although these early studies concerning asbestos hazards did not stand the test of time,[53,54] they represented superior occupational health methods of their era.

Industrial health activities were rapidly demobilized by 1946. The Maritime Commission health consultation office was disbanded. Although few physicians and industrial hygienists remained in active Navy service, those who gained experience during the war, like Drs. Otto Burton and Howard Karl Sessions and industrial hygienists Sidney Goren and George Johnson, led Navy programs through the 1950s.

Navy occupational health had played an important role in wartime industries. Its organization included superior practitioners. It broke new ground for industrial hygiene as a distinct health-related profession. It confidently tackled known health issues and actively pursued newer ones. Members of this team, veterans of occupational medicine and industrial hygiene services in Navy shipyards, arsenals, air stations, and the Maritime Commission, shared a common experience. Taking their know-how with them into private industry, government, and academia, Navy programs left a distinctive mark on American occupational health for many years.

# References

1. Lawton GM, Snyder PJ: Occupational health programs in US naval shipyards *Environ Res* 1976;11:162–165.

2. Garton WN: Report relative to a series of experiments conducted on board the USS Ohio during target practice, with plasticine for the protection of ear drums during heavy gunfire *US Naval Med Bull* 1909;3:142–145.

3. Woods GW: An Account of thirty-seven cases of pityltism occurring on board of the USS Wachusett: *Annual Report of the Surgeon General of the Navy*, US Government Printing Office, 1876, pp 485–489.

4. Kershner E: Hygiene and medical reports of medical officers of the US Navy–USS Swatara: *Annual Reports of the Surgeon General of the Navy*, US Government Printing Office, 1875.

5. Gihon AL: *Practical Suggestions in Naval Hygiene*, ed 3, US Government Printing Office, 1873.

6. Cleborn DJ: Report of US Naval Station, Kittery, Maine: *Annual Report of the Surgeon General of the Navy*, US Government Printing Office, 1876.

7. Blackwood NJ: Industrial notes from the Boston yard *US Naval Med Bull* 1915;9:343–344.

8. Bloedorn WA: Studies of industrial accidents which occurred in the Navy yard at Washington, DC *US Naval Med Bull* 1916;10:585–625.

9. *Safety Record at US Navy Yards, US Naval Med Bull* 1925;22:187–191.

10. Saaka A: Measures to Prevent Poisoning by Trinitroluol: *US Naval Med Bull* 1919;13:634–635.

11. Selby CD: Medical service in the conservation of industrial man power, *JAMA* 1918;71:333–336.

12. Mock HE: Industrial medicine and surgery: A resume of its development and scope *J Indust Hyg Toxicol* 1919;1:1–6.

13. Jones EF: Industrial hygiene at Navy yards: *US Naval Med Bull* 1922;16:575–597.

14. Dublin LI: Occupational hazards and diagnostic signs: A guide to impairments to be looked for in hazardous occupations: *US Naval Med Bull* 1922;17:863–914.

15. Abstracts from the Annual Sanitary Report of the Navy Yard, Boston, Mass., for the Year 1622 *US Naval Med Bull* 1923;18:632.

16. Brown EW: Report of lead poisoning among oxyacetylene welders in the scrapping of naval vessels *US Naval Med Bull* 1925;23:187–217.

17. Secretary of the Navy letter "Safety Engineering" dated October 11, 1928, National Archives, Record Group 52, Washington DC.

18. Brewster JW: Eye examination as a factor in the reduction of industrial accidents *US Naval Med Bull* 1928;26:69–71.

19. Trible GB, Watkins SS: Ear protection *US Naval Med Bull* 1929;13:45–60.

20. Ridout GB: Gunfire deafness in the navy *US Naval Med Bull* 1930;28:736–739.

21. Stitt ER: Lead poisoning from red lead dust: The possible frequency of lead encephalopathy in such cases *US Naval Med Bull* 1912;6:161–165.

22. Fortescue TA: Report of poisoning by trinitrotoluene among enlisted men engaged in transferring TNT from storage to USS Nitro *US Naval Med Bull* 1937;35:491–495.

23. Young CA, Gelatte AC: Dope poisoning as a potential hazard in spray coating airplane wings *US Naval Med Bull* 1933;31:63–86.

24. Shinn BL: Industrial Medicine *US Naval Med Bull* 1935;33:84–96, 250–260.

25. Navy Bureau of Medicine and Surgery restricted letter "Estimates of Medical Supplies for Navy Yard Dispensaries" dated December 29, 1934. Declassified 1951, National Archives, Record Group 52, Washington DC.

26. Brown EW: Industrial hygiene and the Navy in the national defense *US Navy Med Bull* 1941;39:331–335.

27. Brown, EW: Industrial hygiene and the Navy in the national defense *Nav Med* 1941;1:3–14.

28. Joint meeting of Subcommittee on Industrial Hygiene and Health of the Federal Security Agency and Council on Industrial Hygiene of the American Medical Association, unpublished minutes, January, 22, 1941, National Archives, Record Group 52, Washington DC.

29. Harvard School of Public Health letter, Philip Drinker to James P. Conant dated November 30, 1940.

30. Drinker P, Shaw LA: An apparatus for the prolonged administration of artificial respiration: A design for adults and children *J Clin Invest* 1929;7:229–247.

31. Drinker P, Hatch T: *Industrial Dust*. New York, McGraw-Hill Book Co, 1936.

32. Navy Department memorandum "Conference with Representatives of the Division of Industrial Hygiene Concerning Problems of Occupational Illness in the Navy Industrial Establishment" dated February 24, 1941, National Archives, Record Group 52, Washington DC.

33. Navy Department memorandum "Cooperation of Public Health Service" dated February 25, 1941, National Archives, Record Group 52, Washington DC.

34. Navy Bureau of Medicine and Surgery memorandum, "Notes for consideration when you (Surgeon General McIntire) call on Assistant Secretary Bard" dated March 11, 1941, National Archives, Record Group 52, Washington DC.

35. Navy Department press release "Navy to Expand Safety and Industrial Health Program" dated March 2, 1941.

36. Navy Department memorandum "Physical Examinations for Employees Engaged in Work Hazardous to Themselves and Others" dated October 25, 1941, National Archives, Record Group 52, Washington DC.

37. Stephenson CS, Burton OL: Industrial Hygiene Program of the US Navy: *Am J Public Health* 1943;33:319–323.

38. Harvard School of Public Health syllabus "Tentative Schedule of Three Months Course for Medical Officers Who Will Specialize in Industrial Hygiene for the Army and Navy" dated January 27–April 26, 1941.

39. Columbia University syllabus "Course for Navy Officers" dated April, 1941.

40. "Plans for Safety and Health Program" C. W. Fischer, U.S. Navy Department and D. S. Ring, U.S. Maritime Commission, joint memorandum for the Assistant Secretary of the Navy and Commissioner U.S. Maritime Commission, dated November 5, 1942, National Archives, Record Group 52, Washington DC.

41. Minimum Requirements for Safety and Industrial Health in Contract Shipyard, US Navy Department and US Maritime Commission, US Government Printing Office, 1943.

42. Anonymous: Ministry of Industrial Health Program of the US Navy During and After World War II, unpublished Bureau of Medicine and Surgery manuscript, undated, probably 1951, National Archives, Record Group 52, Washington DC.

43. Drinker P, Nelson KW: Welding fumes in steel fabrication *Indust Med* 1944;13:673–675.

44. Drinker P, Nelson KW: Shipyard Health Problems *J Indust Hyg Toxicol* 1944;26:56–59.

45. Chief, Navy Bureau of Ships letter "Insulation—water repellant amosite for cold water piping" dated August 12, 1943, National Archives, Record Group 52, Washington DC.

46. Puget Sound Navy Shipyard, Bremerton, WA. letter "Amosite (magnesium oxide and asbestos) lagging, toxic effects of inhalation and ingestion of, by workmen" dated January 5, 1944, National Archives, Record Group 52, Washington DC.

47. Navy Bureau of Medicine and Surgery letter "Amosite lagging, toxic effects of" dated January 19, 1944, National Archives, Record Group 52, Washington DC.

48. Dresson WC, Fleischer WE, "Report on investigation of asbestosis from amosite pipe covering at Bath Iron works, Bath, Maine, unpublished manuscript dated December 19, 1944, National Archives, Record Group 52, Washington DC.

49. Navy Bureau of Ships letter "Industrial health—Survey of respiratory diseases" dated March 24, 1944, National Archives, Record Group 52, Washington DC.

50. Fleischer WE, Viles FJ, Gade RL, et al: A health survey of pipe covering operations in constructing naval vessels *J Indust Hyg Toxicol* 1946;28:9–16.

51. Drinker P: Health and safety in contract shipyards during the war *Occup Med* 1947;3:335–343.

52. Abstracts from current literature—Environmental Control *Occup Med* 1946;1:511.

53. Marr WT: Asbestos exposure during naval vessel overhaul *Am Indus Hyg Assoc J* 1964;25:264–268.

54. Selikoff IJ, Churg J: The occurrence of asbestosis among insulation workers in the United States *Ann NY Acad Sci* 1965;132:139–155.

*VOL. XVII*                                                         *NO. 1*

# UNITED STATES NAVAL
# MEDICAL BULLETIN

PUBLISHED FOR THE

## INFORMATION OF THE MEDICAL
## DEPARTMENT OF THE SERVICE

———

ISSUED BY

THE BUREAU OF MEDICINE AND SURGERY
NAVY DEPARTMENT

DIVISION OF INSTRUCTION AND PUBLICATIONS
COMMANDER H. W. SMITH, MEDICAL CORPS, U. S. NAVY
IN CHARGE

———

EDITED BY

LIEUTENANT COMMANDER W. M. KERR, MEDICAL CORPS, U. S. NAVY

———

# JULY, 1922
(MONTHLY)



Compiled and published under authority of Naval Appropriation Act
for 1922, approved July 12, 1921

WASHINGTON
GOVERNMENT PRINTING OFFICE
1922

EXHIBIT D

# THE DIVISION OF PREVENTIVE MEDICINE.

Lieut. Commander R. F. JONES, Medical Corps, United States Navy, in charge.

Notes on Preventive Medicine for Medical Officers, United States Navy.

## INSTRUCTIONS TO MEDICAL OFFICERS.

### OCCUPATION HAZARDS AND DIAGNOSTIC SIGNS: A GUIDE TO IMPAIRMENTS TO BE LOOKED FOR IN HAZARDOUS OCCUPATIONS.

By LOUIS I. DUBLIN, Ph. D., Statistician Metropolitan Life Insurance Co., and PHILIP LEINOFF.

### INTRODUCTION.

Many occupations have injurious effects on the physical condition of those engaged in them. The health of those who work with the poisons, such as lead, arsenic, mercury, picric acid, etc.; or those who are exposed for long periods to dust, heat, humidity, or to the infectious materials, etc., may be impaired seriously as the result of their work. The occupation is now recognized as of the very first importance as a factor in the causation of disability and even of death. Doctor Edsall has shown that in his clinic at the Massachusetts General Hospital many of the conditions for which treatment is sought by men of working ages are the effects of occupations.[1] Other industrial clinics are reporting similar results. With their attention directed to occupation as a possible factor, industrial physicians are able to diagnose a great many obscure cases which previously had puzzled even the most competent clinicians. In this way they discover a great many more cases of disease of occupational origin than had before been thought possible. Thus, in 1917 about 150 cases of lead poisoning were discovered at the Massachusetts General Hospital, which are more than were recorded by this clinic during the five-year period prior to the adoption of the more intensive methods of study. It is generally recognized that patients come to physicians with pains and complaints of an indefinite char-

[1] See Monthly Labor Review of the U. S. Bureau of Labor Statistics, December, 1917, p. 169–185.

acter, and it is only when consideration is given to the occupation and its possible effects that many of these cases are cleared up.

The medical examiner should, therefore, be very careful to see if any of the usual diagnostic signs of poisoning, dust, heat, or other hazards which are known to be inherent in occupations are in evidence among their patients where no other explanation of the case is readily available. In the case of those exposed to lead, such as employees of storage-battery plants, white-lead workers, paint mixers, painters, etc., the blue line on the gum, the pale, sallow appearance, and the trembling fingers are significant as indications of chronic lead poisoning, and the physician should look for these signs. Physical symptoms and conditions which ordinarily might be passed by in this way become very important if they point to the possible effect of the occupation.

This article has been prepared to aid physicians in general practice, industrial hygienists, safety engineers, and others who come into close professional contact with those who are engaged in industrial processes. Nine major hazards of employment are listed, namely, abnormalities of temperature; compressed air; dampness; dust; extreme light; infections; poor illumination; repeated motion, pressure, or shock; and the poisons. A separate section is devoted to a discussion of skin irritants. Long exposure to any of these will usually leave definite physical signs which the medical examiner can discover if he will look for them. To aid him in detecting the hazards and their effects on the worker, two lists are presented. The first consists of the more common hazardous occupations, arranged alphabetically; the second consists of hazards, together with their effects or symptoms, as well as the occupations affected. After each occupation in the first list is a reference in code to the particular hazard in the second list. The capital letters after each occupation, "A," "B," "C," etc., refer to the general hazard. The Arabic numerals signify the particular hazard, as "D1," inorganic dust; "D2," organic dust.

The following example will show how this guide may be of value to the general practitioner: A man, who works in a garage, suffering from continuous headaches, visits his physician. The latter can find no cause for the patient's illness. The patient shows no signs of disease other than the subjective symptoms which he describes. Perhaps the physician will recommend an examination of the subject's eyes, ears, and sinuses, which will prove negative. A puzzling diagnosis such as this becomes very simple when the occupation is ascertained and this guide is utilized. Alongside of "Garage workers" in the "Alphabetical list of hazardous occupations," the physician finds the symbols J 16, 25. "J" represents the hazard poisons and "16, 25" the particular poisons—carbon monoxide and gasoline.

respectively. Upon looking up the symptoms of these poisons in the second list he finds that both produce headache when inhaled in small quantities. In such a case the effective remedy lies in the removal of the etiological factor—the two poisons.

The following procedure is therefore recommended: The medical examiner or physician should ascertain the occupation of the applicant. He should then look for it in the "Alphabetical list of hazardous occupations." If found there, it is possible that the person has been exposed to and is possibly suffering from the effects of some hazard of the occupation. The numerals will indicate the particular hazards of the occupation. The physician should then make special effort to discover the symptoms or signs referred to in the second list. By this means he can readily determine whether the person examined is in fact suffering from the effect of his occupation. His examination is in this way made more illuminating. Physicians, not specialists in occupational hygiene, can thus learn to detect the effects of industry and, conversely, can eliminate the occupation as the cause when certain symptoms are observed which do not fit the usually observed effects of the occupation.

Medical examiners should remember that it is often necessary to keep in mind not only the present occupation but the former one as well. Persons suffering from certain ailments may no longer be engaged in the industry which was originally responsible for their condition. But careful inquiry into their occupational history will sometimes result in the recording of an occupation the effects of which are clearly those from which the patient is suffering. The medical profession must give occupational findings greater weight in forming their judgments regarding physical conditions and in diagnosing and treating disease.

## ALPHABETICAL LIST OF HAZARDOUS OCCUPATIONS.

Acetylene makers, D 1, J 4, 16, 48.

Acid dippers, C, J 10, 22, 26, 37, 48.

Acid finishers (glass), J 26, 28, 48.

Acid makers. See particular acid.

Acid mixers, J 26, 37, 48.

Acid recoverers, J 26, 37, 48.

Acid transporters, J 26, 37, 48.

Airplane-wing varnishers, J 50. See also Varnishers.

Alcohol distillery workers, J 5, 6.

Aldehyde pumpmen, J 1, 30.

Alkali salt makers, C, J 14, 13, 26, 46, 47.

Amber workers, J 28.

Ammonium salts makers, A 1, J 4, 15, 22, 26, 48.

Ammonium sulphate makers, J 48.

Aniline dye makers. See Dye makers.

Aniline makers, J 7, 10, 12, 26, 34, 37.

Animal hair dressers. See Hair workers.

Animal handlers, F 1, 3.

Annealers, A 1.

Antimony extractors (refiners), A 1, J 8.

Antimony fluoride extractors, J 27.

Antipyrin makers, J 31, 40.

Arsenic roasters, A 1, J 9.

Art-glass workers, J 5, 11, 27, 28, 30, 52.

Artificial flower makers, H, J 9, 21, 28, 29, 30.

886           DIVISION OF PREVENTIVE MEDICINE.           Vol. XVII.

Artificial ice makers, A 2, C, J 4.

Artificial leather makers, J 7, 9, 12, 37, 48.

Artificial manure makers. *See* Fertilizer makers.

Artificial silk makers, C, J 4, 5, 15, 30, 47, 50.

Asbestos workers, D 1.

Asphalt testers, J 15.

Auto painters, C. *See also* Painters.

Babbitters, J 28.

Bakelite makers, J 39.

Bakers, A 2, D 2, J 16.

Balloon (toy) fillers, J 10.

Barbers, H.

Bar-mill workers (iron and steel), A 1.

Basic slag (artificial manure) workers, D 1.

Batch makers (glass works). *See* Glass mixers.

Batch makers (rubber works). *See* Compounders (rubber).

Baters (tannery), C, F 1.

Battery (dry) makers, D 1, J 5, 10, 12, 21, 26, 28, 29, 49.

Battery (storage) makers. *See* Storage battery makers.

Beamers (textile), D 2.

Beamhouse workers (tannery), C, F 1.

Beatermen (paper and pulp), C, J 18.

Bed rubbers (marble and stone), D 1.

Bench molders (foundry), D 1, J 13, 28.

Benzol stillmen, A 1, J 12.

Bessemer-converter workers (iron and steel), A 1.

Beta still operators (beta naphthol), A 1, J 48.

Bevellers, D 1.

Bicyclists, H.

Billet mill workers (iron and steel), A 1.

Bisque-kiln workers, A 1, D 1, J 16.

Blacksmiths A 1, E, H, J 14, 16, 22, 28.

Blast-furnace workers, A 1, J 22, 46, 47.

Bleachers, A 2, C, J 17, 18, 21, 27, 37, 46.

Bleachers (cloth), A 2, C.

Bleachery dryers, A 2, C.

Blockers (felt hat), C, J 16.

Bloaders (tannery), J 28.

Blooming-mill workers (iron and steel), A 1.

Blowers (felt hat), D 2, J 29.

Blowers (glass manufacturing). *See* Glass blowers.

Blowers-out (zinc smelting), A 1, J 13.

Bluers (revolvers), A 1.

Boiler-room workers, A 1, J 14, 16.

Boiler washers, C.

Bone-black makers, J 4, 42.

Bone renderers, J 3.

Bone workers, D 1.

Bookbinders, J 9, 28, 30.

Bottle-cap makers, J 28.

Brass founders, A 1, J 8, 9, 13, 14, 16, 28, 42, 46.

Brass polishers, J 28.

Braziers, A 1, J 13, 28.

Brewers, A 2, C, J 14.

Brick burners, A 1, J 14, 28.

Brickmakers, A 1, C, D 1, F 2, J 28, 46.

Briquet makers, J 49.

Bronzers, D 1, J 4, 5, 9, 10, 11, 12, 13, 25, 28, 29, 30, 47.

Broom makers D 2, J 18, 46.

Browners (gun barrels), J 22, 28, 29, 33.

Brushers (felt hat), D 2, J 29.

Brush makers, D 2, F 1, J 28, 30, 49.

Buffers, D 1, 2, G.

Buffers (rubber), J 5, 11, 28.

Burners (enameling), A 1, J 28.

Burnishers (iron and steel), G, J 8, 48.

Burnishers (rifle barrels), J 8.

Burrers (needles), D 1.

Burr filers, D 1.

Butchers, A 2, F 1, 3.

Button makers, D 1, 2.

Cable makers, J 28.

Cable splicers, C, J 16, 28, 47, 52.

Caisson workers, A 2, B, C, G, J 14.

Calenderers (rubber), A 2, D 1.

Calico printers, A 2, C, J 7, 8, 9, 16, 18, 21, 22, 26, 28, 30, 39, 48, 52.

Camphor makers, J 26, 52.

Candle (colored) makers, J 9 21.

Candy makers A 2 C.

Canners, A 2, C, F 3, J 28.

Cap loaders, J 29.

Cappers (window glass), A 1.

Carbide makers, A 1, D 1, J 16.

Carbolic acid makers, J 12, 26, 46, 48.

Carbon brush makers, D 1.
Carbon dioxide makers, J 14.
Carbon disulphide makers, J 15.
Carbonizers (shoddy), D 2, J 10, 26, 48.
Carborundum workers, A 1, D 1.
Carders (textile), D 2.
Card grinders (textile), D 1, 2.
Carpenters, H.
Carpet makers, D 2, F 1, J 9.
Carroters (felt hats), J 9, 29, 37.
Cartridge cup washers, C.
Cartridge dippers, J 26, 37, 48.
Cartridge felt and wad makers, C.
Cartridge makers, J 28, 29.
Cartridge shot shell paraffin dippers, A 2, C.
Case hardeners, A 1, J 22.
Casters (brass foundry). *See* Brass founders.
Casters (iron and steel), A 1.
Casting cleaners (foundry), D 1. *See also* Acid dippers.
Cast scrubbers (electroplaters), J 11, 12.
Catchers (iron and steel), A 1.
Cattle salesmen, F 1.
Celluloid makers, J 1, 5, 11, 15, 16, 22, 28, 30, 37, 47, 48.
Celluloid polishers, D 2.
Celluloid workers, D 2.
Cementers (rubber shoes), J 11, 12, 15, 30, 52.
Cement mixers (rubber), J 11, 12, 15.
Cement workers, A 1, D 1.
Chambermen (sulphuric acid), J 46, 48.
Charcoal burners, J 14, 16.
Charcoal workers (sugar refining), A 2, C, D 1.
Chargers (smelting), A 1, D 1.
Chargers (zinc smelting), A 1, D 1, J 9, 13, 16, 28, 46.
Chasers (steel), D 1.
Chauffeurs, H, J 25.
Chimney sweepers, D 1, J 16, 49.
Chippers, D 1.
Chloride of lime makers, J 17, 18.
Chlorine makers (electrolytic), J 18, 29.
Chloroform makers, J 17.
Chromium workers, J 21.
Cigar makers, D 2, H.

Clay and bisque makers (pottery), A 2, C, D 1.
Clay-plug makers (pottery), C, D 1.
Clay-products workers. *See* Pottery workers.
Clerks, H.
Cloth preparers, C. *See also* Bleachers.
Coal miners. *See* Miners.
Coal-tar workers, J 7, 12, 16, 39.
Cobblers, D 2, F 1, H.
Coke-oven workers, A 1, J 4, 12, 16, 49.
Cold-storage-plant workers, A 2.
Color makers, A 1, D 1, J 8, 9, 12, 21, 28, 29.
Colored-paper workers, J 9.
Colorers (white) of shoes, J 28.
Comb makers (celluloid), D 2.
Compositors, D 1, G, H, J 7, 8, 11, 28.
Compounders (rubber), D 1, J 7, 8, 9, 11, 12, 21.
Concentrating-mill workers (lead and zinc), C, D 1, J 28.
Coners (felt hats), D 2, J 29.
Confectioners. *See* Candy makers.
Construction camp workers, F 2.
Cooks, A 2.
Copper founders, J 9.
Copper miners. *See* Miners.
Copper smelters, A 1, J 9, 16, 46.
Cord makers, D 2, J 49.
Core makers, A 1, D 1, J 13, 16.
Cork workers, D 2.
Cotton-mill workers, C, D 2.
Cotton twisters, D 2, H.
Cranemen (glass industry), A 1.
Cranemen (iron and steel), A 1.
Creosoting plant workers, C.
Crucible mixers, D 1.
Crucible-steel department employees, A 1.
Crushermen (clay and stone), D 1.
Cupola men (foundries), A 1.
Curers, vapor (rubber). *See* Vulcanizers.
Curriers (tannery), D 2, F 1, J 9, 11.
Cut-glass workers, D 1, J 9, 28.
Cutlery makers, D 1, J 5, 28.
Cyanamid makers, A 1, D 1.

Dancers, H.
Decorators (pottery), J 9, 11, 12, 28, 52.

Degreasers (fertilizer, leather), J 11, 12, 25.

Dentists, J 29.

Detonator cleaners, J 29.

Detonator fillers, J 29.

Detonator packers, J 29.

Devil operators (felt hats), D 2, J 29.

Diamond cutters, D 1, H.

Diamond polishers, J 28.

Digester-house workers (paper and pulp), A 2, C.

Dimethyl-sulphate makers, J 10, 23, 30, 37, 48.

Dippers (guncotton), J 37.

Dippers (rubber), J 11.

Dippers. See also Acid dippers.

Disinfectant makers, J 17, 18.

Divers, B.

Doffers (textile), C, D 2.

Dressers (glass), A 1.

Dresser tenders (textile), A 2, C.

Drivers, A 2, C.

Drop forgers, A 1.

Dry battery workers. See Battery (dry) makers.

Dry cleaners, A 2, J 11, 12, 15, 30, 52.

Dryers (felt hats), A 2, J 30.

Dryers (rubber), J 12, 15.

Drying-room workers (miscellaneous), A 2, J 14, 16.

Dye makers, A 2, C, J 1, 2, 4, 6, 7, 8, 9, 10, 12, 17, 18, 21, 22, 23, 26, 28, 29, 30, 31, 34, 39, 40, 41, 44, 46, 47, 48, 52.

Dyers, A 2, C, J 4, 21, 25, 26, 27, 28, 39, 44. See also preparatory processes.

Edison storage battery workers, J 29.

Electricians, E.

Electric linemen, E.

Electroplaters, C, J 9, 11, 12, 22, 28.

Electrotypers, A 2, D 1, J 28. See also Electroplaters.

Elevator runners, H.

Embroidery workers, G, J 28.

Emery wheel makers D 1, J 28.

Enamelers. See Enamel makers.

Enamel makers, A 1, C, H, J 5, 8, 9, 10, 11, 15, 16, 21, 26, 28, 37, 52.

Engravers, D 1, H. See also Steel engravers.

Etchers, J 27, 37, 39.

Explosives workers, C, J 1, 5, 7, 12, 29, 30, 34, 35, 37, 44, 48, 51. See also particular occupation.

Extractor operators (soap), A 2, C.

Farmers, F 1, 2.

Fat renderers, A 2, J 3.

Feather curers, D 2, J 3.

Feather workers, D 2, F 3, J 7, 9, 11, 12, 30, 38, 52.

Felt extractors, C.

Felt-hat makers, A 2, C, D 2, J 9, 16, 29, 30, 37, 48. See also particular occupation.

Ferro-silicon workers, J 9, 10, 43.

Fertilizer makers, C, D 1, F 1, 3, J 10, 12, 14, 26, 27, 37, 42, 46, 47, 48. See also Phosphate mill employees.

Fiber workers, D 2.

Filament makers (incandescent lamps), J 16, 30.

File cutters, D 1, J 28.

Filers, D 1, J 8, 28.

Film makers. See Celluloid makers.

Filter press workers, C.

Finishers (incandescent lamps), J 16.

Finishers (leather), D 2.

Finishers (shoe). See Shoe finishers.

Fireworks makers J 8, 29, 42. See also Explosives.

Fishermen, A 2, C.

Fitters (shoe), J 30.

Flangers (felt hats), A 2, J 16.

Flatteners (glass), A 1.

Flax rettery workers, J 47.

Flax spinners, C, D 2.

Flint workers, D 1.

Floor molders (foundry), A 1, D 1, J 13, 28.

Flour workers, D 2.

Flue cleaners, D 1, J 16, 46, 49.

Flush tenders (aluminum), C.

Forgemen, A 1.

Formers (felt hats), D 2.

Foundry workers, A 1, D 1, J 16. See also particular metal.

Fruit-essence makers, J 6.

Fruit preservers, J 46.

Fulminate mixers, J 22, 29.

Fumigators, J 22, 46.

Fur carders, D 2, F 1.

Fur clippers, D 2, F 1.

Fur cutters, D 2, F 1.

Fur handlers, D 2, F 1, J 9, 29.
Furnace workers, A 1, E, J 14, 16.
Furniture polishers, J 5, 11, 25, 30, 38, 52.
Fur preparers, D 2, F 1, J 9, 29, 37.
Fur pullers, D 2, F 1.

Galvanizers, C, J 3, 4, 9, 10, 13, 26, 28, 37, 46, 48.
Garage workers, J 16, 25.
Garbage workers, F 3.
Gardeners, J 9.
Gas (illuminating) workers, A 2, J 4, 12, 16, 22, 39, 47, 49.
Gas purifiers, J 4, 22, 39, 47.
Gatherers (glass), A 1.
Gilders, J 5, 11, 12, 25, 30.
Glass blowers, A 1, D 1, E.
Glass cutters, C, D 1.
Glass finishers, C, D 1, J 26, 27, 28, 48.
Glass-furnace workers, A 1, E.
Glass mixers, D 1, J 8, 9, 21, 26, 28.
Glass polishers, J 28.
Glaze dippers (pottery), C, J 8, 9, 21, 28.
Glaze mixers (pottery), D 1, J 8, 9, 21, 28.
Glost-kiln workers, A 2, J 16, 28.
Glove makers (leather preparers), C, D 2. See also Tannery workers.
Glue workers, A 2, C, D 2, F 3, J 4, 11, 12, 15, 26, 37, 46, 47.
Gold beaters, D 1, H.
Gold refiners, D 1, J 9, 22, 28, 29.
Grain elevator workers, D 2.
Granite workers. See Stonecutters.
Graphite workers, A 1, D 1.
Grinders (colors). See Color makers.
Grinders (metals), C, D 1, J 8, 28.
Grinders (rubber), D 2, J 8, 28.
Guncotton dippers, J 37, 48.
Guncotton pickers, D 2.
Guncotton washers, C.
Guncotton wringers, J 37.
Gypsum workers, D 1.

Hair workers, C, D 2, F 1, 3.
Hammermen, H.
Hardeners (felt hats), J 29, 30.
Hardeners (metals), A 1.
Harness makers, D 2.
Hat makers, felt. See Felt-hat makers.

Heater boys (riveters), J 28.
Heel makers (shoes), D 2.
Hemp workers, D 2.
Horn workers, D 1.
Hothouse workers, A 2.
Hot-rod rollers (iron and steel), A 1.
Hydrochloric-acid makers, J 26, 48.

Ice (artificial) makers. See Artificial-ice makers.
Ice-cream makers, A 2, C.
Imitation-pearl makers, J 28, 37.
Incandescent-lamp makers, J 5, 16, 28, 29, 30, 37. See also particular occupation.
Incandescent-mantle hardeners, E.
Ink makers, J 21, 30.
Insecticide makers, J 9, 15, 28, 42.
Insulators, J 49.
Iron and steel workers (all departments), A 1. See also particular occupation.
Ironers, A 2.

Japan makers, A 2, J 9, 11, 28, 30, 52.
Japanners. See Japan makers.
Jewelers, D 1, G, H, J 5, 9, 26, 28, 29, 37, 48.
Junk metal refiners, A 1, D 1, J 13, 28.
Jute workers, D 2.

Kiln tenders, A 1, J 16.
Knitters, H.
Knitting-mill workers, D 2.

Labelers (paint cans), J 28.
Lace makers, D 2.
Lacquerers. See Lacquer makers.
Lacquer makers, J 5, 11, 12, 28, 30, 52.
Lampblack makers, J 38, 39.
Lapidaries, D 1.
Lard makers, J 3.
Lasters (shoes), A 2, C, D 2, J 30.
Lathe turners, H.
Laundry workers, A 2, C, J 16, 17, 18.
Layer pullers (glass), A 1.
Lead burners, J 10, 28.
Leadfoil makers, A 1, J 28.
Lead miners, J 28. See also Miners.
Lead pipe makers, J 28.
Lead salts makers, J 28.
Lead smelters, A 1, D 1, J 8, 9, 10, 28, 46.

890          DIVISION OF PREVENTIVE MEDICINE.          Vol. XVII.

Leather workers, D 2, F 1. *See also* Tannery workers.
Leer tenders (glass), A 1.
Letter sorters, H.
Levermen (iron and steel), A 1.
Lifters-over (glass), A 1.
Lime burners, D 1, J 10, 14, 16.
Limekiln chargers, D 1, J 14, 16.
Lime pullers (tannery), C, F 1.
Lime workers, D 1.
Linen workers, D 2.
Linoleum colorers, J 9, 21.
Linoleum makers. A 2, C, D 1, J 3, 5, 11, 28, 30, 48, 52.
Linotypers, J 8, 28.
Linseed-oil boilers, J 3, 28.
Lithographers, D 1, H, J 7, 9, 11, 12, 21 28, 37, 52.
Litho-transfer workers, J 28.
Locksmiths, H.
Longshoremen, F 1.
Lumbermen, A 2, F 2.
Luters (zinc smelting), A 1, J 13.

Machinists, H.
Marble cutters, D 1.
Marblers (glass), A 1.
Masons, C, D 1, H.
Match-factory workers, C, D 1, 2, J 15, 21, 28, 42, 47.
Mattress makers, D 2.
Meat inspectors, F 1.
Melters (foundry; glass), A 1.
Mercerizers, J 4, 48.
Mercurial-vapor-lamp makers, J 29.
Mercury bronzers, J 29.
Mercury miners, J 29. *See also* Miners.
Mercury salts workers, J 29.
Mercury smelters, A 1, J 16, 29, 46.
Mercury-solder makers, J 29.
Mercury-still cleaners, J 29.
Metal polishers, G.
Metal-polish makers, J 25.
Metal turners, D 1.
Metal workers. *See* particular occupation.
Mica strippers or splitters, D 1.
Mica workers, D 1.
Microscopist, H.
Milkers, H.
Millinery workers, J 7, 11, 12, 30, 38, 52.

Miners, A 2, C, D 1, F 2, G, H, J 14, 16, 37, 47.
Mirror silverers, A 2, C, J 1, 28, 29.
Mixers (felt hats), D 2, J 29.
Mixers (rubber), A 2, D 1, J 7, 8, 9, 11, 12, 21, 28.
Mixing-room workers (miscellaneous), D 1, 2.
Mold breakers (foundry), D 1.
Molders. *See* Bench molders, Floor molders.
Monotypers, J 8, 28.
Mordanters, J 6, 8, 9, 11, 12, 21, 37.
Motion-picture-film makers. *See* Celluloid makers.
Motormen, A 2.
Mottlers (leather), J 5, 30.
Moving-picture-machine operators, E.
Muffle tenders, A 1.
Muriatic-acid makers. *See* Hydrochloric-acid makers.
Muriatic-acid mixers. *See* Acid mixers.
Musical-instrument makers, J 28.
Musicians, H.

Nickel platers, C. *See also* Electroplaters.
Nitrators, J 37, 48.
Nitric-acid workers, J 28, 37, 48.
Nitroglycerin makers, J 10, 28, 35, 37, 48.

Oilcloth makers. *See* Linoleum makers.
Oil extractors, J 15.
Oil-flotation-plant workers, J 38, 46, 47, 48.
Oil refiners. *See* Petroleum refiners.
Oil-well workers, J 38.
Open-hearth-department workers (iron and steel), A 1.
Oxy-acetylene cutters, E.

Packing-house employees, A 2, C.
Painters, H, J 7, 11, 12, 25, 28, 30, 52.
Paint makers, C, J 7, 11, 12, 15, 28, 29, 30, 49, 52.
Paint removers, D 1, J 28.
Pair heaters (tin-plate), A 1.
Paper-box makers, H.
Paper glazers, J 9.
Paperhangers, D 1, J 9, 21, 28.

Paper makers, A 2, C. *See also* particular occupation.

Paraffin workers, J 15, 38, 49.

Patent-leather makers, A 2, J 5, 16, 28, 30, 48, 52.

Pavers, A 1, H, J 49.

Pencil (colored) makers, J 7, 9, 21.

Perfume makers, J 23, 30, 34.

Petroleum refiners, A 1, C, J 25, 26, 28, 38, 46, 47, 48, 49.

Phenol makers. *See* Carbolic-acid makers.

Phosgene makers, J 16, 18, 41.

Phosphate-mill workers, A 2, C, D 1, J 42. *See also* Fertilizer makers.

Phosphor-bronze workers, J 42.

Phosphorus-compounds makers, J 42.

Phosphorus-evaporating-machine operators, A 2, C, J 48.

Phosphorus extractors, J 42, 43.

Phosphorus (red) makers, J 43.

Photo-engravers, J 12, 21, 30, 37.

Photographers, E, G, J 30, 44.

Photographic workers, J 7, 12, 18, 21, 22, 29.

Photograph retouchers, J 28.

Picklers, C, J 10, 22, 26, 37, 48.

Picric-acid makers, J 37, 39, 44, 48.

Pigment makers. *See* Color makers.

Pipe fitters, J 28. *See also* liquid piped.

Pitch workers, J 9.

Pit molders (foundry), A 1, D 1.

Planer men (stone, metal), D 1.

Plasterers, C, D 1.

Plaster of Paris workers, D 1.

Platers. *See* Electroplaters.

Plumbers, J 28. *See also* substance manufactured.

Pneumatic-tool workers, D 1, H.

Polishers, D 1, J 5, 25, 28, 30.

Polishers (furniture). *See* Furniture polishers.

Porcelain makers. *See* Pottery.

Porters, H.

Pot fillers (glass), A 1.

Pot lifters (iron and steel), A 1.

Pot pullers (foundry), A 1.

Pot-room workers (aluminum foundry; carbide plant), A 1.

Pot setters, A 1.

Pottery workers, A 1, C, D 1, J 9, 14, 16, 26, 28, 46. *See also* particular occupation.

Pouncers (felt hats), D 1, 2.

Pourers (brass foundry), A 1, J 13.

Preparers (tannery), C, F 1, 3.

Pressers, H, J 16.

Pressman (oil refining), C.

Pressmen (printers), D 1.

Pressroom workers (rubber), A 2, J 7, 8, 9, 11, 12, 21.

Primers (explosives), J 20.

Printers, D 1, J 7, 8, 9, 11, 28, 52.

Puddlers (iron and steel), A 1, E.

Pullers-out (felt hats), C.

Pulp-mill employees, C. *See also* particular occupation.

Putty makers, D 1, J 11, 15, 28.

Putty polishers (glass), D 1, J 28.

Pyrites burners, A 1, D 1, J 9, 46, 47.

Pyroxylin makers. *See* Guncotton.

Quarrymen, D 1, F 2.

Rag workers, D 2, F 3.

Reclaimers (rubber), J 7, 12, 15, 26, 28, 48.

Red-lead workers, J 28.

Refiners (metals), A 1, J 9, 10, 16, 28, 29, 37, 46. *See also* particular metal.

Refiners (sugar). *See* Sugar refiners.

Refrigerating-plant workers, A 2, C, J 4.

Riveters, H, J 28.

Roller coverers (cotton mills), C, D 2.

Rollers (metals), A 1.

Roll setters (iron and steel), A 1.

Roll wrenchers (iron and steel), A 1.

Roofers, A 2, J 28, 49.

Roofing-paper workers, J 49.

Rope makers, D 2.

Roughers (iron and steel), A 1.

Rubber-glove makers, J 11.

Rubber-substitute makers, J 45.

Rubber-tire builders, J 9, 11, 12, 21.

Rubber washers, J 9, 11, 12, 21.

Rubber workers, A 2, D 1, 2, J 7, 8, 9, 11, 12, 21, 25, 26, 28, 39, 46, 52. *See also* particular occupation.

Sagger makers, C, D 1, J 28.

Sailors, A 2, H.

Salt extractors (Coke-oven by-products, J 4, 43.

Salt preparers, A 2, C, D 1.

Sand blasters, D 1.

Sand cutters, D 1.

Sanders, D 1.

Sanding-machine operators, D 1.

Sandpaperers (enameling and painting auto bodies, etc.), D 1, J 28.

Saw filers, D 1.

Saw-mill workers, D 2, F 2.

Sawyers, H.

Scissors sharpeners, H.

Scourers, wood lasts (shoes), D 2.

Scrapers (foundry), D 1.

Screen tenders (pulp mill), C.

Screen workers (lead and zinc smelting), D 1, J 28.

Sealers (incandescent lamps), J 16.

Sealing-wax makers, J 9, 52.

Seamstresses, H.

Sewer workers, C, J 4, 14, 47.

Sewing-machine operators, H.

Shale-oil workers. See Petroleum refiners.

Shavers (felt hats, fur, tannery), C, D 2, F 1, 3.

Shaving-brush makers, D 2, F 1.

Sheep-dip makers, J 9.

Sheet-metal workers, J 28.

Shellackers. See Shellac makers.

Shellac makers, J 4, 5, 11, 12, 28, 30, 52.

Shell fillers, J 35, 44, 51.

Shepherds, F 1.

Shoddy workers, D 2, F 3, J 10, 26, 48.

Shoe-factory operatives, D 2, J 5, 12, 30. See also particular occupation.

Shoe finishers, A 2, J 4, 5, 6, 11, 12, 25, 30.

Shoemakers. See Cobblers.

Shot makers, J 8, 9, 28.

Shove-in boys (glass), A 1.

Sifters, D 1, 2.

Silicate extractors, J 27.

Silk workers, D 2, F 3.

Silo workers, J 14.

Silverers (mirrors). See Mirror silverers.

Silver melters, A 2, J 16.

Silver refiners, J 22.

Singers (cloth), J 16.

Sintering-plant workers, D 1.

Sizers (felt hats), C, J 29.

Skimmers (glass), A 1.

Slag-machine tenders (iron and steel), A 1.

Slate workers, D 1.

Slip makers (pottery), C, D 1, J 28.

Slushers (porcelain enameling), J 28.

Smelters. See particular metal.

Smokeless-powder makers, J 5, 12, 15, 34, 39, 44.

Smoothers (glass), C, D 1.

Soap makers, A 2, C, F 3, J 3, 30, 34.

Soda makers, C, J 4, 14, 16, 37, 47.

Sodium-hydroxide makers, C.

Sodium-sulphide makers, J 47.

Softeners (tannery), D 2.

Solderers, J 26, 28.

Sole stitchers (Blake machine), J 29.

Spinners (asbestos), D 1.

Spinners (textiles), D 2, H.

Spongers, C.

Sprayers, C.

Sprayers (trees), J 9, 28.

Spreaders (rubber works), A 2.

Stablemen, F 1.

Stainers (shoes), J 28.

Stamp-mill workers, C, D 1.

Starch makers, D 2, J 14, 47.

Starters (felt hats), C, J 29.

Statuary workers, D 1.

Steam fitters. See pipe fitters.

Stearic-acid makers, A 2, J 3.

Steel engravers, G, J 28, 29, 37. See also Engravers.

Stereotypers, A 2, J 8, 28.

Stiffeners (felt hats), J 29, 30.

Still (coal-tar) cleaners, A 1, J 12, 49.

Stillmen (carbolic acid), A 1, J 39.

Stillmen, operating, A 1.

Stitchers (shoes), J 30.

Stokers, A 1, E, J 16.

Stonecutters (dry), D 1, H.

Stonecutters (wet process), C, D 1, H.

Storage-battery makers, J 28, 29, 46, 48.

Straw-hat makers, A 2, D 2.

Submarine (storage-battery) workers, J 10.

Sugar refiners, A 2, C, D 1, J 4, 14, 46, 47.

Sulphite cooks (pulp mill), A 2, C, J 46.

Sulphur burners, A 1, D 1, J 9, 46.

Sulphur-chloride makers, J 18, 26.

Sulphurers (hops and malt), J 46.

Sulphur extractors, J 15.

Sulphuric-acid workers, J 9, 10, 28, 37, 46, 48.

Sumackers (tannery), C, F 1.

Surgical-dressing makers, J 39.

Table hands (tannery), C, F 1.
Table operators (iron and steel), A 1.
Table turners (enameling), A 2, D 1, J 28.
Tailors, H.
Takers-down (glass), A 1.
Tallow refiners, F 3, J 3, 15, 48.
Tank men, C.
Tannery workers, C, F 1, 3, J 7, 9, 11, 17, 21, 22, 28, 46, 47, 48.
Tapers (airplanes), J 50.
Tappers (smelting), A 1.
Tar workers, J 49.
Taxidermists, D 2, F 1, J 9, 29.
Teazers (glass), A 1, J 16.
Telegraphers, H.
Telephone linemen (trench work), C.
Temperers, A 1, C, J 16, 22, 28, 38, 48.
Textile-comb makers, D 1.
Textile printers. *See* Calico printers.
Textile workers, A 2, C, D 2. *See also* particular occupation.
Thermometer makers, J 29.
Thread glazers, A 2, C.
Tile makers, A 2, C, D 1, J 28.
Tin-foil makers, A 1, J 28.
Tinners, A 1, C, J 3, 4, 9, 10, 26, 28.
Tin-plate mill workers. *See* Iron and steel workers.
Tire builders. *See* Rubber-tire makers.
Tobacco moisteners, C.
Tobacco rollers, D 2.
Tobacco workers, D 2.
Tongsmen (iron and steel), A 1.
Toolmakers, D 1.
Top fillers (foundry), A 1, D 1.
Towermen (sulphuric acid), J 10, 37, 46, 48.
Toy makers, J 5, 9, 28.
Transfer workers (pottery), J 28, 52.
Transporters of hides and wool, F 1.
Treaders (rubber), J 12.
Tree sprayers. *See* Sprayers (trees).
Trench diggers, F 2.
Tube makers (glass), A 1.
Tubulators (incandescent lamps), J 16.
Tumbling barrel workers, D 1.
Tunnel workers, B, F 2, G.
Turners-out (glass), A 1.
Turpentine extractors, C, J 52.
Type cleaners, J 11, 30.
Type founders, J 28.

Typesetters, J 28.
Typists, H.

Upholsterers, D 2, J 30.

Vapor curers. *See* Vulcanizers.
Varnish boilers, J 3.
Varnish makers, A 2, J 1, 3, 4, 11, 12, 39, 52.
Vatmen, C.
Velvet makers, C, J 9.
Veterinarians, F 1, 3.
Vignetters, J 26.
Vinegar workers, J 1.
Vintners, J 14.
Vulcanizers, A 2, C, J 7, 8, 11, 12, 15, 21, 30, 45.
Vulcanizers (steam), A 2, C.

Wall-paper printers, A 2, C, J 9, 21, 28.
Warming-house employees (guncotton), A 2.
Washers, C.
Washers (rubber), C.
Washwomen, C, H.
Watchmakers, G, H.
Water gilders, J 29.
Waterproof-cloth makers, J 25.
Weavers, D 2, H.
Weighers, D 1, 2.
Welders, A 1, E, J 13, 28.
White-lead workers, J 14, 28.
Wire drawers, J 9, 48.
Wirers (incandescent lamps), J 5.
Wood-alcohol distillers, J 30.
Wood-last scourers (shoes), D 2.
Wood preservers, J 9, 39, 49.
Wood stainers, J 21, 28.
Woodworkers, D 2, J 25, 30.
Wool carders, D 2, F 1.
Wool scourers, A 2, C.
Wool spinners, D 2, F 1.
Wool workers, D 2, F 1. *See also* particular occupation.
Wringers (guncotton), J 37.

X-ray workers, E.

Yeast makers, J 14.

Zinc-chloride makers, J 10, 18, 26.
Zinc-electrode makers, J 29.
Zinc miners, J 9. *See also* Miners.
Zinc smelters, A 1, J 13, 16, 28, 46.

LIST OF HAZARDS, SYMPTOMS, OCCUPATIONS EXPOSED, AND
PREVENTION.

### A. Abnormalities of Temperature.

The primary physiological effect of abnormal temperatures is the
disturbance of the heat-regulating system of the body. Heat dilates
the blood vessels on the surface of the body, increasing the supply
of blood in this region. Cold, on the other hand, constricts the blood
vessels, causing a diminished blood supply on the body surface.
Continuous abrupt changes from one extreme of temperature to
another may cause serious congestion of the internal organs, the
heat-regulating system of the body not being capable of adapting
itself to sudden variations. It is in this way that a cold draft, which
causes a sudden variation of the temperature, may produce neu-
ralgia, paralysis, and respiratory diseases. Extremes of tempera-
ture may produce pathological changes by direct action. Thus, ex-
treme dry heat will cause conjunctivitis, cataract, and the familiar
sunburn. Extreme cold may cause frostbite and eczema. With the
above data in mind, abnormalities of temperature have been clas-
sified under only two headings, namely, "Sudden variations of tem-
perature" and "Extreme dry heat." Extreme cold has not been
listed as a distinct hazard, because a temperature so low as to cause
the direct effects mentioned above is rarely met in industry. It is
evident that the occupations listed in the division "Extreme dry
heat" are exposed not only to the danger of the direct action of
the high temperatures but also to the hazard "Sudden variations
of temperature."

The prevention of disease due to exposure to extremes of tem-
perature consists, obviously, in the avoidance of sudden variations
of temperature. Drafts are particularly hazardous, and may be
practically eliminated by the use of vestibule and storm doors.
Workers in cold processes should keep active and avoid chill. The
hot-process worker should allow his body to cool off gradually after
completion of the day's work. He should carefully regulate his
diet, drinking plenty of water and avoiding meats. As direct pre-
ventive measures for the effects of extreme heat, it is advisable to
make use of shields, helmets, goggles, water-cooled furnace doors,
exhaust systems, cold air, fans, etc.

*A. Abnormalities of Temperatures.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 1. Extreme dry heat. | Anemia, general debility, catarrh, stiff joints, cramps, lumbago, Bright's disease, skin eruptions, premature old age, cataracts, retinitis, conjunctivitis. | Ammonium salts makers; annealers; antimony extractors (refiners); arsenic roasters; bar-mill workers (iron and steel); benzol-stillmen; Bessemer-converter workers (iron and steel); beta-still operators (beta naphthol); blast-mill workers (iron and steel); bisque-kiln workers; blacksmiths; blast-furnace workers; blooming-mill workers (iron and steel); blowers-out (zinc smelting); blixers (revolvers); boiler-room workers; brass founders; braziers; brick burners; brick makers; burners (enameling); cappers (window glass); carbide makers; carborundum makers; case hardeners; casters (iron and steel); catchers (iron and steel); cement workers; chargers (smelting); chargers (zinc smelting); coke-oven workers; color makers; copper smelters; core makers; cranemen (glass industry); cranemen (iron and steel); crucible-steel-department employees; cupola men (foundries); cyanamid makers; dressers (glass); drop forgers; enamelers; flatteners (glass); floor molders (foundry); forgemen; foundry workers; furnace workers; gatherers (glass); glass blowers; glass-furnace workers; graphite workers; hardeners (metals); hot-rod rollers (iron and steel); iron and steel workers (all departments); junk (metal) refiners; kiln tenders; layer pullers (glass); lead foil makers; lead smelters; leer tenders (glass) lovermen (iron and steel); liftersover (glass); luters (zinc smelting); marblers (glass); melters (foundry; glass); mercury smelters; muffle tenders; open-hearth-department workers (iron and steel); pair heaters (tin plate); pavers; petroleum refiners; pit molders (foundry); pot fillers (glass); potlifters (iron and steel); pot pullers (foundry); pot-room workers (aluminum foundry; carbide plant); pot setters; pottery workers; pourers (foundry); puddlers (iron and steel); pyrites burners; refiners (metals); rollers (metals); roll setters (iron and steel); roll wrenchers (iron and steel); roughers (iron and steel); shove-in boys (glass); skimmers (glass); slag-machine tenders (iron and steel); still (coal-tar) cleaners; stillmen (carbolic acid); stillmen operating; stokers; sulphur burners; table operators (iron and steel); takers-down (glass); tappers (smelting); teazers (glass); temperers; tin-foil makers; tinners; tongsmen (iron and steel); topfillers (foundry); tube makers (glass); turners-out (glass); welders; zinc smelters. |
| 2. Sudden variations of temperature. | Congestion of internal organs, catarrh, neuralgic and rheumatic affections, gastrointestinal and vesical catarrh, pneumonia, Bright's disease. | Artificial-ice makers; bakers; bleachers; brewers; butchers; caisson workers; calenderers (rubber); calico printers; candy makers; cartridge shot shell paraffin dippers; charcoal workers (sugar refining); clay and bisque makers (pottery); cold-storage-plant workers; cooks; digester-house workers (paper and pulp); dresser tenders (textile); drivers; dry cleaners; dryers (felt hats); drying-room workers (miscellaneous); dye makers; dyers; electrotypers; extractor operators (soap); fat renderers; felt-hat makers; fishermen; flangers (felt hats); gas (illuminating) workers; ghost-kiln workers; glue workers; hothouse workers; ice cream makers; ironers; japan makers; lasters (shoes); laundry workers; linoleum makers; lumbermen; miners; mirror silverers; mixers (rubber); motormen; packing-house employees; paper makers; patent-leather makers; phosphate-mill workers; phosphorus-evaporating machine operators; press-room workers (rubber); refrigerating-plant workers; roofers; rubber workers; sailors; salt preparers; shoe finishers; silver melters; soap makers; spreaders (rubber works); stearic-acid makers; stereotypers; straw-hat makers; sugar refiners; sulphite cooks (pulp mill); table turners (enameling); textile workers; thread glazers; tile makers; varnish makers; vulcanizers; wall-paper printers; warming-house employees (guncotton); wool scourers. *See also* occupations exposed to extreme dry heat. |

B. COMPRESSED AIR.

In building tunnels, laying deep foundations for large buildings, etc., it is necessary for the work to be carried on under increased air pressure in order to prevent the entrance of water into the excavations. The laborer is lowered gradually and at short intervals the

pressure of the air in the compartment is increased. The first sensation of compression is felt on the eardrums, which may be relieved by the act of swallowing. If the air is too quickly compressed hemorrhage may occur. The greater part of the danger of working in compressed air lies in hasty decompression. While under compression the blood and tissue juices dissolve an increased amount of air, the gases of which are released when the pressure is suddenly decreased. The bubbles thus formed cut off the blood supply from various parts of the body by blocking up the capillaries. The symptoms of compressed air illness, the so-called "bends," are the result.

Workers in compressed air must follow strictly the rules governing gradual compression and decompression, especially the latter. It is not advisable for boys and for men over 40 years of age to work under high pressure.

### B. Compressed air.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Compressed air...... | Weakness, vertigo, pains in the back and legs, paralysis of legs and arms, painful constriction of the chest, cerebral hemorrhage and aphasia, coma, subcutaneous hemorrhages, impairment of hearing. | Caisson workers; divers; tunnel workers. |

### C. DAMPNESS.

The moisture content of the air is very important for the proper adjustment of the physiologic processes of the body. Damp air will prevent the evaporation of moisture from the body and will therefore affect the body temperature. High humidity tends to increase the effects of high temperature. Moist cold air has the effect of undermining the general vitality of the organism, weakening its resistance to diseases of the respiratory passages, and to neuralgic and rheumatic affections. The same effects are noticed among workers around open tanks and vats, who are continuously working in wet clothes. Excessive dampness suggests dry air as a hazard. The latter causes chapped skin and catarrhal conditions. It has not been listed among the hazards because it is not characteristic of any one occupation but is prevalent generally, especially during the winter months.

When dampness is a feature of an industrial process the following precautions should be taken to avoid ill effects:

(1) Provision of exhaust systems wherever steam is generated.

(2) Provision of floors with drain channels to prevent the accumulation of water.

(3) Provision of adequate waterproof clothing, such as rubber boots, rubberized aprons, etc.

Wherever there is dampness special measures should be taken to keep the humidity at its proper percentage. In this connection the wet-bulb thermometer is invaluable in determining the degree of moisture in the air. By circulating the air the effects of high humidity may be mitigated.

*C. Dampness.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Dampness............ | Diseases of the respiratory passages, neuralgic and rheumatic affections. | Acid dippers; alkali-salt makers; artificial-ice makers; artificial-silk makers; auto painters; baters (tannery); beamhouse workers (tannery); bastermen (paper and pulp); bleachers; bleachery dryers; blockers (felt hats); boiler washers; brewers; brickmakers; cable splicers; caisson workers; calico printers; candy makers; canners; cartridge-cup washers; cartridge felt and wad makers; cartridge shot shell paraffin dippers; charcoal workers (sugar refining); clay and bisque makers (pottery); clay-plug makers (pottery); cloth preparers; concentrating-mill workers (lead and zinc); cotton-mill workers; creosoting-plant workers; digester-house workers (paper and pulp); doffers (textile); dresser tenders (textile); drivers; dye makers; dyers; electroplaters; enamelers; explosive workers; extractor operators (soap); felt extractors; felt-hat makers; fertilizer makers; filter-press workers; fishermen; flax spinners; flush tenders (aluminum); galvanizers; glass cutters; glass finishers; glaze dippers (pottery); glove makers (leather preparers); glue workers; grinders (metals); guncotton washers; hair workers; ice-cream makers; lasters (shoes); laundry workers; lime pullers (tannery); linoleum makers; masons; match-factory workers; miners; mirror silverers; nickel platers; packing-house employees; paint makers; paper makers; petroleum refiners; phosphate-mill workers; phosphorus-evaporating-machine operators; picklers; plasterers; pottery workers; preparers (tannery); pressmen (oil refining); pullers-out (felt hats); pulp-mill employees; refrigerating-plant workers; roller coverers (cotton mills); sagger makers; salt preparers; screen tenders (pulp mill); sewer workers; shavers (felt hats, fur, tannery); sizers (felt hats); slip makers (pottery); smoothers (glass); soap makers; soda makers; sodium-hydroxide makers; spongers; stamp-mill workers; starters (felt hats); stone cutters (wet process); sugar refiners; sulphite cooks (pulp mill); sumackers (tannery); table hands (tannery); tank men; tannery workers; telephone linemen (trench work); temperers; textile workers; thread glazers; tile makers; tinners; tobacco moisteners; turpentine extractors; vatmen; velvet makers; vulcanizers (steam); wallpaper printers; washers; washers (rubber); wool scourers. |

## D. Dust.

Dusts have here been divided into two kinds, according to their chemical composition, namely, organic and inorganic. The difference in symptoms listed under each is based on the findings of recent investigators that organic dusts do not cause pulmonary lesions. Dr. H. R. M. Landis [a] has found that wherever fibrosis was present in the lungs of men exposed to organic dust, the latter was always mixed with some form of mineral or metallic dust. Tobacco workers exposed to organic dust for years showed no pulmonary changes other than those found in people living in the city. Mineral and metallic dusts, however, produce fibrosis of the lung tissue, the

[a] See article on "The Pathological and Clinical Manifestations Following the Inhalation of Dust," in The Journal of Industrial Hygiene, July, 1919, pp. 117–139.

extent of which depends on the time of exposure and the particular dust inhaled. Of the inorganic dusts, silica is the most harmful, producing serious pulmonary damage in a comparatively short period of time, while the least harmful are those which produce slight changes and then only after long exposure, for example, lime, coal, etc. The relationship between occupational dust and tuberculosis is rather a doubtful one. Authorities disagree as to the effect of fibrosis on the resisting power to the tubercle bacillus. Dust, by acting as a carrier of the bacilli, may increase their number in the lungs. In this way, men exposed to dust may be in greater danger of contracting turberculosis than others. Dr. H. R. M. Landis claims, however, that in the trades exposed to inorganic dust, mistaken diagnosis of pneumoconiosis swells the mortality statistics for tuberculosis. As a means of avoiding incorrect diagnosis of pneumoconiosis, Roentgen ray examinations of the lungs and sputum analyses are invaluable.

There are four effective methods that may be used to prevent the inhalation of dust generated during industrial processes. No one of these can apply to all conditions, but the particular method to be used must be adapted to the peculiarities of the process.

(1) The use of water to dampen the dust and thus prevent it from rising and filling the atmosphere.

(2) The use of exhaust systems which remove the dust at the point of origin.

(3) The use of inclosing chambers in which the dust-producing processes are confined, being regulated from the outside.

(4) The use of respirators and helmets.

In many cases it may be necessary to combine several of these measures effectively to prevent the inhalation of dust by the worker.

*D. Dust.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 1. Inorganic dust.... | Cough, dyspnea, pleuritic pains, hemoptysis, clubbed fingers, marked flatness of chest, deficient expansion (unilateral), dullness, diminished resonance, mucous rales, fibrosis, inflammatory condition of eyes, ears, nose, and throat; colds, chronic catarrh of respiratory tract, chronic catarrh of digestive tract, pleurisy, tuberculosis. | Acetylene makers; asbestos workers; basic slag (artificial manure) workers; battery (dry) makers; bed rubbers (marble and stone); bench molders (foundry); bevellers; bisque-kiln workers; bone workers; brickmakers; bronzers; buffers; burrers (needles); burr filers; button makers; calenderers' (rubber); carbide makers; carbon-brush makers; carborundum workers; card grinders (textiles); casting cleaners (foundry); cement workers; charcoal workers (sugar refining); chargers (smelting); chargers (zinc smelting); chasers (steel); chimney sweepers; chippers; clay and bisque makers (pottery); clay-plug makers (pottery); color makers; compositors; compounders (rubber); concentrating-mill workers (lead and zinc); core makers; crucible mixers; crushermen (clay and stone); cut-glass workers; cutlery makers; cyanamid makers; diamond cutters; electrotypers; emery-wheel makers; engravers; fertilizer makers; file cutters; filers; flint workers; floor molders (foundry); flue cleaners; foundry workers; glass blowers; glass cutters; glass finishers; glass makers; glaze mixers (pottery); gold beaters; gold refiners; graphite workers; grinders (metals); gypsum workers; horn workers; jewelers; junk (metal) |

### D. Dust—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 1. Inorganic dust—Continued. | Cough, dyspnea, pleuritic pains, etc.—Continued. | refiners; lapidaries; lead smelters; lime burners; lime-kiln chargers; lime workers; linoleum makers; lithographers; marble cutters; masons; match-factory workers; metal turners; mica strippers or splitters; mica workers; miners; mixers (rubber); mixing-room workers (miscellaneous); mold breakers (foundry); paint removers; paperhangers; phosphate-mill workers; pit molders (foundry); plaster men (stone, metal); plasterers; plaster of Paris workers; pneumatic-tool workers; polishers; pottery workers; pouncers (felt hats); pressmen (printers); printers; putty makers; putty polishers (glass); pyrites burners; quarrymen; rubber workers; sugar makers; salt preparers; sand blasters; sand cutters; sanders; sanding-machine operators; sandpaperers (enameling and painting auto bodies, etc.); saw filers; scrapers (foundry); screen workers (lead and zinc smelting); sifters; sintering-plant workers; slate workers; slip makers (pottery); smoothers (glass); spinners (asbestos); stamp-mill workers; statuary workers; stonecutters (dry); stonecutters (wet process); sugar refiners; sulphur burners; table turners (enameling); textile-comb makers; tile makers; tool makers; top filers (foundry); tumbling-barrel workers; weighers. |
| 2. Organic dust | Dryness of nose, throat, and mouth, cough, amphyloxis, asthma, bronchitis, emphysema, tuberculosis. | Bakers; beamers (textiles); blowers (felt hats); broom makers; brushers (felt hats); brush makers; buffers; button makers; carbonizers (shoddy); carders (textiles); card grinders (textiles); carpet makers; celluloid polishers; celluloid workers; cigar makers; cobblers; comb makers (celluloid); coners (felt hats); cork workers; cotton-mill workers; cotton twisters; curriers (tannery); devil operators (felt hats); doffers (textiles); feather cutters; feather workers; felt-hat makers; fiber workers; finishers (leather); flax spinners; flour workers; formers (felt hats); fur carders; fur clippers; fur cutters; fur handlers; fur preparers; fur pullers; glove makers (leather preparers); glue workers; grain-elevator workers; grinders (rubber); gun-cotton pickers; hair workers; harness makers; heel makers (shoe); hemp workers; jute workers; knitting-mill workers; lace makers; lasters (shoes); leather workers; linen workers; match-factory workers; mattress makers; mixers (felt hats); mixing-room workers (miscellaneous); pouncers (felt hats); rag workers; roller coverers (cotton mills); ropemakers; rubber workers; sawmill workers; scourers, wood lasts (shoes); shavers (felt hats, furs, tannery); shaving-brush makers; shoddy workers; shoe-factory operatives; sifters; silk workers; softeners (tannery); spinners (textiles); starch makers; straw-hat makers; taxidermists; textile workers; tobacco rollers; tobacco workers; upholsterers; weavers; weighers; wood-last scourers (shoes); wood workers; wool carders; wool spinners; wool workers. |

### E. EXTREME LIGHT.

Intense light is usually a product of a process associated with heat. Among the different kinds of light included under this heading are the arc light, furnace glare, glowing metal or glass, and X ray. Poor illumination as a hazard is treated under "G. Poor illumination." Continuous exposure to strong light is not only irritating to the conjunctiva, but may also cause a degeneration of the retina and decomposition of the visual purple. Repeated electric flashes of brilliant light have caused severe ophthalmia, retinitis, and even blindness. Glass blowers and steel puddlers, who have to look at a glowing molten mass, are apt to develop cataracts. It seems that the invisible ultra-violet rays and infra-red rays are responsible. The introduction of X rays into the medical field has brought to light the highly

dangerous character of the radiographer's work. Severe dermatitis and cancer may ensue after exposure to X rays.

The following protective devices prove effective in preventing the injurious action of extreme light:

(1) Shields.

(2) Helmets.

(3) Goggles which eliminate the ultra-violet and infra-red rays.

(4) Clothing which covers the skin completely.

(5) X-ray apparatus should be inclosed as completely as possible with lead plates.

*E. Extreme light.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Extreme light............ | Cataracts, retinitis, conjunctivitis, dermatitis, ulceration and exfoliation of the skin, electrical ophthalmia, cancer. | Blacksmiths; electricians; electric linemen; furnace workers; glass blowers; glass-furnace workers; incandescent-mantle hardeners; moving-picture machine operators; oxyacetylene cutters; photographers; puddlers (iron and steel); stokers; welders; X-ray workers. |

### F. INFECTIONS.

There are many infectious diseases, such as tetanus, trachoma, and syphilis, which are often of occupational origin. They are not, however, specifically occupational; that is, they do not arise from a condition caused by an industrial process. The conditions which cause these diseases in industry are identical with those which cause them out of industry. The above-mentioned diseases have not therefore been included in this list of occupational infections. Those diseases which have been included arise primarily in occupational exposure. There are a number of other diseases which occur in occupations, but these are of such little numerical importance that they also have not been included.

Besides the general rules of sanitation, the following measures are recommended:

(1) *Anthrax.*—All hides and animal hair must be thoroughly sterilized. Foreign skins or hair should not be carried on the unprotected shoulder. The hands should be frequently washed with bichloride of mercury. Hair sorters should wear respirators.

(2) *Hookworm.*—Workers in mines and others who are exposed to infected soil should make special effort to keep the skin clean. Shoes must always be worn and gloves are also of value in preventing the entrance of the hookworm through the skin. Infected soil should be disinfected and kept dry. The stools of infected individuals must be disinfected immediately.

(3) *Septic infections.*—Workers should avoid puncturing the skin. Cuts, scratches, or abrasions should be treated at once to avoid in-

fection. Men having open wounds should not be allowed to work with putrid material.

### F. Infections.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 1. Anthrax: External........... | 1. *Malignant pustule.*—Begins as in amed pimple or boil. Papule becomes hard, with a purple center and deep red zone of "ltration surrounding, appearance of minute vesicular areola. Central papule becomes vesicular. discharges thick, bloody serum, later forming a brown gangrene. A painful lymphangitis with hard edema extending over neck and arm. Local phlebitis in the edematous area. chilliness, anore ia, vomiting, prostration, high temperature, feeble pulse. | Animal handlers: baters (tannery); beam house workers (tannery); brush makers' butchers' carpet makers; cattle salesmen; cobblers; curriers; farmers (erill) er makers' fur carders; fur clippers; fur cutters; fur handlers fur preparers; fur pullers (tannery); longshoremen; meat inspectors' preparers tannery); shavers (felt hats, fur tannery); shaving brush makers; shepherds; stablemen; sunmackers (tannery); table bands tannery); tannery workers ta idermists; transporters of hides and wool; veterinarians; wool carders; wool spinners; wool workers. |
| Internal........... | 2. *Malignant edema.*—A spreading in'ammation of loose connective tissue accompanied by sloughing and gangrene. Constitutional symptoms those of pyæmia. High fever, pains in head and back, vomiting, constipation, pain and tenderness in the abdomen, rapid, feeble pulse, palpable spleen, dyspnea, cyanosis. May be hemorrhage from bowels. When lungs are involved, there are additional symptoms—cough, pain in the chest, suffocation. | |
| 2. Hookworm (ankylostomiasis). | Anemia, pallor of the face even when the blood count is not very low; a dull, heavy, listless e"pression, manner, speech, and gait; increasing muscular weakness; occurrence of parasites in stool. Victims often complain of gastrointestinal pains and cramps in exaggerated cases there are edema, ascites, progressive emaciation, protuberant abdomen, and increasing stupor. | Brick makers; construction campworkers; farmers; lumbermen; miners; ¢uarrymen; sawmill workers; trench diggers; tunnel workers; workers who come in contact with infected soil, especially prevalent in gold mines of California. |
| 3. Septic infections... | Skin infections such as boils, carbuncles, blood poisoning, local red lymphangitis or cellulitis. | Animal handlers; butchers; canners; feather workers; fertilizer makers; garbage workers; glue makers; hair workers; preparers (tannery); rag workers; shavers (felt hats, fur, tannery); shoddy makers; silk workers; soap makers; tallow renders; tannery workers; veterinarians; handlers of putrid or decomposing animal products. |

#### G. POOR ILLUMINATION.

The effects of poor illumination are not easily apparent. The hazard may be present in any plant, but is especially prevalent in a limited number of occupations because of the peculiar conditions that make it difficult properly to illuminate the workroom. Miner's nystagmus is the outstanding example of the effects of this hazard. Poor illumination is not only the cause of the conditions listed below but is also an important factor in the causation of accidents.

Artificial light is least harmful to the worker when it comes from overhead, reflected from the ceiling by inverted bowl-shaped reflectors. Light-colored walls and ceilings aid materially in properly illuminating a room. Special precaution must be taken to avoid glare. All lights should be shaded so that only diffused light reaches the eye.

*G. Poor illumination.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Poor illumination... | Nystagmus, eyestrain, deficient vision due to astigmatism or hyperopia, headache, giddiness. Eyestrain contributes to neurasthenia. | Buffers; burnishers (iron and steel); caisson workers; compositors; embroidery workers; jewelers; metal polishers; miners; photographers; steel engravers; tunnel workers; watchmakers; any factory worker. |

### H. REPEATED MOTION, PRESSURE, SHOCK, ETC.

Under this heading are included those muscle-strain conditions which are caused by the continuous repetition of movements, pressure, or blows. This section is not concerned with the neurasthenic phenomena which are sometimes called occupational neurosis. Everyone is familiar with the muscular strain experienced in performing for the first time some exercise, such as rowing, long walking, etc. Men newly introduced into a process requiring such repeated action are affected similarly but often much more severely, so as to disable them temporarily for the particular job. The injury does not stop with muscular strain but may even cause inflammation of the surrounding sheaths or paralysis of the parts concerned.

Many types of occupational neurosis may be avoided by working at a comfortable pace, avoiding fatigue. Where continuous pressure or shock is the cause, pads or cushions are often beneficial. Workers who have to grasp tools tightly would do well frequently to change their method of holding the instrument, if this is possible. Occasional rest periods will do much toward the prevention of muscular pains and cramps.

*H. Repeated motion, pressure, shock, etc.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| Repeated motion, pressure, shock, etc. | Pain of muscle used, set up by a myositis, bursitis, synovitis, or other local changes of a chronic inflammatory nature: trembling, gradual emaciation and partial paralysis of parts, acroparesthesia. | Artificial-flower makers; barbers; bicyclists; blacksmiths; carpenters; chauffeurs; clerks; cobblers; compositors; cotton twisters; dancers; diamond cutters; elevator runners; enamelers; engravers; gold beaters; hammermen; jewelers; knitters; lathe turners; letter sorters; lithographers; locksmiths; machinists; masons; microscopists; mill cutters; miners; musicians; painters; paper-box makers; pavers; pneumatic-tool workers; porters; pressers; riveters; sailors; sawyers; scissors sharpeners; seamstresses; sewing machine operators; spinners (textiles); stone cutters (dry); stone cutters (wet process); tailors; telegraphers; typists; washerwomen; watchmakers; weavers. |

### J. Poisons.

The continued introduction of new processes making use of new poisonous substances in industry makes this section of more and more importance. The enormous increase in the production of dye-stuffs and other chemicals will no doubt show its effects on the workmen in the form of industrial poisoning. During the war the increased production of trinitrotoluol and tetrachlorethane for air-plane dope resulted in a large number of cases of poisoning from these substances. For the data presented under this heading, the revised "List of industrial poisons," compiled by Sommerfeld and Fischer for the International Association for Labor Legislation, has been drawn upon largely. The arrangement is similar.[a] The mate-rial in that list has been revised and brought up to date. Several poisons have been added and all the occupations exposed are given for each poison. The symptoms are those given by recent investi-gators. In order to avoid swelling the list of poisons to unwar-ranted proportions, substances the effects of which are similar have been grouped. Thus all nitro compounds of benzol and its homo-logues have been included under one heading and the same pro-cedure has been followed with amido compounds. An endeavor has been made to limit this list to those substances the actions of which are mainly constitutional. The next section (p. 912) is devoted to the substances occurring in industry which act as skin irritants. Because of the very large number of substances in the latter class, it has not been possible to treat them as fully as the other poisons.

To prevent industrial poisoning the following precautions should be taken: Personal cleanliness must be maintained. Workers must be instructed as to the toxicity of the substances handled. Frequent medical examinations of workers must be made to detect early symp-toms of disease. Men should not be allowed to eat in workrooms where poisonous substances are handled. Work clothes should be removed at end of day's work. Proper lavatory facilities should be provided. Work clothes should receive special attention. The use of gloves and boots are often necessary. Mechanical devices for confining the poisons are of prime importance. (See also preventive measures, under "Dust.") Fumes and gases should be taken care of by proper ventilation, the use of exhaust systems, fans, and blowers. Men who work in an atmosphere polluted by poisonous fumes and gases should always wear gas masks properly suited for the obtaining conditions.

---

[a] See United States Bureau of Labor. Bulletin No. 100, May, 1912.

## J. Poisons.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
| --- | --- | --- |
| 1. Acetaldehyde | Irritation of the mucous membranes of the nose, larynx, bronchi, and eyes; acceleration of the heart's action; profuse night sweats. | Aldehyde pump men; celluloid makers; dye makers; explosives workers; mirror silverers, varnish makers; vinegar workers. |
| 2. Acridine | Irritation and inflammation of skin and mucous membranes, severe burning and itching of the skin, vincal smelling. | Dye makers. |
| 3. Acrolein | Itching in the throat, irritation of the eyes, exciting lachrymation, conjunctivitis, irritation of the air passages, bronchial catarrh. | Bone renderers; fat renderers; galvanizers; lard makers; linoleum makers; linseed oil boilers; soap makers; stearic-acid makers; tallow refiners; tinners; varnish boilers. |
| 4. Ammonia | Acute inflammation of the respiratory organs, cough, edema of the lungs, chronic bronchial catarrh, redness of the eyes, increased secretion of saliva, retention of the urine. | Acetylene makers; ammonium-salts makers; artificial-ice makers; artificial-silk makers; bone-black makers; bronzers; coke-oven workers; dye makers; dyers; galvanizers; gas-illuminating workers; gas purifiers; glue workers; mercerizers; refrigerating-plant workers; salt extractors; coke-oven by-products; sewer workers; shellac makers; shoe finishers; soda makers; sugar refiners; tinners; varnish makers. |
| 5. Amyl acetate | Nervous symptoms, headache, fullness of the head, giddiness, numbness, nausea, disturbances of digestion, palpitation of the heart, inflammation of the respiratory organs, fatty degeneration of the liver. | Alcohol-distillery workers; art-glass workers; artificial-silk makers; battery (dry) makers; bromine buffers; cutlery; celluloid makers; cutlery makers; enamelers; explosives workers; furniture polishers; gilders; incandescent-lamp makers; jewelers; lacquer makers; linoleum makers; mottlers (leather); patent-leather makers; patent-leather enamelers; shoe-factory workers; shoe finishers; smokeless-powder makers; toy makers; wirers (incandescent lamps). |
| 6. Amyl alcohol | Congestion of the heart, oppression of the chest, irritation of the air passages, lowering of the blood pressure, faintness, nausea. | Alcohol-distillery workers; dye makers; fruit-essence makers; mordanters; shoe finishers. |
| 7. Aniline and other amino compounds of benzol and its homologues. | Pallor of the skin, vertigo, unsteady gait, loss of appetite, increased frequency of respiration, anemia, slowing of the pulse, eczematous eruptions, bloody urine, spasmodic muscular pains, cyanosis. | Aniline makers; artificial-leather makers; calico printers; coal-tar workers; compositors; color makers; cutlery; dye makers; explosive workers; leather workers; lithographers; military workers; mixers (rubber); painters; paint makers; pencil colored makers; photographic workers; pressroom workers; rubber; printers; reclaimers (rubber); rubber workers; tannery workers; vulcanizers. |
| 8. Antimony and its compounds. | Itching eruptions of the skin, inflammation of the mouth, throat, and stomach; albuminuria in the urine, weakness of the heart, vertigo, faintness, coryza, dyspepsia, intestinal colic, nephritis. | Antimony extractors (refiners); brass founders; burnishers (iron and steel); burnishers (rifle barrels); calico printers; color makers; compositors; compounders; rubber; dye makers; enamelers; fireworks makers; glass mixers; glass dippers (pottery); glass mixers (pottery); grinders (metals); grinders (rubber); lead smelters; linotypers; mixers (rubber); monotypers; mordanters; pressroom workers; rubber; printers; rubber workers; shot makers; stereotypers; vulcanizers. |
| 9. Arsenic and its compounds. | Headache, melancholia, sleeplessness, gastric disturbances, emaciation, catarrh of the mucous membranes, skin diseases of various forms, falling out of the hair and nails, melanosis, perforations of the nasal | Arsenic roasters; artificial-flower makers; artificial-leather makers; bookbinders; brass founders; bronzers; calico printers; candle makers; carpet makers; carrotters (felt hats); chartreuse lime smelters; color makers; colored-paper workers; compounders (rubber); copper founders; copper smelters; curriers (tannery); cut-glass workers; decorators (pottery); dye makers; electroplaters; enamelers; feather curers; feather workers; felt-hat makers; ferrosilicon workers; fur handlers; fur preparers; galvanizers; gardeners; glass mixers; glass dippers (pottery); glaze mixers (pottery); gold refiners; |

*J. Poisons*—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 9. Arsenic and its compounds—Continued. | septum, bleeding gums, peripheral multiple neuritis, paralysis. | Insecticide makers; japan makers; jewelers; lead smelters; linoleum colorers; lithographers; mixers (rubber); mordanters; paper glazers; paper-hangers; pencil (colored) makers; pitch workers; pottery workers; pressroom workers (rubber); printers; pyrites burners; refiners (metals); rubber-tire builders; rubber washers; rubber workers; sealing-wax makers; sheep-dip makers; shot makers; sprayers (trees); sulphur burners; sulphuric-acid workers; tannery workers; taxidermists; tinners; toy makers; velvet makers; wallpaper printers; wax-ornament makers; wire drawers; wood preservers; zinc miners. |
| 10. Arseniureted hydrogen. | General malaise, difficulty of breathing, fainting fits, gastric disturbance, jaundice, bluish discoloration of the mucous membrane, pain in the region of the spleen and kidney, darkened urine, fetor of the mouth resembling garlic. | Acid dippers; aniline workers; balloon (toy) fillers; battery (dry) makers; bronzers; carbonizers (shoddy); dimethyl-sulphate makers; dye makers; enamelers; ferro-silicon workers; fertilizer makers; galvanizers; lead turn-silicon workers; fertilizer makers; galvanizers; lead turners; lime burners; nitroglycerin makers; picklers; refiners (metals); shoddy workers; submarine-storage battery workers; sulphuric-acid workers; tinners; tower-men (sulphuric acid); zinc chloride makers. |
| 11. Benzine | Headache, vertigo, nausea, cough, irregular respiration, weakness of the heart, drowsiness, cyanosis, twitching of the muscles, psychosis, skin lesions. | Art-glass workers; bronzers; buffers (rubber); cast scrubbers (electroplaters); celluloid makers; cementers (rubber shoes); cement mixers (rubber); compositors; compounders (rubber); curriers (tannery); decorators (pottery); degreasers (fertilizer, leather); dippers (rubber); dry cleaners; electroplaters; enamelers; feather workers; furniture polishers; gilders; glue workers; japan makers; lacquer makers; linoleum makers; lithographers; millinery workers; mixers (rubber); mordanters; painters; paint makers; pressroom workers (rubber); printers; putty makers; rubber-glove makers; rubber-tire builders; rubber washers; rubber workers; shellac makers; shoe finishers; tannery workers; type cleaners; varnish makers; vulcanizers. |
| 12. Benzol | Headache, vertigo, anemia, muscular tremor, scarlet lips, spots of extravasated blood in the skin, irritant cough, fatty degeneration of liver, kidneys, and heart. | Aniline makers; artificial-leather makers; battery (dry) makers; benzol stillmen; bronzers; carbolic-acid makers; cast scrubbers (rubber shoes); cement mixers (rubber); coal-tar workers; coke-oven workers; color makers; compounders (rubber); decorators (pottery); degreasers (fertilizer, leather); dry cleaners; driers (rubber); dye makers; electroplaters; explosives workers; feather workers; fertilizer makers; gas (illuminating) workers; gilders; glue workers; lacquer makers; lithographers; millinery workers; mixers (rubber); mordanters; painters; paint makers; photo-engravers; photographic workers; pressroom workers (rubber); reclaimers (rubber); rubber-tire builders; rubber washers; rubber workers; shellac makers; shoe-factory workers; shoe finishers; smokeless-powder makers; still (coal-tar) cleaners; treaders (rubber); varnish makers; vulcanizers. |
| 13. Brass (zinc) | Headache, general malaise, throat irritation, cough, nausea, vomiting, constipation, trembling, muscular pains, accelerated respiration, profuse sweating, deposit of green tartar on the teeth, metallic taste in the mouth, anemia, premature old age, respiratory and degenerative diseases. | Bench molders (foundry); blowers-out (zinc smelting); brass founders; brewers; brick burners; caisson workers; core makers; floor molders (foundry); galvanizers; junk-metal refiners; luters (zinc smelting); pourers (brass foundry); welders; zinc smelters. |
| 14. Carbon dioxide | Anemia, cyanosis, headache, drowsiness, vertigo, tinnitus, and general nervousness. | Alkali-salt makers; blacksmiths; boiler-room workers; brass founders; brewers; brick burners; charcoal burners; drying-room workers (miscellaneous); fertilizer makers; furnace workers; lime burners; limekiln chargers; miners; pottery workers; sewer workers; silo workers; soda makers; starch makers; sugar refiners; vinters; white-lead makers; yeast makers. |

906                    DIVISION OF PREVENTIVE MEDICINE.              Vol. XVII.

J. *Poisons*—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 15. Carbon disulphide. | Headache, pain in the extremities, trembling, deafness; reduction of the reflexes, acceleration of the heart's action, nausea, digestive trouble, emaciation, disturbance of sense of vision, excitement and violent temper followed by depression, hyperstimulation of sexual instinct, later its abnormal decline, chronic dementia. | Ammonium-salts makers; artificial-silk makers; asphalt testers; carbon-disulphide makers; celluloid makers cementers (rubber shoes); cement mixers (rubber); dry cleaners; driers (rubber); enamelers; glue workers; insecticide makers; match-factory workers; oil extractors; paint makers; paraffin workers; putty makers; reclaimers (rubber); smokeless-powder makers; sulphur extractors; tallow refiners; vulcanizers. |
| 16. Carbon monoxide. | Headache (usually frontal), dizziness, sense of fullness of the head, fatigue, nausea, general weakness, polycythemia. | Acetylene makers; bakers; bisque-kiln workers; blacksmiths; blockers (felt hats); boiler-room workers; brass founders; cable splicers; calico printers; carbide makers; celluloid makers; charcoal burners; chargers (zinc smelting); chimney sweepers; coal-tar workers; coke-oven workers; copper smelters; core makers; drying-room workers (miscellaneous); enamelers; felt-hat makers; filament makers (incandescent lamps); finishers (incandescent lamps); flangers (felt hats); flue cleaners; foundry workers; furnace workers; garage workers; gas (illuminating) workers; glost-kiln workers; incandescent-lamp makers; kiln tenders; laundry workers; lead smelters; lime burners; limekiln chargers; mercury smelters; miners; patent-leather makers; phosgene makers; pottery workers; pressers (metals); sealers (incandescent lamps); silver melters; singers (cloth); soda makers; stokers; teazers (glass); temperers; tubulators (incandescent lamps); zinc smelters. |
| 17. Chloride of lime. | Irritating cough, inflammation of upper air passages, difficulty of breathing, bronchitis, asthma, sometimes hemoptysis, conjunctivitis, lachrymation, hyperhidrosis, burning eruption on the skin. | Bleachers; chloride of lime makers; chloroform makers; disinfectant makers; dye makers; laundry workers; tannery workers. |
| 18. Chlorine............ | Pallid countenance, emaciation; decayed teeth, bronchial irritation and asthma, gastric disturbances, irritation of the skin, chloracne. | Alkali-salt makers; beatermen (paper and pulp); bleachers; broom makers; calico printers; chloride of lime makers; chlorine makers; disinfectant makers; dye makers; laundry workers; phosgene makers; photographic workers; sulphur-chloride makers; zinc-chloride makers. |
| 19. Chlorodinitrobenzol. | *See* Nitrobenzol.......... | |
| 20. Chloronitrobenzol. | *See* Nitrobenzol.......... | |
| 21. Chromium compounds. | Pitlike, phagedenic ulcers, very difficult to heal and very painful; perforation of the nasal septum at the cartilaginous portion, irritation of the conjunctiva, small areas of inflammation in the lungs, inflammation of the kidneys, chronic gastritis, anemia. | Artificial-flower makers; battery (dry) makers; bleachers; calico printers; candle (colored) makers; chromium workers; color makers; compounders (rubber); dye makers; dyers; enamelers; glass mixers; glaze dippers (pottery); glaze mixers (pottery); ink makers; linoleum colorers; lithographers; match-factory workers; mixers (rubber); mordanters; paraffinagers; pencil (colored) makers; photo-engravers; photographic workers; pressroom workers (rubber); rubber-tire builders; rubber washers; rubber workers; tannery workers; vulcanizers; wall-paper printers; wax-ornament workers; wood stainers. |
| 22. Cyanogen compounds. | Headache, vertigo, unsteadiness of gait, nausea, loss of appetite, disturbance of gastric and intestinal functions, slowing of the pulse, albuminuria. | Acid dippers; ammonium-salts makers; blacksmiths; blast-furnace workers; browners (gun barrels); calico printers; case hardeners; celluloid makers; dye makers; electroplaters; fulminate mixers; fumigators; gas (illuminating) workers; gas purifiers; gold refiners; photographic workers; picklers; silver refiners; tannery workers; temperers. |

*J. Poisons—Continued.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 23. Dimethyl sulphate. | Strongly corrosive effect on the skin and mucous membranes, hoarseness, lachrymation, conjunctivitis, edema, photophobia. | Dimethyl-sulphate makers; dye makers; perfume makers. |
| 24. Dinitrobenzol... | *See Nitrobenzol.*...... | |
| 25. Gasoline... | *See Naphtha.*....... | |
| 26. Hydrochloric acid. | Irritation of mucous membranes; conjunctivitis; coryza; pharyngeal, laryngeal, and bronchial catarrh; dental caries. | Acid dippers; acid finishers (glass); acid mixers; acid recoverers; acid transporters; alkali-salt makers; ammonium salts makers; aniline makers, battery (dry) makers; calico printers; camphor makers; carbolic-acid makers; carbonizers (shoddy); cartridge dippers; dye makers; dyers; enamel makers; fertilizer makers; galvanizers; glass finishers; glass mixers; glue workers; hydrochloric-acid makers; jewelers; petroleum refiners; picklers; pottery workers; reclaimers (rubber); rubber workers; shoddy workers; solderers; sulphur-chloride makers; tinners; vignetters; zinc-chloride makers. |
| 27. Hydrofluoric acid. | Intense irritation of the eyelids and conjunctiva, coryza, bronchial catarrh with s p a s m o d i c cough; ulceration of the nostrils, gums, and oral mucous membrane; painful ulcers of the cuticle, erosion and formation of vesicles, suppuration under the finger nails. | Antimony fluoride extractors; art-glass workers; bleachers; dyers; etchers; fertilizer makers; glass finishers; silicate extractors. |
| 28. Lead and its compounds. | Sallow, pale, yellowish hue of the skin; metallic taste, nausea, anorexia, constipation, lead line, asthenia, lassitude, headaches, arthralgias and neuritis, weakness or grip, tremors of fingers and tongue; local paralyses, especially of muscles used most; atrophy of optic nerve. | Acid finishers (glass); amber workers; art-glass workers; artificial-flower makers' babbitters; battery (dry) makers; bench molders (foundry); blacksmiths; bloomers (tannery); bookbinders; bottle-cap makers; brass founders; brass polishers; braziers; brick burners; britt'nia makers; bronzers; brown'rs (gun barrels); brush makers; buffers (rubber); burners (enameling); cable makers; cable splicers; calico printers; canners; cartridge makers; celluloid makers; chargers (zinc-smelting); color makers; colorers (white) of shoes; compositors; concentrating-mill workers (lead and zinc); cut-glass workers; cutlery makers; decorators (pottery); diamond polishers; dye makers; dyers; electroplaters; electrotypers; embroidery workers; emery-wheel makers; enamel makers; file cutters; filers; floor molders (foundry); galvanizers; glass finishers; glass mixers; glass polishers; glaze dippers (pottery); glaze mixers (pottery); glost-kiln workers; gold refiners; grinders (metals); grinders (rubber); heater boys (riveters); imitation-pearl makers; incandescent-lamp makers; insecticide makers; japan makers; jewelers; junk-metal refiners; lacquerers (paint cans); lacquer makers; lead burners; lead-foil makers; lead miners; lead-pipe makers; lead-salts makers; lead smelters; linoleum makers; linotypers; linseed-oil boilers; lithographers; litho transfer workers; match-factory workers; mirror silverers; mixers (rubber); monotypers; musical-instrument makers; nitric-acid workers; nitroglycerin makers; painters; paint makers; paint removers; paper hangers; patent-leather makers; petroleum refiners; photograph retouchers; pipe fitters; plumb'ers; polishers; pottery workers; printers; putty makers; putty polishers; reclaimers (glass); reclaimers (rubber); red-lead workers; refiners (metals); riveters; roofers; rubber workers; sagger makers; sandpaperers (enameling and painting automobiles, etc.); screen workers (lead and zinc smelting); sheet-metal workers; shellac makers; shot makers; slip makers (pottery); slushers (porcelain enameling); solderers; stainers (shoes); steel engravers; stereotypers; storage-battery makers; sulphuric-acid workers; table turners (enameling); tannery workers; temperers; tile makers; tin-foil makers; tinners; toy makers; transfer workers (pottery); tree sprayers; type founders; typesetters; wallpaper printers; welders; white-lead workers; wood stainers; zinc smelters. |

908    DIVISION OF PREVENTIVE MEDICINE.   Vol. XVII.

*J. Poisons*—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 29. Mercury and its compounds. | Ptyalism; swelling, inflammation, and bleeding of the gums; blue line on the gums, rodent ulcers, pallor, mercurial tremor, digestive disturbances, localized white spots in the mucosa surrounded by pale blue or reddened area, general weakness of the hand and digital extensors, foul breath, corrosion of the teeth, furunculosis, sleeplessness and depression or drowsiness and apathy, loss of energy and initiative. | Artificial-flower makers; battery (dry) makers; blowers (felt hats); bronzers; browners (gun barrels); brushers (felt hats); cap loaders; carpeters (felt hats); cartridge makers; chlorine makers (electrolytic); color makers; coners (felt hats); dentists; detonator cleaners; detonator-fillers; detonator packers; devil operators (felt hats); dyr makers; Edison storage battery workers; explosive workers; felt-hat makers; fireworks makers; fulminate mixers; fur handlers; fur preparers; gold refiners; hardeners (felt hats); incandescent-lamp makers; jewelers; mercurial-vapor-lamp makers; mercury bronzers; mercury miners; mercury-salts workers; mercury smelters; mercury-solder makers; mercury-still cleaners; mirror silverers; mixers (felt hats); paint makers; photographic workers; primers (explosives); refiners (metals); sizers (felt hats); sole-stitchers (Blake machines); starters (felt hats); steel engravers; stiffeners (felt hats); storage-battery makers; taxidermists; thermometer makers; water gilders; zinc-electrode makers. |
| 30. Methyl alcohol. | Headache, nausea, abdominal cramps, ringing in the ears, muscular prostration, insomnia, delirium, difficulty of breathing, inflammation of the throat and mucous membrane of the air passages, conjunctivitis, serious affections of the retina and optic nerve resulting in blindness, fatty degeneration of the liver. | Aldehyde pumpmen; art-glass workers; artificial-flower makers; artificial silk makers; bookbinders; bronzers; brush makers; calico printers; celluloid mat ornamenters (rubber shoes); dimethyl sulphate makers; dry cleaners; dryers (felt hats); dye makers; explosives workers; leather workers; felt-hat makers; filament makers (incandescent lamps); fitters (shoes); furniture polishers; gilders; hardeners (felt hats); incandescent lamp makers; ink makers; japan makers; lacquer makers; lasters (shoes); linoleum makers; millinery workers; mottlers (leather); painters; paint makers; patent leather makers; perfume makers; photo-engravers; photographers; polishers; shellac makers; shoe-factory operatives; shoe finishers; soap makers; stiffeners (felt hats); stitchers (shoes); tyre cleaners; varnish makers; vulcanizers; wood-alcohol distillers; woodworkers. |
| 31. Methyl bromide. | Vertigo, headache, staring look, pallor of the skin, retarded pulse, constipation, excitability, trembling. | Antipyrin makers; dye makers. |
| 32. Naphtha. | Headache, vertigo, nausea, vomiting, dyspnea, palpitation, insomnia, hysteria. | Bronzers; chauffeurs; degreasers (fertilizer, leather); dyers; furniture polishers; garage workers; gilders; metal-polish makers; painters; petroleum refiners; polishers; rubber workers; shoe finishers; waterproof-cloth makers; woodworkers. |
| 33. Nitraniline. | *See* Aniline. | |
| 34. Nitrobenzol and other nitro compounds of benzol and its homologues. | Icterical skin which gradually becomes cyanotic, methemoglobin formation, general debility, anemia, presence of hematoporphyrin, albumin, and sometimes free poison in the urine; skin eruptions, visual disturbances, dyspnea, odor of bitter almonds in breath. | Aniline makers; dye makers; explosives workers; perfume makers; smokeless-powder makers; soap makers. |

J. Poisons—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 35. Nitroglycerin..... | Severe headache, vertigo, nausea, paralysis of the muscles of the head and eyes as well as of the lower extremities, cyanosis, reddening of the countenance, burning in the throat and stomach, disturbances of digestion, trembling, neuralgia, colic, retarded respiration and heart action, obstinate ulcers under nails and on the finger tips, eruptions on the plantar aspect of the feet and interdigital spaces, with extreme dryness and formation of fissures. | Explosives workers; nitroglycerin workers; shell fillers. |
| 36. Nitronaphthalene. | See Nitrobenzol. | |
| 37. Nitrous gases and nitric acid. | Irritation of air passages, cough, labored respiration, inflammation of the eyes, corrosion of the teeth, erosion and perforation of nasal septum. | Acid dippers; acid mixers; acid recoverers; acid transporters; aniline makers; artificial leather makers; bleachers; carroters (felt hats); cartridge driers; celluloid makers; dimethyl-sulphate makers; dippers (guncotton); enamelers; etchers; explosive workers; felt-hat makers; fertilizer makers; fur preparers; galvanizers; glue workers; guncotton dippers; guncotton wringers; imitation-pearl makers; incandescent lamp makers; jewelers; lithographers; miners; mordanters; nitrators; nitric-acid workers; nitroglycerin workers; photo-engravers; picklers; picric-acid makers; refiners (metals); soda makers; steel engravers; sulphuric-acid workers; towermen (sulphuric acid); wringers (guncotton). |
| 38. Petroleum....... | Inflammation of the skin, acne, suppurating ulcers; papilloma; numbness and irritation of the Schneiderian membrane; headache and sensory disturbances; affections of the respiratory organs. | Browners (gun barrels); feather workers; furniture polishers; lampblack makers; millinery workers; oil-flotation-plant workers; oil-well workers; paraffin workers; petroleum refiners; temperers. |
| 39. Phenol. ......... | Erosion of the skin, eczema, irritation of respiratory organs, digestive disturbances, symptoms of degeneration of the blood, emaciation, nephritis, gangrene, icterus. | Bakelite makers; calico printers; coal-tar workers; dye makers; dyers; etchers; gas (illuminating) workers; gas purifiers; lampblack makers; picric acid makers; rubber workers; smokeless powder makers; stillmen (carbolic acid); surgical-dressing makers; wood preservers. |
| 40. Phenyl hydrazine. | Vesicular eruptions on the skin with itching and burning, diarrhea, loss of appetite, granular degeneration of the blood corpuscles, formation of methemoglobin, a sense of general malaise. | Antipyrin makers; dye makers. |

*J. Poisons—Continued.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 41. Phosgene........ | Destruction of lung tissue, emphysema and edema, myocardial insufficiency due to the emphysema, pleural thickening and adhesions, chronic bronchitis, mild diffuse bronchiectasis, nocturnal dyspnea, polycythemia. | Dye makers; phosgene makers. |
| 42. Phosphorus..... | Inflammation and sclerosis of the bones and of the periosteum, necrosis of the bones of the jaw, swelling and ulceration of the gums and buccal membrane, loosening and falling out of the teeth, suppuration and destruction of jawbone with fistulous channels burrowing through the cheek, meningeal inflammation, brittleness of bones, digestive disturbances, emaciation. | Boneblack makers; brass founders; fertilizer makers; fireworks makers; insecticide makers; match-factory workers; phosphate-mill workers; phosphor-bronze workers; phosphorus-compounds makers; phosphorus extractors. |
| 43. Phosphuretted hydrogen. | Oppressed feeling in the chest, headache, vertigo, tinnitus aurium, general debility, loss of appetite, great thirst. | Acetylene makers; ferrosilicon workers; phosphorus extractors; phosphorus (red) makers. |
| 44. Picric acid....... | Itching, inflammation of the skin, vesicular eruptions, yellow pigmentation of epidermis and conjunctiva, inflammation of buccal mucous membrane, digestive disturbances, vertigo, jaundice, nasal catarrh, nephritis. | Dye makers; dyers; explosives workers; photographers; picric acid makers; shell fillers; smokeless-powder makers. |
| 45. Sulphur chloride. | Symptoms are due to the combined effects of chlorine, hydrochloric acid and sulphur dioxide. Sulphur chloride when in contact with moisture reacts with water to form these products. | Rubber-substitute makers; vulcanizers. |
| 46. Sulphur dioxide. | Irritation of the mucous membrane of respiratory organs and eyes, spasmodic cough, bronchial catarrh, digestive disturbances, blood-tinged mucous. | Alkali-salt makers; blast-furnace workers; bleachers; brass founders; brick makers; broom makers; carbolic acid makers; chambermen (sulphuric acid) chargers (zinc smelting); copper smelters; dye makers; fertilizer makers; flue cleaners; fruit preservers; fumigators; galvanizers; glue workers; lead smelters; mercury smelters; oil-flotation-plant workers; petroleum refiners; pottery workers; pyrites burners; refiners (metals); rubber workers; storage battery makers; sugar refiners; sulphite cooks; sulphur burners; sulphurers (hops and malt); sulphuric-acid workers; tannery workers; towermen (sulphuric acid); zinc smelters. |
| 47. Sulphuretted hydrogen. | Headache, debility, vertigo, nausea, disturbances of digestion, sallow complexion and emaciation, slowing of the pulse, conjunctival catarrh, tendency to the formation of boils. | Alkali-salt makers; artificial-silk makers; blast-furnace workers; bronzers; cable splicers; celluloid makers; dye makers; fertilizer makers; flax-rettery workers; gas (illuminating) workers; gas purifiers; glue workers; match-factory workers; miners; oil-flotation-plant workers; petroleum refiners; pyrites burners; sewer workers; soda makers; sodium sulphide makers; starch makers; sugar refiners; tannery workers. |

*J. Poisons*—Continued.

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 48. Sulphuric acid... | Inflammation of respiratory organs, injury to teeth through softening of the dentine, chronic catarrh. | Acid dippers; acid finishers (glass); acid mixers; acid recoverers; acid transporters; ammonium-salts makers; ammonium-sulphate makers; artificial-leather makers; bett-still operators (beta naphthol); burnishers (iron and steel); calico printers; carbolic acid makers; carbonizers (shoddy); cartridge dippers; celluloid makers; chambermen (sulphuric acid); dimethyl-sulphate makers; dye makers; explosives workers; felt-hat makers; fertilizer makers; galvanizers; glass finishers; guncotton dippers; hydrochloric acid makers; jewelers; linoleum makers; mercerizers; nitraters; nitric-acid makers; nitroglycerine makers; oil - flotation - plant workers; patent - leather makers; petroleum refiners; phosphorus-evaporating machine operators; picklers; picric acid makers; reclaimers (rubber); salt extractors (coke oven byproducts); shoddy workers; storage-battery makers; sulphuric-acid workers; tallow refiners; tannery workers; temperers; towermen (sulphuric acid); wire drawers. |
| 49. Tar............ | Tar itch, diffuse acne, eczema or psoriasis, loss of appetite, nausea, diarrhea, headache, numbness, vertigo, albuminuria, edema, ischuria, conjunctivitis, bronchitis. | Battery (dry) makers; briquet makers; brush makers; chimney sweepers; coke-oven workers; cord makers; flue cleaners; gas (illuminating) workers; insulators; paint makers; paraffin workers; pavers; petroleum refiners; roofers; roofing-paper workers; still (coal-tar) cleaners; tar workers; wood preservers. |
| 50. Tetrachlorethane (acetylene tetrachloride). | Abnormal sense of fatigue, profuse perspiration, general discontent and grouchiness, inability to concentrate, nocturia, slight polyuria, dreaming, headache, vertigo, nervousness, insomnia, loss of appetite, constipation, diarrhea, gas in stomach, general abdominal pain, nausea, eructations of gas, vomiting, loss of weight, jaundice, enlarged liver, bile in the urine, abdominal tenderness, increase of mononuclear cells, appearance of many immature large mononuclears, elevation in the white count, slight anemia, slight increase in number of platelets. | Airplane-wing varnishers; artificial-silk makers; tapers (airplanes). |
| 51. Trinitrotoluol... | Nose and throat irritation, obstinate cough, bluish color of the lips and lobes of the ears, yellowing of the whites of the eyes, expectoration of yellow mucous, discoloration—a mixture of lividity and jaundice, rash on the skin, shortness of breath, anemia, palpitation of the heart, bile stained urine, rapid weak pulse. | Explosive workers; shell fillers. |

912                    DIVISION OF PREVENTIVE MEDICINE.        Vol. XVII.

*J. Poisons—Continued.*

| Health hazard. | Symptom, condition, or disease to look for. | Occupations which offer such exposure. |
|---|---|---|
| 52. Turpentine...... | Irritation of the mucous membrane of the eyes, nose, and upper air passages; cough, bronchial inflammation; salivation; giddiness, headache, irritation of the kidneys, odor of violets in urine, severe irritation of the skin, eczema, and hardening of the epidermis. | Art-glass workers; cable splicers; calico printers; camphor makers; cementers (rubber shoes); decorators (pottery); dry cleaners; dye makers; enamelers; enamel makers; leather workers; furniture polishers; japan makers; lacquer makers; linoleum makers; lithographers; millinery workers; painters; paint makers; patent-leather makers; printers; rubber workers; sealing-wax makers; shellac makers; transfer workers (pottery); turpentine extractors; varnish makers. |

## SKIN IRRITANTS.

Because of the fact that dermatoses form such a large proportion of all occupational diseases and are often disabling, the more important occupations that are exposed to skin irritants have been listed separately. A complete enumeration of such occupations would be impossible. Almost any foreign substance can become a skin irritant if it is in continuous contact with the skin. Thus soap and water, which ordinarily do not irritate the skin, may cause severe dermatoses in washerwomen.

The data presented below are a compilation of the literature on the subject, taken largely from Dr. R. Prosser White's compilation of "Occupational Affections of the Skin."

Skin affections caused by different external irritants often show the same clinical picture. A number of occupational skin eruptions have no specific lesions or special pathology, which makes their differential diagnosis very difficult. Most superficial industrial skin diseases show simply a difference in degree of catarrhal inflammation, depending on the intensity of the irritant. For these reasons the symptoms for each irritating substance have not been listed as has been done for the other hazards.

Occupational dermatoses are characterized by their grouping, situation, mode of appearance, spread, and evolution. They crop up in series, retaining their initial type throughout, unless they are secondarily infected. They are most often local, except when they are a differentiating sign of the toxemias. The onset and development are usually sudden. The inflammation is sharply outlined. Exudation is excessive and there is deep-seated edema. The eruption usually predominates on the right side.

There are many cases of dermatitis which are caused by physical agents, such as heat, cold, friction, etc. In this bulletin these conditions are dealt with only as they are related to the hazards listed.

Thus among the symptoms for "Extreme dry heat" and "Extreme light" we find skin eruptions.

The following is the list of the more common occupations exposed to dermatoses with the irritating substances concerned:

*Occupation exposed to specified skin irritants.*

| Occupation exposed. | Skin irritants. |
| --- | --- |
| Acetylene makers | Calcium carbide. |
| Acid workers | Acids. |
| Alkali-salt makers | Caustic alkali. |
| Artificial-flower makers | Caustic alkali, dyes. |
| Bakelite makers | Formaldehyde, phenol. |
| Barbers | Soap, hair-tonics. |
| Battery (dry) makers | Acids, zinc chloride, ammonium salts, charcoal. |
| Bestermin (paper and pulp) | Caustic alkali, dyes. |
| Bleachers (cloth) | Acids, bleaching powder, caustic alkali, hydrogen peroxide, sodium silicate. |
| Blenders (tannery) | Dyes. |
| Bobbin carriers | Nitrobenzol, aluminum salts, formaldehyde, magnesium salts, sodium fluosilicate. |
| Bricklayers | Lime. |
| Bronzers | Dyes. |
| Broom makers | Dyes, vegetable dust. |
| Calico-printers | Dyes. |
| Candy makers | Sugar. |
| Cap loaders | Mercury compounds. |
| Carbide makers | Calcium carbide. |
| Carbolic-acid makers | Caustic alkali, phenol. |
| Cardboard stickers | Sodium silicate. |
| Carroters (felt hats) | Acids, mercury compounds. |
| Cartridge dippers | Acids, soap. |
| Celluloid makers | Dyes. |
| Cementer (rubber shoes) | Benzine, coal-tar products, naphtha, methyl alcohol. |
| Cement workers | Lime. |
| Cloth preparers | Acids, caustic alkali, lime, soap, potassium salts, sodium salts, sodium silicate. |
| Confectioners | Sugar. |
| Cotton sizers | Acids, zinc, chloride, arsenic salts, phenol. |
| Curriers (tannery) | Paraffin, benzine. |
| Dampers (conditioning cotton) | Nitrobenzol, aluminum salts, formaldehyde, magnesium salts, sodium fluosilicate. |
| Dentists | Procain. |
| Detonator cleaners | Mercury compounds. |
| Detonator fillers | Mercury compounds. |
| Detonator packers | Mercury compounds. |
| Disinfectant makers | Formaldehyde. |
| Druggists | Bleaching powder, soap, iodoform, sodium salts, sugar. |
| Dye makers | Acids, benzine, caustic alkali, coal-tar products, dye intermediates, dyes, turpentine, antimony compounds, barium salts, calcium salts, cresol, dextrins, ferrocyanides, formaldehyde, gums, hydroquinone, lead salts, phenol, potassium chlorate. |
| Dyers | Dyes. |
| Electroplaters | Acids, benzine, caustic alkali, lime, potassium cyanide, soap, nickel sulphate. |
| Embalmers | Formaldehyde. |
| Engravers | Acids, caustic alkali, ferric chloride, potassium cyanide. |
| Etchers | Acids, caustic alkali. |
| Explosives workers | Dye intermediates, explosives (TNT, etc.), ammonium salts, bromine, mercury compounds. |
| Felt-hat makers | Acids, mercuric nitrate, dyes. |
| Fish dressers | Brine. |
| Flax spinners | Lime, brine. |
| Furniture polishers | Benzine, caustic alkali, naphtha, turpentine, methyla lcohol, pyridin, rosin. |
| Fur workers | Dyes. |
| Galvanizers | Ammonium chloride. |
| Gas-mantle impregnators | Thorium compounds. |
| Glass blowers | Charcoal, pitch, rosin. |
| Glass mixers | Caustic alkali. |
| Ink makers | Dyes. |

914        DIVISION OF PREVENTIVE MEDICINE.        Vol. XVII.

*Occupation exposed to specified skin irritants*—Continued.

| Occupation exposed. | Skin irritants. |
|---|---|
| Lampblack makers | Soot. |
| Laundry workers | Caustic alkali, soap. |
| Lime burners | Lime. |
| Lime pullers (tannery) | Lime. |
| Linoleum makers | Dyes. |
| Machinists | Cutting compounds, lubricants, oils. |
| Masons | Lime. |
| Match-factory workers | Dyes, dextrins, gums. |
| Mercerizers | Acids, caustic alkali. |
| Mixers (rubber) | Accelerators (hexamethylenetetramine). |
| Mordanters | Acids, caustic alkali, chromates, zinc chloride, aluminum salts, antimony compounds, arsenates, chromium salts, copper salts, iron salts, lead salts, phosphates, silicates, tin salts. |
| Mottlers (leather) | Dyes. |
| Nickel platers | Zinc chloride, nickel sulphate. |
| Nitroglycerin makers | Acids, explosives. |
| Packing-house employees | Brine. |
| Painters | Acids, caustic alkali, paints, zinc chloride. |
| Paint makers | Paints. |
| Paper-box makers | Glue. |
| Paraffin workers | Paraffin. |
| Parchment makers | Zinc chloride. |
| Pencil (colored) makers | Dyes. |
| Petroleum refiners | Caustic alkali, paraffin. |
| Photographers | Acids, eau de alkali, chromates, metol, pyrogallic acid, turpentine, amidol, bronzing powder, hydroquinone, rodinal. |
| Photographic plate cleaners | Caustic alkali. |
| Pitch workers | Pitch. |
| Plasterers | Lime. |
| Polishers | Caustic alkali, naphtha. |
| Polishers (silver and brass) | Potassium cyanide. |
| Printers | Ink, benzine. |
| Rock-salt workers | Brine. |
| Rope makers | Oil, tar. |
| Rubber workers | Accelerators (hexamethylenetetramine). |
| Salt preparers | Brine. |
| Scratch brushers (electroplating) | Acids, benzine, lime, oils. |
| Shell borers | Explosives (TNT, etc.). |
| Shoe finishers | Benzine, coal-tar products, naphtha, methyl alcohol. |
| Sizers (cotton) | Zinc chloride, aluminum salts, calcium salts, magnesium salts. |
| Soap makers | Caustic alkali, soap, vegetable oils, sodium silicate. |
| Sodium hydroxide makers | Caustic alkali. |
| Solderers | Acids, zinc chloride. |
| Sugar refiners | Sugar. |
| Tannery workers | Acids, lime, sodium sulphide, arsenic salts, brine, calcium hydrosulphide, chromium salts. |
| Temperers | Oil, brine. |
| Tinners | Zinc chloride. |
| Tobacco rollers | Vegetable dust, vegetable oils. |
| Tube layers (cotton conditioning) | Nitrobenzol, aluminum salts, formaldehyde, magnesium salts, sodium fluosilicate. |
| Typists | Carbon paper. |
| Vulcanizers | Accelerators (hexamethylenetetramine). |
| Washers | Caustic alkali. |
| Washwomen | Caustic alkali, soap, sodium salts. |
| Watchmakers | Potassium cyanide. |
| Waterproofers (paper) | Paraffin. |
| Wax-ornament makers | Dye intermediates, potassium cyanide. |
| Wet-bobbin winders | Lime, aluminum salts, formaldehyde, magnesium salts, sodium fluosilicate. |
| Wood preservers | Tar, zinc chloride. |
| Zinc-chloride makers | Acids, zinc chloride. |



# HANDBOOK

OF THE

# HOSPITAL CORPS

## UNITED STATES NAVY

## 1939

⚓

PUBLISHED BY

THE BUREAU OF MEDICINE AND SURGERY

UNDER THE AUTHORITY OF

THE SECRETARY OF THE NAVY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1939

For sale by the Superintendent of Documents, Washington, D. C. - - - - - - Price $1.75 (Buckram)

DEFENDENT'S
EXHIBIT
Buffalo Pumps

14

EXHIBIT E

1



BUREAU OF MEDICINE AND SURGERY,
NAVY DEPARTMENT,
*Washington, D. C., July 1, 1939.*

The Handbook of the Hospital Corps, United States Navy, 1939, is a revised edition of the former Handbook of the Hospital Corps, United States Navy, 1930, and is compiled from articles prepared by members of the Medical, Dental, Hospital, and Nurse Corps, U. S. Navy, and reviewed and revised by Commander W. J. C. Agnew, Medical Corps, and Chief Pharmacist N. L. Saunders, U. S. Navy. It is published for the instruction and guidance of members of the Medical Department of the United States Navy and for use at the Hospital Corps Schools.

The use in this volume of certain portions of the text of the United States Pharmacopœia is by virtue of permission received from the Board of Trustees of the United States Pharmacopeial Convention. The said Board of Trustees is not responsible for any inaccuracy of quotation nor for any errors in the statement of quantities or percentage of strengths.

Permission to use for comment parts of the National Formulary, Sixth Edition, in this volume has been granted by the Committee on Publications by authority of the American Pharmaceutical Association.

Authority for use of New and Nonofficial Remedies, 1935 Edition, has been granted by the American Medical Association.

ROSS T. McINTIRE,
*Surgeon General, U. S. Navy.*

II



MEDICINE AND SURGERY,
NAVY DEPARTMENT,
Washington, D. C., July 1, 1939.

ed States Navy, 1939, is a revised
spital Corps, United States Navy,
red by members of the Medical
rvy, and reviewed and revised by
ps, and Chief Pharmacist N. L.
the instruction and guidance of
Jnited States Navy and for use at

s of the text of the United States
eived from the Board of Trustees
ion. The said Board of Trustees
ptation nor for any errors in the
ngths.

se National Formulary, Sixth Edi-
he Committee on Publications by
sociation.
Remedies, 1935 Edition, has been

Ross T. McINTIRE.
Surgeon General, U. S. Navy.

## TABLE OF CONTENTS

| | Page |
|---|---|
| FOREWORD | v |
| CHAPTER I. HISTORY OF THE HOSPITAL CORPS | 1 |
| II. ANATOMY AND PHYSIOLOGY | 5 |
| III. SECTION 1. MINOR SURGERY AND FIRST AID | 85 |
| SECTION 2. BANDAGES AND BANDAGING | 131 |
| SECTION 3. SPLINTS AND APPLIANCES | 148 |
| SECTION 4. EMERGENCY DENTAL TREATMENT | 165 |
| IV. SECTION 1. MATERIA MEDICA AND THERAPEUTICS | 177 |
| SECTION 2. TOXICOLOGY | 257 |
| V. SECTION 1. NURSING | 271 |
| SECTION 2. WARD MANAGEMENT | 344 |
| SECTION 3. OPERATING ROOM AND SURGICAL TECHNIQUE | 356 |
| VI. SECTION 1. HYGIENE AND SANITATION | 371 |
| SECTION 2. ALLERGY | 469 |
| SECTION 3. GENITO-URINARY AND VENEREAL DISEASES | 490 |
| SECTION 4. PREVENTION OF VENEREAL DISEASES | 511 |
| SECTION 5. INDUSTRIAL MEDICINE AND INDUSTRIAL HAZARDS | 514 |
| SECTION 6. FIELD SANITATION | 521 |
| SECTION 7. DUTY WITH MARINE CORPS EXPEDITIONARY FORCES | 564 |
| SECTION 8. LANDING FORCE | 570 |
| SECTION 9. SHORE PATROL | 574 |
| VII. DIETS AND MESSING FOR THE SICK | 579 |
| VIII. PHARMACY | 599 |
| IX. CHEMISTRY | 643 |
| X. ANAESTHESIA | 735 |
| XI. SECTION 1. ADMINISTRATION AND GENERAL CLERICAL PROCEDURES | 749 |
| SECTION 2. HOSPITAL SUPPLIES AND PROPERTY ACCOUNTABILITY | 774 |
| SECTION 3. COMMISSARY SUPERVISION | 804 |
| SECTION 4. DEATHS AND MEDICO-LEGAL MATTERS | 833 |
| XII. HOSPITAL CORPS TECHNICAL SPECIALTIES | |
| SECTION 1. AVIATION MEDICINE | 847 |
| SECTION 2. BASAL METABOLISM | 849 |
| SECTION 3. BLOOD GROUPING AND MATCHING | 856 |
| SECTION 4. CHEMICAL WARFARE | 862 |
| SECTION 5. DIVING AND SUBMARINE DUTY | 872 |
| SECTION 6. ELECTROCARDIOGRAPHY | 879 |
| SECTION 7. EMBALMING | 882 |
| SECTION 8. INDEPENDENT DUTY | 887 |
| SECTION 9. LABORATORY PROCEDURES AND TECHNIQUE | 889 |
| SECTION 10. PHYSICAL THERAPY | 917 |
| SECTION 11. RECRUITING | 936 |
| SECTION 12. X-RAY | 940 |
| INDEX | 969 |

iii

3

# FOREWORD

In this 1939 edition of the Handbook of the Hospital Corps, U. S. Navy, the subject matter has been revised, enlarged, and brought up-to-date, as nearly as possible, with the sciences which are briefly discussed in the various chapters and sections.

The handbook is intended to serve as a general guide and reference book for the hospital corpsmen of the Navy, especially those performing duty independent of medical officers, and as a textbook for their instruction in the Hospital Corps Schools and elsewhere. It contains information and instructions concerning the duties of the Hospital Corps of the Navy, but hospital corpsmen, particularly those in the upper ratings, are urged to make frequent reference to the U. S. Navy Regulations, the Manual of the Medical Department, U. S. Navy, the manuals of other Navy Department bureaus, circular letters, etc., for additional information and instructions.

The principal subjects have been arranged in the order in which they occur in examinations for advancement in rating. As these subjects necessarily are presented in epitomized form, readers of the handbook should realize that the information contained in it must be supplemented by reference to the standard textbooks and professional journals usually available in the medical libraries of hospitals, ships, and stations.

The Bureau of Medicine and Surgery herewith expresses appreciation to the following-named members of the Medical Department, U. S. Navy for the time and effort spent in preparing, reviewing, and revising the material for this book:



| | |
|---|---|
| Captain J. Harper, (MC), U. S. Navy | |
| Commander G. B. McArthur, (MC), U. S. Navy | Anatomy and Physiology. |
| Commander M. D. Willcutts, (MC), U. S. Navy | Minor Surgery and First Aid. Bandages and Bandaging. |
| Captain H. E. Harvey, (DC), U. S. Navy | |
| Captain W. L. Darnall, (DC), U. S. Navy | Emergency Dental Treatment. |
| Commander R. S. Davis, (DC), U. S. Navy | |
| Chief Pharmacist E. G. Swann, U. S. Navy | Materia Medica and Therapeutics. Pharmacy. |
| Chief Pharmacist A. T. Schwartz, U. S. Navy | Toxicology. |
| Pharmacist P. S. Gault, U. S. Navy | |
| Chief Nurse J. Ferris, U. S. Navy | Nursing. |
| Chief Nurse F. W. Hoyle, U. S. Navy | Ward Management. |
| Commander G. A. Eckert, (MC), U. S. Navy | Operating Room and Surgical Technique. |
| Lieutenant O. L. Burton, (MC), U. S. Navy | Hygiene and Sanitation. Prevention of Venereal Diseases. |
| Lieut. Commander F. M. Rohow, (MC), U. S. Navy | Allergy. |
| Commander M. S. Mathis, (MC), U. S. Navy | Genito-urinary and Venereal Diseases. |

v



VI                                        FOREWORD

Commander H. L. Shinn, (MC), U. S. Navy\_\_\_ Industrial Medicine and Indus-
                                         trial Hazards.
Captain W. L. Mann, (MC), U. S. Navy\_\_\_\_\_ Field Sanitation.
Commander W. T. Brown, (MC), U. S. Navy\_\_ Duty with Marine Corps Expe-
                                         ditionary Forces.
Commander L. D. Arbuckle, (MC), U. S. Navy\_ {Landing Force.
                                           {Shore Patrol.
Nurse R. Dunbar, U. S. Navy_____ Diets and Messing for the Sick.
Lieut. Commander C. L. Bozarth, (MC), U. S.}
  Navy_____}Chemistry.
Pharmacist's mate second class, J. F. Reid,}
  U. S. Navy_____}
Captain F. L. Conklin, (MC), U. S. Navy\_\_\_\_ Anaesthesia.
Chief Pharmacist N. L. Saunders, U. S. Navy\_ Administration and General
                                         Clerical Procedures.
Division of Finance, Bureau of Medicine} Hospital Supplies and Property
  and Surgery.                         } Accountability.
Chief Pharmacist J. H. Bell, U. S. Navy\_\_\_\_ Commissary Supervision.
Captain C. W. O. Bunker, (MC), U. S. Navy\_\_} Deaths and Medico-Legal Mat-
Chief Pharmacist R. Aikman, U. S. Navy\_\_\_\_\_} ters.
Commander J. C. Adams, (MC), U. S. Navy\_\_\_ Aviation Medicine.
Commander J. M. McCants, (MC), U. S. Navy\_ Basal Metabolism.
Commander H. E. Eagle, (MC), U. S. Navy\_\_\_ Blood Grouping and Matching.
Commander B. H. Adams, (MC), U. S. Navy\_\_ Chemical Warfare.
Commander F. S. Johnson, (MC), U. S. Navy\_ Diving and Submarine Duty.
Captain C. R. Baker, (MC), U. S. Navy\_\_\_\_\_ Electrocardiography.
                                         Embalming. (Based on the
                                         Manual of the Medical De-
                                         partment, U. S. Navy.)
Chief Pharmacist C. P. Dean, U. S. Navy\_\_\_\_ Independent Duty.
Commander O. Wildman, (MC), U. S. Navy\_\_\_ Laboratory Procedures and
                                         Technique.
Lieutenant C. C. Welch, (MC), U. S. Navy\_\_\_ Physical Therapy.
Captain G. E. Thomas, (MC), U. S. Navy\_\_\_\_ Recruiting.
Commander W. A. Fort, (MC), U. S. Navy\_\_\_\_} X-ray.
Commander F. W. Muller, (MC), U. S. Navy\_\_\_}

Appreciation and thanks are herewith expressed for the courtesy of the
American Red Cross, the General Electric X-ray Corporation, and the follow-
ing publishers in permitting the reproduction and use of certain illustrations
appearing in this book: William Wood & Co., for figures 8, 9, 12, 15, 17, 18, 24,
27, 30, 32, 33, 37, 41, 47, and 52; Lea and Febiger for figures 10, 11, 16, 29, 40,
44, 56, 66, 67, 69, 70, 71, 77, 78, 81, and 123; W. B. Saunders & Co., for figures
49, 50, 57, 65, and 147; P. Blakiston's Son & Co., for figures 13, 14, 20, 23, 48,
124, 137, 138, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, and 178; J. B.
Lippincott & Co., for figures 72, 146, and 148; and The Macmillan Co., for
figure 153.

The courtesy of the Medical Department, U. S. Army in permitting use of
the text and the reproduction and use of the illustrations in the Manual of
Splints and Appliances of the U. S. Army, is acknowledged.

The assistance of Pharmacist's mate first class C. E. Otwell, Jr., U. S. Navy,
in preparing the index and typewriting much of the manuscript and of Chief
Pharmacist's mate, J. A. McCalley, U. S. Navy, and Pharmacist's mate third class
M. J. Hadden, U. S. Navy, in preparing a number of the sketches and illustra-
tions is acknowledged.

It should always be remembered that diseases that have attacked more than half the men of the country during youth, diseases that bring misery to thousands of children and suffering to hundreds of thousands of women innocently infected, and that are incurred almost exclusively through promiscuous sexual intercourse, are diseases to be avoided. It should also be remembered that the man who practices promiscuous cohabitation almost invariably contracts one of the venereal diseases, sooner or later, in spite of every precaution. And if sufficient moral stamina to resist sexual temptation is not possessed, then it must be remembered to take prophylactic treatment as soon as possible after exposure.

REFERENCES

Syphilology.—Stokes.
Practice of Urology.—Young.
Hospital Corps Handbook, U. S. Navy, 1923

## Section 5.—INDUSTRIAL MEDICINE AND INDUSTRIAL HAZARDS

Industrial Medicine is that branch of medicine which deals with the prevention of diseases and injuries among industrial workers. Strictly speaking, industrial medicine has become of such importance in late years, that it is not now limited to workers, but endeavors to promote good health and increase the life span of the entire people.

Its purposes or aims are to insure good health, the prevention of avoidable accidents, to alleviate unnecessary suffering and thereby provide contentment and promote more efficient work. It further deals with the rehabilitation of diseased and injured persons and reclassifies them to work in such positions as their disabilities will permit, thereby obviating the necessity for their becoming public charges and insuring them a livelihood.

Industrial Medicine is akin to Hygiene and Sanitation and Preventive Medicine, but spreads out to embrace accident prevention as well. Its aims are accomplished by endeavoring to reduce the health and accident hazards to a minimum by education, safety devices and precautions, periodic physical examinations, cooperation of employees, and by the passage of laws for the protection of the workers.

The need for the development of this branch of Medicine is apparent to all, when it is known that in the sixteenth century the average life expectancy of the working man was 22 years, as compared to 44 years for those of the upper classes. The working men were really slaves. They worked from 12 to 20 hours daily, 7 days a week. They were subjected to forms of health hazards about which little or nothing was known. The death of the men was considered a natural course of events.

The value of Industrial Medicine to the workers has been clearly manifest. Today, the average working man in industry may well expect to live to the age of 50 with still a better outlook for the future when the hazards to health and accident are better understood and safety measures are developed and perfected to protect against such hazards.

In this country today, every employee is protected by laws which require that certain standards of protection be maintained against health and accident hazards. Compensation laws are in force to require the payment of disability benefits to those incapacitated by accident or disease which were connected with their employment.

6

hat have attacked more
seases that bring misery
of thousands of women
clusively through promis-
ded. It should also be
ious cohabitation almost
sooner or later, in spite
to resist sexual tempta-
ke prophylactic treatment

### ID INDUSTRIAL

hich deals with the pre-
nkers. Strictly speaking,
in late years, that it is
iote good health and in-

a prevention of avoidable
reby provide contentment
with the rehabilitation
m to work in such post-
ng the necessity for their
d.

ion and Preventive Medi-
n as well. Its aims are
nd accident hazards to a
s, periodic physical exam-
of laws for the protection

dicine is apparent to all,
average life expectancy
14 years for those of the
They worked from 12 to
cted to forms of health
he death of the men was

as been clearly manifest
rell expect to live to the
hen the hazards to health
sures are developed and

d by laws which require
ainst health and accident
the payment of disability
se which were connected

A National Safety Council was established in 1912 and its slogan of "Safety First", has become a by-word in all homes. In 1914 a health section composed largely of Industrial Surgeons, was incorporated as part of the association. Thus the need of medical advice in industry was established. It is a well-recognized fact that the "human machine" constitutes a very definite hazard to health and accident. The medical man therefore must form a definite part of any industrial organization. Today, the National Safety Council in America is one of the greatest organizations of its kind and by its help has put the working conditions in this country on a very high plane and the industrial worker has reaped the benefits.

Today, every industry in this country, no matter how large or how small, has its medical staff, or its equivalent. Many large industries have their own hospitals and medical staffs; others have contract surgeons but all are required in one form or other to give medical attention to the employees under them. The Government having passed such laws must therefore lead the way in protecting its own employees. The United States Navy is one of the largest of the industries maintained by this Government. An organization has been set up in the Navy to protect its personnel, both civilian and naval. A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy. He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like. He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities. A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented. Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of the medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea. In each of these places a variety of health hazards exist. It is therefore necessary that this personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

An occupational hazard is any condition, existing in the trades, which will lead directly or indirectly to disease or injury. No method can be devised for classifying hazards for they are too numerous. However, they may be grouped under the following headings:

1. Those hazards present in the working force by reason of physical defect.
2. Those hazards found in the working places, including hygienic and sanitary defects, mechanical defects of machinery, lack of safety education and the like.
3. Those hazards presented by carelessness of employees. A large majority of accidents are due to this cause alone.
4. Those hazards due to unforeseen influences such as lightning, earthquake, tornado, and the like.

Industrial accidents may be prevented by an understanding of the hazards presented in the foregoing groups, by:

1. Thorough physical examination of all new employees, prior to their actual employment, to discover potential physical defects which would render the em-



ployee a hazard to himself or others. An example of this would be a person with manifestly defective vision being employed as a machinist. Physical examination of all regular employees periodically, to determine their ability to continue working at their trade and to reclassify them to less hazardous work or to retire them, as found necessary in individual cases. Repeated examination of all employees engaged in hazardous trades such as sandblasting, painting, chrome plating, T. N. T. handling, and others, to determine any possible systemic effects present as a result of their trade.

2. A constant and thorough inspection of all shops and working places by the safety engineer, the medical officer, and their assistants to determine the causes of accidents, the hazards to health and the immediate correction of these faults. Education of the employees by means of lectures, motion pictures, posters, and such, will further accomplish much in the line of prevention.

3. The prevention of carelessness by indoctrination of all employees with the spirit of prevention and building up a spirit of cooperation and high morale among them. If necessary, disciplinary measures should be taken when workers are habitually careless.

4. Providing, in so far as is possible, means of protection and escape in cases of disaster.

An exact classification of occupational diseases is difficult, in view of the great number and types of diseases presented by the industry. There is such a great variety and number of skin diseases in the trades that they are generally grouped under the heading of *Occupational* or *Trade Dermatoses*. It is sufficient to state here that practically all diseases and injuries may be associated with industry.

To successfully carry out the objects of Industrial Medicine the medical personnel of the Navy must know:

1. The organization of a safety unit of an industry and the duties of each of the personnel.

2. The hazards to health and accident presented by the particular industry to which they are attached.

3. The methods and means of protection to be established against the encountered hazards.

4. The treatment of industrial diseases and injuries.

5. The laws relating to compensation and treatment of sick and injured personnel, including a knowledge of the necessary reports and returns to be submitted in such cases.

For the purpose for which this book is intended, it seems sufficient to give the hospital corpsmen a general idea of the organization, hazards, protection, treatment and laws as related to the Navy, rather than to try to discuss Industrial Medicine as a whole. This may well be done by discussing the safety organization and its associated duties at a navy yard, for those in force at navy yards are applicable to a greater or lesser degree throughout the Navy. These will be considered in the order given.

**Organization.**

At all navy yards, the Commandant is the head of the organization. He is responsible to the Navy Department for the protection of the employees, as well as the naval personnel, under his command. He is familiar with the nature of the work being performed by the employees at his station and the health and accident hazards presented. Accordingly, he appoints, as the working head of the organization, a safety officer or a safety engineer, as he is better known. The safety engineer must be of sufficient rank and service to have

INDUSTRIAL MEDICINE 517

his would be a person with
thist. Physical examina-
e their ability to continue
hazardous work or to re-
Repeated examination of
Blasting, painting, chrome
y possible systemic effects

and working places by the
ts to determine the causes
correction of these faults.
tion pictures, posters, and
vention.

of all employees with the
peration and high morale
uld be taken when workers

lection and escape in cases

s difficult, in view of the
industry. There is such a
les that they are generally
ds Dermatoses. It is suf-
injuries may be associated

Medicine the medical per-

ry and the duties of each

by the particular industry

established against the en-

t.
nt of sick and injured per-
ris and returns to be sub-

it seems sufficient to give
ration, hazards, protection,
than to try to discuss in-
ne by discussing the safety
ard, for those in force at
gree throughout the Navy.

of the organization. He is
tion of the employees, as
He is familiar with the
ees at his station and the
he appoints, as the work-
fety engineer, as he is bet-
t rank and service to have

become familiar with the various trades in a navy yard, a knowledge of machinery, a man of cooperative ability and well liked, and having sufficient knowledge of safety devices and appliances to intelligently make inspections and recommend proper protective measures. His duties are primarily, to prevent accidents and promote healthy working conditions. It is his duty to inspect all working places, make a general survey of all mechanical conditions and to recommend the addition of all necessary safety appliances for the protection of the workers. He must make daily inspections of the shops to see that these safeguards are in working order and are being used. He must investigate all major accidents in order to determine the cause and recommend methods to prevent a similar accident. There should be full cooperation between him and the medical officer. All improvements come under his supervision.

The Commandant further assigns a medical officer to act as advisor to the safety engineer. The medical officer must be of the same qualifications as the safety engineer, with the addition that he must be thoroughly versed in the diseases connected with Industry. He need not have a thorough knowledge of machinery but must understand sufficient of the operation of the various machines to intelligently advise the safety engineer in matters relating to the development of safety devices. The duties of the medical officer are as follows, and in this connection it is well for members of the Hospital Corps to understand the nature of these duties in order that they may be of assistance to him in the performance of these duties:

The medical officer is the safety engineer of the human body. He acts as consultant to the safety engineer in all matters pertaining to the general welfare and health of the employees. Hygiene and sanitation are his important duties. He must interest himself in the employees and instruct them in the every day principles of personal hygiene and self preservation. He must instruct the employees in safety measures and encourage them to cooperate in protective measures. They must be made "safety conscious" or "safety minded". The morale must be kept up. A high morale leads to fewer accidents and better workmanship. The medical officer must inspect all working places in order to have a better understanding as to the actual conditions under which the men work. He must make appropriate recommendations to improve deficiencies noted and must then see that these recommendations are carried out. He must personally make all physical examinations of prospective employees or see that the physical standards for employment are adhered to. He must make physical examinations of all employees believed to be physically unfit for further work to prevent them from injuring themselves or others. He must further treat and view the scene of all accidents to be able to determine their cause and to assist the safety engineer in formulating plans to prevent recurrence. He must so organize the personnel under him that prevention will be effectively handled.

The safety engineer is assisted in his work by the foremen of the shops and in some instances by safety committees in each shop elected by the employees. These men or committees are generally chosen from among the older employees and from men who have considerable experience in their trade. It has been repeatedly recommended, but not as yet accomplished, that the safety organization be enlarged by the creation of two new civil service ratings. These are, a civilian safety engineer and a civilian assistant safety engineer. These men would be appointed by competitive examination and should be men who have had considerable experience in the trades with a liberal understanding of all. They would act as assistants to the naval safety officer and would be of great value to the organization, inasmuch as their duties would be permanent. A



518    HANDBOOK OF THE HOSPITAL CORPS, U. S. NAVY

naval officer is subject to change of duty and cannot act as permanent safety officer. In changing the safety officers at intervals a weakness is left in the organization which the civilian assistants could well fill, until such time as the new officer became familiar enough with his new duties to take hold.

The organization of the medical advisor is composed of junior medical officers, dental officers, to some extent, members of the Hospital Corps, and of nurses. The duties of the hospital corpsmen are to assist the medical officer in his inspections, assist in the treatment of the injured and to prepare the necessary reports and returns in cases of accident, occupational disease, and the physical examination of employees. This, then, is briefly the organization of a safety unit in a navy yard. This unit will function as well aboard a battleship or in other places. The commanding officer of a ship is the head of the organization. He is assisted by the First Lieutenant acting as safety engineer. Division Officers act as assistants to the First Lieutenant and safety committees are elected in each division from among the crew. The medical officer is the advisor to the safety engineer and he in turn is assisted by the dental officer and hospital corpsmen. All that is necessary for the unit to function is that a study be made of the hazards presented aboard ship and to proceed as explained later.

Hazards to health and accidents.

The organization completed, a study must be made to determine the hazards ... ting in the particular organization to which the unit is attached. There ... major hazards and minor hazards. A major hazard is represented by unguarded machinery or improperly, or faulty insulated electrical wiring. A minor hazard is a greasy shop floor, loose articles lying around on the deck or an open, unguarded hatchway aboard ship. It must be remembered that no two industries present the same hazards. There are hazards peculiar to each trade or profession. Efforts must therefore be made by the safety organization to locate these hazards and afford protection accordingly. To indicate just what types of hazards may be encountered while working with a safety unit of a navy yard and in an effort to make the subject of hazards a little clearer to the readers the following questionnaire, prepared by the inspector of the Medical Department Activities of the West Coast is quoted in part. This questionnaire represents a very thorough picture of the major hazards with which a safety unit of a navy yard must cope, aside from the many minor ones always present in any organization. Answers to these questions must be made not only to the inspecting officer but they must in some form or other be answered daily if the organization is to be successful. By this is meant that problems of this nature are a daily occurrence and the safety unit must be prepared to meet them at once and not wait to formulate answers at inspection intervals.

"Q. 1. What industrial processes employ lead at some stage of the work? This includes tetraethyl lead. How many workers are exposed to lead? What precautions are taken to prevent damage to workers using lead? How frequently are workers using lead checked to determine possible absorption of this element?

"Q. 2. What industrial processes employ chromium at some stage of the work? What precautions are employed to safeguard workers from chromium poisoning?

"Q. 3. What processes create a possible dust hazard? What precautions are observed to prevent damage to workers exposed to dust? Are routine examinations made of the chests of workers exposed to dust? Are X-rays made to de-

annot act as permanent safety
vals a weakness is left in the
well fill, until such time as the
duties to take hold,

composed of junior medical
of the Hospital Corps, and of
re to assist the medical officer
he injured and to prepare the
ient, occupational disease, and
hen, is briefly the organization
vill function as well aboard a
f officer of a ship is the head-
st Lieutenant acting as safety
he First Lieutenant and safety
among the crew. The medical
l he in turn is assisted by the
that is necessary for the unit
rds presented aboard ship and

made to determine the hazards
h the unit is attached. There
ijor hazard is represented by
insulated electrical wiring. A
cles lying around on the deck
.It must be remembered that
There are hazards peculiar to
fore be made by the safety
rd protection accordingly. To
ountered while working with a
make the subject of hazards a
uestionnaire, prepared by the
r of the West Coast is quoted
thorough picture of the major
ard must cope, aside from the
ganization. Answers to these
cting officer but they must in
rganization is to be successful
are a daily occurrence and the
once and not wait to formulate

d at some stage of the work?
ers are exposed to lead? What
workers using lead? How fre-
termine possible absorption of

romium at some stage of the
guard workers from chromium

hazard? What precautions are
to dust? Are routine examina-
dust? Are X-rays made to de-

termine the presence of silicosis in workers exposed to dust? Have cases of silicosis developed?

"Q. 4. What industrial processes produce fumes which may be a health hazard? How are these fumes controlled?

"Q. 5. What industrial processes produce carbon monoxide in possible danger-ous concentrations? What industrial processes produce carbon dioxide in possible dangerous concentrations? Have any cases of poisoning from these sources occurred?

"Q. 6. What processes employ volatile solvents during some stage of the work? Are aniline compounds used? Has damage occurred from their use?

"Q. 7. Are organic wax compounds used? Has damage occurred?

"Q. 8. What precautions are exercised to prevent damage from pipe covering compounds? What asbestos hazards exist?

"Q. 9. What precautions are taken to prevent damage from glass wool?

"Q. 10. What radio-active compounds are used on the station and what precautions are used to prevent damage from this and luminous paints?"

These are but a few of the questions asked but they serve the purpose for which they were intended, i. e., to indicate just what is meant by a health hazard and ones which must be studied in Industrial Medicine..

Protection.

Having made a survey to determine the hazards presented in the organization to which one is attached, means of protection must be sought. This is done first by protecting against physical hazards by employing physically fit men. In the Government, the physical standards are set according to the employment and the hazards to be met with in each type of work. The U. S. Civil Service standards are as follows:

1, For employment in arduous duties. Must be physically sound and in good health, active and able bodied. Rating "A". For some positions e. g. divers, requirements are specially rigid. Rating "A plus".

2. For less arduous employment. Requiring sound general health but less physical strength, though for some employment special requirements exist, i. e, perfect color preception for brakemen and chauffeurs. Rating "B".

3. For lighter and usually sedentary employments. General good health but minor anatomical defects not interfering with efficient performance of work may be passed, i. e. a typist may be lame.

Next, having employed a healthy working force it is necessary to protect their health. Proper working places must be provided and maintained. Hygienic and sanitary conditions must be kept on a high plane. All moving parts of machinery must be guarded; goggles provided for workers required to use them; helmets and masks for sand blasters; proper ventilation for the chrome workers; masks for asbestos workers; protection for workers in X-ray and radium; protective gloves, shoes, and other garments for foundry workers, and other means of protection too numerous to mention here must be available and used.

Special physical examinations must be made of all sand blasters, asbestos handlers, those exposed to radium and its compounds, lead workers, those engaged in dusty or smoky trades, handlers of T. N. T. and other explosives, etc., to prevent the occurrence of the diseases associated with those trades from injuring the men.

As mentioned before, all workers who are sick for any length of time and whose efficiency has fallen off because of physical reasons must be examined and either retired or reclassified.

**Treatment.**

The treatment of industrial diseases and injuries is essentially that for any others. All accidents are treated according to the severity and locality. Men are not allowed to treat themselves for even minor accidents by reason of the dangers of infection and later incapacity. The treatment of diseases of occupation is a specialty in itself and need not be considered here.

**Laws governing workers and accidents occurring during work.**

The laws governing occupational diseases and injuries are quite numerous. It is therefore essential that a hospital corpsman be familiar with only those pertaining to Government employees. These, in general, are as follows:

All men injured or taken sick during the course of their employment are required to report to the dispensary for treatment. It makes no difference how trivial the accident or how minor the illness, he must still report. No first-aid boxes are allowed in any of the shops or offices. When a man reports, his injury or illness is investigated, treated, or otherwise disposed of. At the U. S. Navy Yard, Puget Sound, Wash., a form report of the case is prepared in quintuplicate, two copies of which are forwarded to the safety engineer, one copy is sent to the foreman of the shop or the supervisor of the office, one is given to the employee, and one placed in his file jacket. A separate file jacket is maintained for each employee who reports to the dispensary for treatment or for any other reason and is a permanent record which is kept during the entire time of employment. The information furnished on this report is as follows: Date; whether report is of injury or return to work; name; rating; pay number; shop; diagnosis; date and hour of injury; date and hour reported to dispensary; whether or not injury is due to employment; disposition (treated and returned to work, given time off, or transferred to naval hospital); name of medical officer treating case; and patient's statement regarding injury.

In addition to this form, a card-index form, U. S. Employees' Compensation Commission Form CA-19, is made out in each case. This form is started when the man reports and when final disposition of the case is made it is likewise filed in the man's jacket.

When an injured employee returns to his shop or office, or when the foreman or supervisor receives his copy of the form report, the foreman or supervisor immediately fills out U. S. E. C. C. Form CA-2, and forwards it to the injury officer, who, in turn, submits it to the dispensary for completion by the medical officer treating the case. The medical officer gets the data for this report from the forms previously described.

U. S. E. C. C. Form CA-3 is forwarded at the termination of total or partial disability of an employee, or upon his death.

U. S. E. C. C. Form CA-4 is a claim for disability allowance or compensation for injuries received which must be submitted by the employee within 60 days after the injury. This form must also be completed by the medical officer attending the case and once again the form report and U. S. E. C. C. Form CA-19 are of value.

U. S. E. C. C. Form CA-8 is similar to Form CA-4 but must be submitted on the first and sixteenth of each month by the employee, during the period of his disability.

When it becomes necessary for an injured employee to have hospital or other treatment not provided by a dispensary or local physician, U. S. E. C. C. Form CA-16 is made out and forwarded with the patient to the hospital or place where he is to receive such additional care.

njuries is essentially that for
ig to the severity and locality.
ven minor accidents by reason
ty. The treatment of diseases
not be considered here.

during work.

d injuries are quite numerous.
an be familiar with only those
general, are as follows:
ourse of their employment are
tment. It makes no difference
ness, he must still report. No
or offices. When a man reports,
or otherwise disposed of. At
a form report of the case, is
h are forwarded to the safety
e shop or the supervisor of the
ed in his file jacket. A separate
e reports to the dispensary for
ermanent record which is kept
information furnished on this
of injury or return to work;
date and hour of injury; date
et injury is due to employment;
ven time off, or transferred to
ting case; and patient's state-

U. S. Employees' Compensation
ch case. This form is started
tion of the case is made it is

hop or office, or when the fore-
m report, the foreman or super-
n CA-2, and forwards it to the
e dispensary for completion by
edical officer gets the data for
L

e termination of total or partial

bility allowance or compensation
by the employee within 60 days
leted by the medical officer at-
port and U. S. E. C. C. Form

CA-4 but must be submitted on
ployee, during the period of his

ployee to have hospital or other
physician, U. S. E. C. C. Form
atient to the hospital or place

Times arise when there is doubt as to the origin of the disability, i. e., whether or not the disability is occupational. In such cases U. S. E. C. C. Form CA–17 is substituted for Form CA–16. Whenever U. S. E. C. C. Forms CA–16 and CA–17 are made out they must be accompanied by U. S. E. C. C. Form CA–20.

U. S. E. C. C. Form CA–21, Discharge Report of Injury Case, is forwarded when an employee is discharged from treatment after having been incapacitated by reason of occupational injury or disease.

U. S. E. C. C. Form CA–32 is a report of hernia and must be submitted in all cases in which claim is made that a hernia was caused by employment.

Numerous other forms, such as public bills for payment for treatment, are used in handling these cases, but as they are accomplished by the injury officer they are not listed here.

Forms showing reports of all physical examinations of employees, including the special examinations previously mentioned, are also kept. These are routine however, and are easily learned when actually engaged in this work. Special forms for W. P. A., E. R. N., and P. W. A. workers are also provided.

In conclusion, it is well to state the qualifications expected of a hospital corpsman engaged in Industrial Medicine.

1. He should realize that his first duty is to the workman who is injured.
2. His personality should inspire confidence.
3. He should have a knowledge of first aid.
4. He should have a knowledge of an efficient medical record system and of statistical methods.
5. He should have a knowledge of working conditions, of occupational hazards and preventive measures.
6. He should possess a general knowledge of industrial relations, including employment, its methods and problems.
7. He should have a working knowledge of the workmen's compensation laws.
8. It would be well for all hospital corpsmen to obtain and read the publication Medical Service in Industry and Workmen's Compensation Laws, 1938, published by the American College of Surgeons as prepared by M. N. Newquist, A. B., B. Sc., M. D., to enhance their knowledge of this subject and thereby be of more value to the medical organization of the Navy for industrial medicine. This publication contains concise, complete statements of the problems of the industrial organization and is of value to all industries.

REFERENCES

Industrial Medicine and Surgery.—Mock, 1931.
Industrial Health.—Kober and Hayhurst.
U. S. Naval Medical Bulletin, January and April, 1935.
Medical Service in Industry and Workmen's Compensation Laws, 1938.
Inspection Questionnaire, West Coast Medical Activities, U. S. Navy.

## Section 6.—FIELD SANITATION

*Health is necessary in war, and cannot be replaced by anything else.—Napoleon*

Introduction

The activities of a medicomilitary organization tend to concentrate toward one primary objective, "The conservation of physical efficiency for combat." The hospital corpsmen of the Navy serve ashore, as well as afloat, and in



EXHIBIT F

UNITED STATES NAVY DEPARTMENT
BUREAU OF MEDICINE AND SURGERY

# ANNUAL REPORT OF THE
# SURGEON GENERAL, U. S. NAVY

CHIEF OF THE BUREAU OF MEDICINE AND SURGERY

TO THE SECRETARY OF THE NAVY

CONCERNING

STATISTICS OF DISEASES AND INJURIES
IN THE UNITED STATES' NAVY

FOR THE CALENDAR YEAR

1939



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1941

DEFENDENT'S
EXHIBIT
Buffalo Pumps

15

ious action of the light.

## INDUSTRIAL MEDICINE

Navy Yard, Charleston, S. C.—In order that claims for industrial injury, may be confined to those receiving such injury by reason of their employment in the navy yard, all applicants for trades listed as potentially hazardous, receive a special examination, including X-ray examination of chest, where necessary, prior to their employment assignment to the hazardous occupation. In addition to the entrance examination, periodical examinations are given during continuance of occupation in such work. This increases the work of the Yard dispensary and involves considerable additional cost to the government by reason of materials expended, but it is believed that the results obtained will prevent any serious industrial injury to the man occupied in hazardous industrial trades and prevent unjust compensation claims to be filed against the Government. As a means of protection to fellow employees and to prevent unjust claims to compensation for injuries alleged to have been received by reason of industrial employment, it is recommended that as a condition of employment all Civil Service applicants be required to have a serological test, with the provision that applicants who show a positive serological reaction but no active lesions, shall be required to have continuous medical treatment until negative serological tests are obtained or the disease is pronounced non-infectious by the Yard medical officer. It is also recommended that where infection occurs subsequent to employment that serological tests be made compulsory. As condition of employment, large private industrial corporations require serological tests prior to employment and at periodic intervals thereafter. If it is found that employees have active syphilitic disease, medical treatment is compulsory unless they are pronounced non-infectious by the company physician. Medical treatment for Civil Service employees could be obtained from private physicians or public clinics, and such treatment could be evidenced by certificates signed by licensed practitioners, but serological examinations should be performed at the Yard dispensary in order that a uniform procedure may be followed.

Puget Sound Navy Yard, Bremerton, Wash.—The average employee of this Navy Yard is safety-minded, and a general spirit of cooperation with regard to accident prevention continues. The safety program has been carried forward with excellent results during the past year, emphasis being placed on education of men through indoctrination of the supervisors. Analysis of representative periods have shown that approximately 90 percent of all accidents are directly attributable to carelessness of the men. The record of 18 lost-time accidents among 5,985 employees as compared with 22 lost-time accidents among 4,022 employees in 1938 is considered very satisfactory.

During the past year the following additional safety measures have been undertaken: (a) a new type of face shield has been obtained for buffing and polishing work which is a great improvement over goggles; (b) new double lenses for helmets have been obtained which are found to be much more satisfactory than the old; (c) salt tablet dispensers have been installed in all shops in which "hot work" is carried on; (d) ventilation of shops and offices has been materially improved, and is continuing to improve as funds become available for projected work; (e) an investigation has shown that men on machine tool work wearing corrective spectacles have only one-eighth the number of edded particle eye injuries as compared to men wearing no spectacles. Or-

dinary cup goggles are unsuitable for most types of machine tool work due to restricted vision. It has been proposed to the Navy Department Safety Engineer that a suitable type of spectacle goggle without side pieces be approved for use on these types of machine tool work; and (f) present Navy specification welding glove has been found to be unsatisfactory, particularly for overhead electric welding. A number of men have been burned due to failure of exposed stitching in this glove. It has been proposed that a more suitable type of glove be approved.

The number of eye injuries among the regular Yard employees was more than double for the calendar year 1938 – 223 for 1938 and 467 for 1939. The increased number of employees can account for some of the increase but the eye injuries have increased out of proportion. Outstanding causes of injuries to the eyes have been poor fitting goggles and failure to use goggles in spite of educational activities on the part of the medical department, injury officer, and supervisors. It is gratifying to note that there were no lost-time eye injuries among the regular Yard force and only one case among the relief workers.

Statistics show a definite increase in all types of injuries among classes of employees except the Emergency Relief, Navy. This increase is out of proportion to the increased personnel and it is believed to be due to the fact that the shop superintendents insist that employees receiving injuries, no matter how slight or insignificant they may seem in extent or severity, report to the Dispensary for treatment. This opinion is supported by the reduction in the actual number of "Injuries resulting in Loss of Time" from 22 during 1938 to 18 during 1939.

Navy Yard, New York, N. Y.—Welding: There are approximately 450 electric welders and 112 gas welders carried on the rolls.

It is well recognized that in the absence of protective measures or with inadequate measures welding incurs certain health hazards, such as toxic gases from the arc of the flame, fumes or dust of metallic oxides of an injurious nature from the coating of certain welding rods, damage to the eyes from ultraviolet rays, etc. The question arises whether or not control protective methods now provided are entirely adequate to prevent occupational diseases in welders under all circumstances.

It was recommended to the Commandant in December 1939, at the suggestion of the Director of the Division of Industrial Hygiene, New York State Department of Labor, that a joint health study of the 930 electric, gas, and tack welders, be conducted by the latter agency and the medical officer of the Yard. The proposed research contemplated medical and occupational histories, physical examinations, and X-ray studies, the funds and bulk of the research staff to be supplied by the New York State Division of Industrial Hygiene.

It was believed that such a study would yield results of great benefit to the workers and that the findings would be significant as a check upon the present methods of control and of value to the U. S. Employees Compensation Commission in relation to certain possible future compensation claims. Other outstanding authorities in industrial hygiene were consulted and all concurred in the view that a large-scale health study of welders was required to settle definitely certain questions relative to hazards of the occupation.

Lead and Lead Compounds: There is little hazard incident to brush painting in this Yard. Lead paint is used, chiefly for the red lead priming coat for the hulls of ships. Zinc, titanium or aluminum paints are largely used for other applications. The enamel paints consist of a zinc base in varnish and turpentine. No cases of lead poisoning have come to the attention of the Medical Department during the period un-

der consideration. Metallic lead is handled in the molten state as a component of Babbitt metal in the Inside Machine Shop (No. 31). This metal contains lead, antimony, and copper. The lead volatilizes at a relatively low temperature. The melting kettles are equipped with a hood connected to an air exhaust system with suitable suction fan pipe and conduit to remove fumes which form on the surface of the molten metal. In addition, a respirator is provided for protection against the inhalation of fumes.

Lacquer painting with spray technique is conducted with lacquers made up of a celluloid base with certain volatile solvents, some fast and some slow drying, which may lead to toxic symptoms if inhaled beyond threshold concentrations.

The Ordnance Machine Shop, Electrical Shop, and Sheet Metal Shop are equipped with hoods connected to adequate exhaust systems. In the Ordnance Machine and Sheet Metal Shops a water spray curtain is also provided for more effective removal of fumes. The spray room of the paint shop is not equipped with a hood, dependence being placed upon an exhaust blower for removal of fumes. This lack of localized exhaust results in a much slower rate of removal of contaminated air. No cases of volatile solvent poisoning were reported during the calendar year.

It is recommended that all spray painters be given an annual examination for evidence of toxic effects of volatile solvents.

Industrial Protection Against X-ray and Radium: (a) X-ray protection.--The Pipefitter Shop is equipped with one portable X-ray machine of 220 kilovolts and 25 milliamperes capacity which was installed approximately two years ago. This is employed chiefly for the detection of flaws in pipe-welded joints for high steam pressure installation. The maximum number of exposures approximates a total of 51 minutes a day. (1) Engineering Control: The X-ray tube is encased in lead of 2mm. thickness. The machine is contained in an enclosure 20 feet by 20 feet bounded by a shield 6-1/2 feet high, 10 feet from the tube in all directions and lined with sheet lead 2mm. thickness on three sides. (2) Medical Control: Four men are assigned as operators of the X-ray and radium installations. One of the earliest effects of radiation exposure is a destructive action on the white and red cells of the blood, more marked on the white cells in the early stages. A procedure has been established for a quarterly blood examination of operating personnel and an examination for possible general radiation injury.

(b) Radium Protection.--The use of radium was initiated 4 to 5 years ago for the detection of flaws in castings constructed for high pressure steam installations, both steel and non-ferrous. A capsule containing 278 mgms. of radium is the source of the radiation, the tests being conducted in the Inside Machine Shop. This is in use for an average of 150 to 200 hours a month. The chief metallurgist reports that high speed films exposed at a distance of 12 feet from the capsule for one hour showed no fogging. It is therefore concluded that employees are not subject to harmful radiation at that distance. Protective measures appear adequate.

It is emphasized that a thorough physical examination of a radium or X-ray worker shall be made before he is employed and at any time that the blood count shows suggestive changes or the worker complains of an obscure ailment. The question arises whether the foregoing measures of protection against X-ray radiation are entirely adequate. The situation was recently discussed with the Chairman of the Advisory Committee on X-ray Protection of the Bureau of Standards. '   ug- gested that personnel within the distance of 40 feet external of     lead

workers would probably not receive a damaging exposure, the question of such a possibility demands consideration. The absolute necessity for further protection can be definitely determined by actual measurements of scattered radiation by means of the portable ionization chamber. It is recommended that the advisability of such tests be considered.

Precautions Relative to Pickling of Metals: (a) Building Ways, No. 1.--There are two sets of pickling tanks in this area  one for flat steel and one for piping. The acid employed is dilute sulphuric. The question at issue is whether at any stage of operation personnel are subjected to the inhalation of arsine gas or arsenic dust originating as a result of contact with arsenic, present as an impurity of the metal, with nascent hydrogen in the bath. Such a possibility appears extremely remote in view of the fact that the operations are conducted in the open air thus excluding the possibility of rising accumulation of arsenical compounds which might result in an enclosed space. However, it is advisable that the operating personnel be examined semi-annually for possible evidence of arsenic absorption instead of the quarterly examination now prescribed.

(b) Coppersmith Shop.--Both sulphuric and muriatic acids are used in the vats of this enclosed space connected with the coppersmith shop. The possibility of arsenical exposure discussed above also obtains for this space. Forced exhaust ventilation is provided and appears adequate. A semi-annual medical examination of operating personnel is advisable.

Occupational Dust Hazards: (a) The Steel and Brass Foundries.-- The chief hazard to be considered is silicosis due to the inhalation of silica dust, the extent of the hazard being dependent upon the concentration, size of the particles, percentage of free silica, and the duration of exposure. Whether or not a silicosis hazard exists in these foundries can only be determined by actual counts of dust particles concentration under the various working conditions and the estimation of free silica in the sand used. It has recently been reported by the New York State Department of Labor that silicosis can be prevented if the average plant concentration does not exceed 15 million parts per cubic foot.

(b) Casting Cleaning Shop.--The conditions in this shop appear to be particularly unfavorable. The iron and brass foundry buildings are equipped with forced exhaust ventilation although its efficiency in controlling dust concentrations is undetermined. The casting cleaning shop, however, is not provided with any mechanical ventilation, dependence being placed mainly on roof cowls, which, it is believed, are inadequate.

Certain of the grinding and chipping operations should be conducted under hoods with localized suction ventilation. Two high-speed emery wheels and two carborundum grinding wheels are not equipped with suction ventilation. It is recommended that consideration be given to a systematic engineering survey of both foundries and the casting cleaning shop to include dust counts and the measures necessary to reduce silicosis hazards.

There are 33 employees in the iron foundry, 64 in the brass foundry, and 22 in the casting cleaning shop. It would be desirable to carry out a medical survey, including X-ray of the lungs, of all personnel in order to determine the incidence of silicosis. For the present, however, it is suggested that such a study be limited to employees in the casting cleaning shop where the worst conditions prevail.

All candidates for employment for foundry oper    n should be given an X-ray examination of the lungs in order to scre    out cases in

any state of silicosis.

(c) Sandblasters.--The present practice of an annual X-ray examination of the chest, or oftener if so indicated, will be continued.

(d) Hazard of Buffing and Polishing.--The possible hazard incident to dust from artificial abrasives such as carborundum, alundum, and emery should be considered. The dust from these materials does not contain free silica and therefore will not produce silicosis. However, if breathed for protracted periods, these dusts induce an X-ray appearance similar to that of early silicosis. This picture changes very slightly as length of exposure increases. There is clinical evidence, however, that workers exposed to heavy concentrations of abrasive dust are more susceptible to diseases of the chest than those not so exposed. Authorities in this field advise that an effort should be made to keep the dust count below 20 million particles per cubic foot. The dust is approximately 50 percent abrasive and 50 percent metallic. Although respirators are provided for individual use, it is impracticable to wear such a device constantly.

The buffing and polishing wheels in the Sheet Metal Shop are now equipped with localized exhaust. This is recommended as a safety precaution.

The grinding wheels in the tool-room of the Shipfitter Shop are provided with either individual exhaust or are kept constantly wet which reduces to a marked degree the quantity of escaping dust.

Hazard of Asbestosis: Asbestosis is an industrial disease of the lungs incident to the inhalation of asbestos dust for prolonged periods, and is distinct from silicosis. The development of the disease depends upon the concentration of the dust, the size of the dust particles, and the length of exposure. The workers in the Pipe Covering and Insulating Shop are exposed to the inhalation of asbestos dust incident to the cutting of asbestos insulating felt in the fabrication of covers for flanges, valve bonnets, and high temperature steam turbines. The material falls under the trade name of "Amosite."

A medical survey of the 11 employees in this Shop was conducted recently with the object of ascertaining whether asbestosis in any stage could be detected. The history of exposure varied from 1.7 to 17 years, 6 men reporting 10 years or over. Present and past disability attributable to asbestosis was denied by all the men and X-rays of the chest were essentially negative in all cases. However, it was not considered that the negative findings precluded the future development of asbestosis by continued exposure to present occupational conditions. The following recommendation made jointly by the medical officer of the Yard and the safety engineer was approved: Install an exhaust blower over work table in the Pipe Covering and Insulating Shop to remove asbestos dust at the source as a protective measure against the hazard of asbestosis.

Norfolk Navy Yard, Portsmouth, Va.—Considerable work has been accomplished in industrial medicine. The medical officer, safety engineer, and W. P. A. Safety Supervisor work in close consultation. In this manner the medical and technical aspects of each industrial problem is properly coordinated. The Bureau of Medicine and Surgery and the Navy Department Safety Engineer have been consulted on several occasions and have given valuable suggestions.

A special effort has been made to collect literature and data with regard to industrial medicine to be used for reference purposes. Special attention is given to the working conditions in hazardous occupations such as sand-blasting, asbestos pipe-covering, amosite (fiberglass insulation. Ventilation, clothing, masks, etc. are checked frequently. Routine inspections have revealed that helmets used in

blasting are of various types. A special study is being attempted with regard to types of masks, helmets, and respirators with the idea of recommending standard items of as near one type as possible.

An extensive study of a new insulating material, fiber-glass, now employed by the Navy, has recently been carried out by this department. Representatives of the manufacturers of this product have been interviewed, and numerous reports of clinical and laboratory investigations have been reviewed. The representatives claim that no harmful effects from the material have been noted among their employees over a period of 8 years, and the only precautions used are loose clothing and a good cleansing shower at the end of each working day. The evidence submitted is not entirely convincing, and the period of time since the introduction of the product is too short to warrant any definite conclusions at present. Until further information is available the following precautions are in effect: the employee must wear hood, respirator, and gloves at all times; the clothing must be loose and cover the arms and neck; goggles must be worn if there is excessive circulation in the compartment; and showers are required before lunch and at the close of the day.

At present the Norfolk Navy Yard has no instruments for making dust counts. The acquisition of at least one of the new and recently improved instruments would be a great advancement in the field of industrial medicine at this Navy Yard and would afford an opportunity for considerable research.

The hazards to civil employees consequent to industrial activity is a problem and requires continued, intense, effort and research with regard to personnel, new materials, new machinery, and new processes. Safety devices and rules should maintain a high standard. This aspect should be studied, developed, and mastered. It requires cooperation in safety engineering and intensive study of industrial health problems.

Naval Torpedo Station, Newport, R. I.—The number of infections following injuries remains low among civil employees at this station. This is due no doubt to the cooperation of all concerned in routing injuries, no matter how trivial, to the dispensary, where they are promptly treated. A follow-up system is also used whereby cases must report for daily observation and redressings until discharged. Many cases of colds, grippe, and bronchitis have developed among the civilian employees during the fall and winter months. By treating these cases three times daily with antiseptic sprays, cough mixtures, and cold capsules, and the prompt checking out of cases with elevated temperatures, an appreciable decline in lost-time incidence has been noted. It is encouraging to note that accidents are on the decline in spite of the increase in employees. By comparative classification we find that in 1935 there were about 4,982 injuries among 2,493 employees and in 1939 about 3,500 injuries among 3,852 employees.

A general physical examination of all workers in explosive materials, including a complete blood analysis and urinalysis, has been done monthly since October, 1939. An effort is being made to prevent occupational poisonings, with particular reference to tetryl and fulminate of mercury. To date no statistical data have been completed. Sand-blasters are examined routinely each month, and routine chest X-rays are done every three months, oftener if thought necessary.

114                          Diseases By Systems                          Respiratory System        115

*(Left side: a rotated full-height table)*

Diseases of Class XVI by occupational groups, new admissions, 1939

| Occupational group | Psychoneuroses | Constitutional psychopathic states without psychosis | Constitutional psychopathic states "drift" | Drusable psaces | Psychasthenia | Psychotic intoxication, alcoholic | Psychasis | Psychosis, senile (?) | Miscellaneous |
|---|---|---|---|---|---|---|---|---|---|

*(table data illegible)*

*(footnote)* [1] Includes "Tactical Inability." [2] Includes "Hypochondriasis."

There were 318 original admissions and 20,719 sick days for diseases in this class during the year 1939, accounting for 0.52 percent of all admissions and 1.72 percent of total sick days.

In addition, there were 54 admissions for complications of other diseases or conditions, 21 admissions reported as existing prior to enlistment, 74 readmissions, and 47 cases remaining from the previous year.

Four of the diagnoses in Class XVIII (chronic bronchitis, asthma, acute fibrinous pleurisy, and sero-fibrinous pleurisy) caused 75 percent of class admissions and 68 percent of class sick days.

The common acute infectious diseases of the respiratory tract, colds, acute bronchitis, etc., as well as pneumonia, are classified as "Communicable diseases transmissible by oral and nasal discharges," and certain other diseases that might be thought of as diseases of the respiratory system, are accounted for in Class V, "Diseases of ear, nose, and throat." Class XVIII, therefore, does not account for a great number of admissions to the sick list.

Diseases in this class causing more than 10 admissions, together with a total for those diseases in the class causing less than 10 admissions, are listed in the following table:

Diseases of Class XVIII, admissions and sick days, 1939

| Disease | New admissions | Admission rate per 100,000 | Sick days per case |
|---|---|---|---|
| Bronchitis, chronic | 91 | 97 | 32.1 |
| Asthma | 64 | 74 | 31.1 |
| Pleurisy, fibrinous, acute | 62 | 26 | 16.6 |
| Pleurisy, serofibrinous | 40 | 31 | 46.2 |
| Pneumonitis, acute | 24 | 16 | 17.5 |
| Total for diseases in the class causing less than 10 admissions | 97 | 28 | 51.9 |
| Total for entire class | 318 | 215 | 40.3 |

Diseases of Class XVIII, with complications, 1939

| Disease | Number cases admitted | Complication | Cases | Percent |
|---|---|---|---|---|
| Bronchitis, chronic | 91 | Pleurisy, serofibrinous | 1 | 1.10 |
| Asthma | 69 | Poisoning, therapeutic, acute, bichloride of mercury | 1 | 1.45 |
| Pleurisy, fibrinous, acute | 62 | Pleurisy, fibrinous, chronic | 4 | 7.55 |
| | | Pneumonitis, acute | 1 | 1.80 |
| | | Pneumonia, lobar, Type VIII | 1 | 1.80 |
| | | Pyelonephritis | 1 | 1.80 |
| Pleurisy, serofibrinous | 53 | Pleurisy, suppurative | 3 | 5.66 |
| | | Pleurisy, fibrinous, chronic | 2 | 3.80 |
| Pneumonitis, acute | 28 | Pneumonia, chronic, nontuberculous | 1 | 3.56 |
| Pleurisy, fibrinous, chronic; Pleurisy, suppurative | 16 | Bronchiectasis | 1 | 6.67 |
| | 11 | Abscess, brain | 1 | 10.13 |
| | | Pleurisy, fibrinous, chronic | 1 | 9.00 |
| | | Hernia, inguinal-axillary | 1 | 9.00 |
| Pneumothorax | 10 | Pleurisy, fibrinous, chronic | 1 | 10.00 |
| | | Pleurisy, serofibrinous | 1 | 10.00 |
| Pneumonitis, chronic, nontuberculous | 6 | Pneumonia, chronic, interstitial | 1 | 16.67 |



116                        Diseases By Systems

### Diseases of Class XVIII, classified personnel, admissions by age group, 1939

| Age group | Officers, Navy and Marine | | | Enlisted men, Navy | | | Enlisted men, Marine | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number in group | New admissions | Rate per 1,000 | Number in group | New admissions | Rate per 1,000 | Number in group | New admissions | Rate per 1,000 |
| 16 to 19 | 5 | 0 | 0 | 11,810 | 30 | 2.54 | 3,602 | 2 | 0.59 |
| 20 to 24 | 1,130 | 1 | 2.66 | 50,129 | 69 | 1.37 | 8,362 | 42 | 2.15 |
| 25 to 29 | 2,400 | 10 | 4.17 | 32,550 | 29 | 1.72 | 3,812 | 6 | 2.12 |
| 30 to 34 | 2,226 | 3 | 1.33 | 14,650 | 27 | 1.81 | 1,886 | 4 | 1.11 |
| 35 to 39 | 2,358 | 6 | 2.53 | 11,772 | 22 | 1.00 | 1,206 | 3 | 2.49 |
| 40 to 44 | 1,821 | 5 | 3.19 | 2,923 | 8 | 2.74 | 528 | 2 | 3.78 |
| 45 to 49 | 1,494 | 6 | 4.02 | 630 | 6 | 6.48 | 281 | 2 | 7.40 |
| 50 to 54 | 1,067 | 2 | 1.89 | 181 | 0 | 0 | 53 | 0 | 0 |
| 55 to 59 | 410 | 0 | 0 | 23 | 0 | 0 | 23 | 1 | 43.48 |
| 60 to 64 | 163 | 1 | 6.45 | 11 | 0 | 0 | 5 | 0 | 0 |
| 65 and over | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 |
| All ages | 13,282 | 35 | 2.64 | 114,527 | 232 | 2.03 | 18,281 | 44 | 2.51 |

### CIRCULATORY SYSTEM

Diseases in this class were responsible for 562 original admissions and 40,522 sick days, or 0.92 percent of all admissions and 3.37 percent of total sick days. The admission rate was 376 per 100,000, as compared with 326, the admission rate in 1938, and 356, the median for the 9 preceding years.

Five of the diagnoses in the class (arterial hypertension; varicose veins; thrombosis, coronary artery; phlebitis; and chronic myocarditis) caused 61 percent of class admissions and 63 percent of class sick days.

In addition to the 562 original admissions shown in the table below, there were 51 admissions covering cases reported as complications of other diseases and conditions, 116 readmissions, 85 for diseases reported as existing prior to enlistment, and 107 cases remaining from the previous year.

Thirty-five of the 105 persons invalided from the service on account of diseases in this class incurred the disability prior to entering the service.

Diseases for which 10 or more admissions were recorded during the year and a total for those diseases in the class causing less than 10 admissions are shown in the following table:

### Diseases of Class II, admissions and sick days, 1939

| Diseases | New admissions | Admission rate per 100,000 | Sick days per case |
|---|---|---|---|
| Hypertension, arterial | 182 | 106 | 44.7 |
| Varicose veins | 79 | 53 | 39.0 |
| Thrombosis, coronary artery | 38 | 25 | 71.7 |
| Phlebitis | 31 | 21 | 42.6 |
| Myocarditis, chronic | 30 | 20 | 50.4 |
| Cardiac arrhythmia, premature contractions | 23 | 15 | 43.3 |
| Syncope | 21 | 14 | 23.8 |
| Epistaxis | 17 | 11 | 5.8 |
| Arteriosclerosis, general | 16 | 11 | 45.1 |
| Tachycardia | 16 | 11 | 31.0 |
| Coronary heart disease, arteriosclerosis | 15 | 9 | 92.3 |
| Angioneurotic edema | 12 | 8 | 19.6 |
| Cardiac disorder, functional | 11 | 8 | 23.5 |
| Cardiac arrhythmia, paroxysmal tachycardia | 10 | 7 | 28.3 |
| Total for diseases in the class causing less than 10 admissions | 51 | 34 | 52.1 |
| Total for entire class | 562 | 376 | 44.0 |

UNITED STATES NAVY DEPARTMENT
BUREAU OF MEDICINE AND SURGERY

# ANNUAL REPORT OF THE

# SURGEON GENERAL, U.S. NAVY

CHIEF OF THE BUREAU OF MEDICINE AND SURGERY

TO THE SECRETARY OF THE NAVY

CONCERNING

STATISTICS OF DISEASES AND INJURIES
IN THE UNITED STATES NAVY

FOR THE CALENDAR YEAR

## 1941



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON · 1944

and reclaiming unit. The decrease in the concentration of dust
has been of primary importance from the health standpoint. Other
advantages are a decrease in operating cost because of ability to
reclaim some 75 percent of the sand and water, decrease in time
needed for cleaning castings, better quality of the finished job,
and elimination of pickling process to get rid of last traces of
sand.

*Navy Yard, New York, N. Y.*—Experience indicates that indi-
viduals of the type to apply for employment through the Labor
Board have an incidence of active pulmonary tuberculosis of
about 2 percent. In most cases, the disease cannot be detected by
ordinary physical examination. Consideration is at present being
given to the practicability of including a chest x-ray as part of
the preemployment examination.

The urgent demand for personnel, particularly in some of the
skilled trades, has led to a lowering of the physical standards set
forth by the Civil Service Commission in a number of occupa-
tional classifications. Up to the present time, there has been no
evidence that this lowering of physical requirements has been
responsible for increased illness or accident rates.

In accordance with instructions contained in Secretary of the
Navy letter dated 25 October 1941 periodic physical examinations
have been given to employees engaged in certain work hazardous
to themselves or others. In addition to these periodic examinations,
it has been considered advisable to perform periodic chest x-ray
examinations on tool-grinders and on workers handling fibre glass.
The use of this latter material has recently been introduced for
insulating purposes, and since little is known of the effects of
fibre glass dust upon the lungs, it seems desirable to keep a close
watch of those employees who handle this material. In view of
the increased scope of the periodic examinations, expansion of
the facilities for performing these examinations has been neces-
sary. The establishment of an industrial health office has been
the first step to meet the increased requirements of the industrial
program. It was felt that improved x-ray equipment suitable for
taking chest x-ray films would facilitate and expedite perform-
ance of the required periodic examinations. Purchase of such
equipment has been approved.

In July 1941, a Reserve officer with a wide experience in indus-
trial health work was assigned to duty at the yard. Shortly there-
after, a medical officer from the Regular Navy who had under-
one a course of training in industrial hygiene, was ordered to
duty at the yard. After a short period of indoctrination, these two
officers were designated as Industrial Health Officer and Assistant
Industrial Health Officer, respectively.

A comprehensive industrial health program has been put into
operation. The following activities have already been accom-
plished:

(a) Survey of lighting in several shops with recommenda-
tions for improvement.

(b) Study of the efficiency of spray painting booths, with
recommendations.

(c) Study of ventilation in the temporary foundry, with
recommendations.

(d) A study of illness (mercury poisoning) among painters
working with antifouling plastic paint. As a result of
this study, effective control measures have been put into
effect.

(e) An investigation of nonstandard cleaning and degreas-
ing agents used in the yard. As a result the findings
an order was issued prohibiting the use of unapproved
cleaning agents in the yard.

(f) Compilation of a list of materials used in the yard
which may offer potential health hazards. This list in-
cludes all solvents, such as benzol and carbon tetra-
chloride; all dust-producing materials, such as asbestos,
sand, and fibre glass; and all toxic metals, such as lead
and magnesium. Tabulations have been made showing
which shops are using each substance and a paralleled
analysis showing what materials are used in each shop.
These tabulations are to be used as a basis for a com-
prehensive program of occupational disease prevention.

(g) A campaign of health education was instituted in an
effort to reduce lost time due to nonindustrial illness
among civilian employees. Posters illustrating the spread
of respiratory infections have been placed on all bulle-
tin boards in the yard. Plans have been formulated for
distributing educational material on the subject of colds,
tuberculosis, and nutrition.

(h) Preemployment chest x-ray survey. During the latter
part of 1941, plans were completed for taking chest
x-ray films on a sample of 1,000 consecutive male appli-
cants for employment to ascertain whether any signifi-
cant number of cases of active pulmonary tuberculosis
will be found among men seeking employment at the
yard.

(i) Space on the ground floor of Building No. 200, at the
present time occupied by the safety engineer, has been
allocated for use as industrial health office and labora-
tory.

*Norfolk Navy Yard, Portsmouth, Va.*—Although some atten-
tion has been directed to industrial hygiene at this yard for sev-
eral years, it was not until the latter part of 1941 that a medical
officer was assigned to this phase of medical department activities.
The safety officer and the medical department have cooperated
in an effort to detect hazards, and recommend measures to obvi-
ate them or make them less hazardous.

Preemployment physical examinations were conducted by the
medical section of the Labor Board. An attempt is being made
to conduct recheck examinations as recommended by the Navy
Department, especially on those engaged in occupations involving
hazardous exposures. Complete blood counts were obtained on
um handlers, basophilic aggregation tests on welders, cutter.

burners, and painters, and x-ray examinations of the chest are made on sandblasters.

The silica hazard in the foundry was reduced somewhat by the substitution of steel grit for sand in two modern blasting units. One old type sandblasting unit using sand is still in operation. Plans to replace this unit have been made and it is anticipated that this will be accomplished as soon as practicable. To minimize the hazard presented by sandblasting operations, approved personal protection equipment is provided.

There has been some time loss from metal fume fever, particularly among those working around welding and burning operations on new construction and repair jobs. In many cases the men are exposed unnecessarily to fumes due to reluctance on the part of leading men to take the time to secure and set up blowers in compartments where they are needed. It very frequently happens that attacks of metal fume fever develop among others working in the compartment than in welders or burners. Also cases develop among those working in a compartment when the bulkhead is being heated on the opposite side. This necessitates adequate ventilation in both compartments. An approved metal fume respirator that is so constructed that it can be worn under a welder's shield is being recommended for use by those exposed to metal fumes, and it is anticipated that the use of these respirators will reduce the time loss and increase production and efficiency.

There continues to occur an unnecessary number of cases of ophthalmia, due to actinic rays from the welding arc. This is due to inexperience among many of the welders' helpers, carelessness on the part of those that may be working near welding operations, and failure of the welder in many instances to shield his work properly.

Goggles are provided for and generally used by those engaged in chipping and grinding. In spite of this an average of five foreign bodies in the eye occurs each day. These are most frequently due, however, to causes other than grinding and chipping. Occasionally a foreign body in the eye case is due to improperly fitting goggles as well as goggles worn on the forehead instead of over the eyes, and many of them happen while the worker is walking about in the yard to and from jobs and to and from work.

The campaign for the wearing of safety shoes has not been successful, and there continues to be an undue number of toe injuries, particularly among riggers.

*Puget Sound Navy Yard, Bremerton, Wash.*—A medical officer reported 11 August 1941 as the industrial medical officer for this navy yard. He is doing excellent work, and has offered many suggestions that have been instituted in aiding the health and hygiene of the industrial yard.

The list of technical equipment to establish an industrial health laboratory has been approved.

The industrial health officer is working in close cooperation with the injury officer and the leading-men of the various shops projects. Some very interesting and informative data he

been accumulated regarding injuries to yard employees and non-occupational lost time.

The enlarged industrial health program was explained to the heads of the departments in the yard and to the masters of the various shops. The new program was received with enthusiasm and assured full cooperation. Many contacts with quartermen, leadingmen and individual workers have been established by the industrial medical officer during his frequent visits to the shops. A survey was made of all the shops and activities, and a chart prepared showing the location and nature of the possible health hazards.

Space for an industrial hygiene laboratory has been allotted in the chemical laboratory building and technical equipment has been requested. With the establishment of this laboratory, facilities will be available for investigation of industrial health hazards in this naval district.

A total of 2,276 eye injuries were treated at the dispensary during 1941 which indicates that the present eye protection is not satisfactory. The fact that eye injuries totaled 25.5 percent of all cases, but accounted for only 3.2 percent of the lost-time accidents indicates that there were few complications following the injuries.

The industrial medical officer has been working in cooperation with the safety engineer to determine the basic causes of the high frequency of certain types of injuries in the various trades. Meetings of supervisors in classes of 40 to 50 have been initiated. At these meetings emphasis is placed on the responsibility of the supervisors in guarding the safety and health of their men. Numerous problems and comments about procedures, policies, equipment and conditions were uncovered in the discussions following these meetings.

There were 10,401 sick leave applications during the year requesting a total of 46,451 sick days. Since a few employees do not have sufficient accumulated sick leave to cover their entire illness or injury, some take annual leave instead of sick leave, and some of the sick leave applications are not approved, 46,451 is not the total days absent from work due to nonoccupational illness. The following summary of a 3-year period is submitted for comparison:

| | 1939 | 1940 | 1941 |
|---|---|---|---|
| Number of sick leave applications | 2,768 | 6,174 | 10,401 |
| Number of sick days requested and approved | 16,987 | 28,594 | 46,451 |
| Average days requested per application | 6.25 | 4.63 | 4.46 |
| Average number of applications each month per 1,000 employees | 46.1 | 66.6 | 62.1 |
| Average number of sick days requested each month per 1,000 employees | 282 | 318 | 277 |

The lower average days of illness per case in 1940 and 1941 is apparently due to a great increase in one and two-day absences.

Both the frequency of applications and the number of sick days requested show an expected seasonal variation



U. S. Navy Department • U. S. Maritime Commission

573-1- 6

## *Minimum Requirements*

### FOR

# SAFETY AND INDUSTRIAL HEALTH

### IN

# CONTRACT SHIPYARDS

1943

Approved
U. S. Navy
Jan. 28, 1943

Approved
U. S. Maritime Commission
Feb. 2, 1943

United States Government Printing Office • Washington • 1943

EXHIBIT G

DEFENDENT'S
EXHIBIT
Buffalo Pumps

34

1



U. S. NAVY DEPARTMENT
WASHINGTON, D. C.

U. S. MARITIME COMMISSION
WASHINGTON, D. C.

*To All Contractors Constructing Ships for United States Navy–United States Maritime Commission:*

As a result of the national conference on safety and health in shipyards holding contracts with the United States Navy and Maritime Commission, conducted under the auspices of these agencies in Chicago December 7 and 8, 1942, a unanimous agreement was reached upon the minimum standards which have now been approved by the Navy Department and United States Maritime Commission and which should be put into effect in shipyards holding contracts with the two agencies.

These standards represent a specialized study based upon a fact-finding survey on all coasts by experts in that field. They have received the unanimous concurrence of the representatives of the medical and safety departments and of labor-management committees from shipyards on all coasts.

The necessity for conserving manpower and promoting the physical welfare, health, and safety of what shortly will amount to one million workers in shipyards requires that careful observance of standards for the prevention of accidents and protection of health be accorded. Aside from the weight which must be given humanitarian considerations, it is simply good common sense that as much care and attention be given to protecting the human factors in the war production program as is given machines.

Under the administrative direction of the Maritime Commission, safety and industrial health consultants will be made available in all regions wherein shipyards holding contracts with the Navy and the Commission are located.

Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and the Maritime Commission, and each is requested to give full cooperation to the consultants on health and safety who will be charged with the coordination and supervision of the safety and health programs of the two agencies.

The cumulative restriction of manpower makes speedy attention and comprehensive action in respect to the subject matter hereof of vital importance.

FRANK KNOX, *Secretary of the Navy.*

E. S. LAND, *Chairman,*
*U. S. Maritime Commission.*

(II)



# UNITED STATES NAVY—MARITIME COMMISSION

## MINIMUM REQUIREMENTS

FOR

## SAFETY AND INDUSTRIAL HEALTH IN CONTRACT SHIPYARDS

**S and H-1. Introduction.**

1.1  The standards for industrial health and safety as presented in this manual cover only minimum requirements. It is not to be assumed that compliance with these minimum standards is insurance of the development of good health and safety records.

1.2  It is recognized that in many shipyards, standards for health and safety are already in effect which go beyond the requirements of those listed here. The Maritime Commission and Navy urge that any standards of higher level be continued and that where substandard conditions of health and safety exist, they immediately be brought to the required standard or better.

1.3  In all cases the use of the words *shall* or *must* indicates that compliance with that section of the minimum requirements is mandatory. Where the words *should* or *may* are used the section may be considered desirable but not necessarily mandatory under certain circumstances which the contractor in his discretion may determine.

### MINIMUM REQUIREMENTS FOR INDUSTRIAL HEALTH

**H-2. Medical Facilities.**

2.1  *Personnel.*—Yards employing up to 5,000 men should have two full-time physicians, and one additional physician for each additional 5,000 men. Yards with less than 2,000 to 3,000 men will not need full-time physicians.

2.2  Specialists in the various branches of the medical profession available in the area should be consulted as indicated.

2.3  Yards employing up to 5,000 men should have in the main dispensary six full-time nurses and three additional nurses for each additional 5,000. Additional nurses will be required for first aid stations.

2.4  There should be at least three clerks employed in the medical department for each 5,000 employees.

2.5  One ambulance driver should be available per ambulance per shift.

(1)

**H–3. Physical Facilities.**

**3.1** The medical department should be provided with:

a. A waiting room with suitable registration facilities.

b. A general treatment room.

c. An eye treatment room.

d. A minor surgery room.

e. A ward with three beds for the first 5,000 employees, and one bed for each additional 10,000.

f. Doctors' offices and private examining rooms.

g. A nurses' office and dressing room.

h. X-ray room for yards employing 5,000 men and above.

i. A physiotherapy room.

j. Toilet facilities for doctors, nurses, and patients.

k. A storeroom for general medical stores.

l. X-ray files and viewing room.

**3.2** First-aid treatment rooms, manned by nurses, should be provided wherever there is overcrowding at the main dispensary and loss of time due to distance from shipways and shops. These sub-stations may be located under building ways or near locations where the number of men working is large so that the distance a man need travel to a sub-station will not exceed approximately 400 yards.

**H–4. Equipment.**

**4.1** The following equipment should be provided:

a. One ambulance for each 15,000 employees, or reasonable fraction thereof, with an ordinary passenger car always in reserve.

b. In some yards a station wagon is used satisfactorily inside the yard and an ambulance used only for trips outside.

c. An X-ray unit for yards employing about 5,000 men and above.

d. Medical and surgical stores required for minor surgery, eye injuries and physiotherapy.

**H–5. Records and Forms.**

**5.1** The following records and forms are recommended:

NOTE.—*In an emergency no form need be filled out.*

a. A form authorizing the workman to report to the medical department for examination or treatment issued by a foreman or leading man or other supervisor. This shall show time of issue, arrival at dispensary, discharge from dispensary and return to work.

b. Appointment form for revisits and retreatments issued by the physicians and nurses.

c. A disposition form issued by physicians and nurses indicating return to work, hospitalization, to home, or other disposition.

d. A complete and accurate permanent filing system recording personal data, nature and cause of injury, diagnosis, treatment, disposition, and results.



4

3

*e.* The necessary state and insurance company forms.

*f.* Daily report to the safety department showing all new cases for the day, together with the nature and cause of injury, and the *diagnosis.*

*g.* The adoption of the standard nomenclature when made available by the Council on Industrial Health of the American Medical Association, Chicago, Illinois.

**H-6. Examinations.**

6.1  Physical examinations to insure proper placement of employees shall be given.

6.2  Periodic check examinations shall be given men working in occupations potentially hazardous to themselves or others, as for example to crane operators, locomotive and hoisting and portable engineers.  Periodic check examinations should be given men in jobs in which there may be health hazard, as for example to sand blasters, radium and X-ray workers, and paint sprayers.

6.3  Special examinations such as X-ray, scriologic and urinalyses shall be given in the individual case as indicated and in accordance with local needs.

**H-7. Air Raid Precautions.**

7.1  The medical department shall locate, equip, and maintain such emergency first aid dressing stations as may be deemed necessary to handle air raid casualties.

7.2  A certain number of yard employees shall be trained in first aid procedures to render assistance to the medical department in handling air raid victims.

7.3  Close cooperation should be maintained with the local civilian defense officials in order that evacuation and care of air raid victims may be carried out to the best advantage.

7.4  In keeping with local army and navy regulations, steps should be taken to provide protection of dispensaries by sandbags, or otherwise, from fragments and concussion of bombs.

**H-8. Responsibilities of the Medical Services.**

8.1  Frequent inspection of the yard by the medical staff shall be required in order that physicians may become familiar with shipyard jobs and thus help intelligently in preventing accidents and occupational disease.

8.2  Close collaboration shall be maintained with the safety department especially in regard to records of accidents and absenteeism.

8.3  It shall be the joint responsibility of the medical and safety departments through the supplies department to know the composition of paints, thinners, paint removers, and other chemicals used in the yard, and to see that the workers exposed are protected by the best safety practices.

5

4

8.4  As in the general practice of medicine the confidential relations of doctor and patient shall be maintained.

8.5  It is certain that in the near future women in large numbers are to be employed in the mechanical trades.  It is necessary in shipyards to make special provisions for this class of patients.  This will necessitate the establishment of separate waiting, treatment, and examining rooms.  In yards where the number of employees is large, it may be logical to establish a separate dispensary for the handling of women patients.

**H-9. Sanitary Inspections.**

9.1  *Cafeterias and canteens.*—It shall be the duty of the medical department to adapt from Army and Navy standards, in reasonable conformity with the local health department rules, and inspection scheme to include preemployment examination of food handlers, quality and quantity of food, general cleanliness and comfort, screening, dishwashing, garbage and waste disposal.  These inspections shall be made at unscheduled times and never less than once each week.

9.2  *Water supply, sewerage, and waste disposal.*—In cooperation with Maritime and Navy engineers the medical department shall inspect and report upon the above as often as seems advisable, but not less than twice yearly.

9.3  *Salt tablets.*—Salt tablets shall be made available to all employees and shall be kept in covered dispensers appropriately located.

**H-10. Respiratory Protective Equipment for Shipyards.**

The U. S. Bureau of Mines, 4800 Forbes Street, Pittsburgh, Penna., maintains a laboratory which tests and *approves* for use in industry respiratory protective equipment of all kinds.  The Maritime Commission and Navy will require the use of *approved* equipment throughout all yards.  The safety department shall be responsible for instructing men in the proper use of such equipment and for the maintenance of ample supplies.

10.1  Details of Bureau of Mines respirators with names of manufacturers, prices, and descriptions can be obtained from the Bureau or from the Maritime Commission.

10.2  The safety department shall be responsible to the management for cleaning and sterilizing all such equipment as often as may be agreed upon with the medical department.  (A method for such sterilization is included in these standards; see section H-12.0)

10.3  *General requirements for respirators.*—

*a.* Adequate protection as defined by American Standard Safety Code for the Protection of Heads, Eyes, and Respiratory Organs. Handbook H-24, Nov. 1, 1938.  Superintendent of Documents, Washington, D. C.; price 15¢.

*b.* Comfort (light weight and not obstructive to vision).



6

H-11. Jobs Requiring Respiratory Protective Equipment.

## 11.1 Dust.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Silica of Sand Dusts (as in sand blasting) | (1) Abrasive blasting helmets. |
| | (2) Dust respirator. |
| Lead Dust (as in mixing paint) | (1) Air line respirator. |
| | (2) Lead dust respirator. |
| Asbestos (as in covering pipes) | (1) Air line respirator. |
| | (2) Dust respirator. |

## 11.2 Metal fumes and smokes.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Lead and zinc oxide from welding and burning. | (1) Air line respirator. |
| | (2) Fume respirator for lead. |
| | (3) Dust respirator for zinc oxide. |

## 11.3 Solvent vapors.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Spray painting, both indoors and outdoors. | |
| Paint removing, usually indoors | (1) Air line respirator. |
| Cementing, usually indoors | (2) Chemical cartridge respirator. |
| Cleaning, usually indoors | |
| Degreasing, usually indoors | |

## 11.4 Acid gases and mists.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Pickling (indoors) | (1) Mist respirator. |
| Cleaning (indoors) | (2) Chemical cartridge respirator. |
| Degreasing (indoors) | |

## 11.5 Alkali mists.—

| JOBS | PROTECTIVE DEVICES |
|---|---|
| Cleaning (indoors) | (1) Mist respirator. |
| Degreasing (indoors) | (2) Chemical cartridge respirator. |

## 11.6 Asphyxiating atmospheres.—

| | PROTECTIVE DEVICES |
|---|---|
| | (1) Nose mask. |
| | (2) Oxygen-breathing mask. |
| | (3) All-service mask. |

11.7  Air supply for air-line masks of all kinds.—Air at a comfortable temperature and free from odors and excessive moisture sometimes is difficult to furnish, especially for outdoor jobs in winter. Air quality and temperature shall be tested by the Safety Department and shall meet the suggestions of the American Standard Safety Code for air-supplied respirators (sec. 10.3a).

H-12. Sterilization of Respirators.

12.1  Each worker who needs a respirator should be assigned his own respirator.  Where this is not done, it is important that the respirator be sterilized in addition to being cleaned.  Adequate sterilization may be accomplished by—

134454 O - 43 - 5



a. Washing the rubber and metal parts with soap, a brush and warm water, after which the respirator is sterilized by immersion for 10 minutes in a solution of formalin made by placing one part of 40 percent formaldehyde solution into nine parts of water.

b. Washing the rubber and metal parts with soap and warm water, after which the respirator is sterilized by dipping in a 3 percent solution of carbolic acid, a 2 percent solution of lysol, or a 70 percent solution of denatured alcohol.

c. Subjecting the respirator to sterilization by a moist atmosphere of antiseptic gas, preferably formaldehyde, for a period of ten minutes at room temperature.

d. After following any one of the outlined procedures, the respirator should be rinsed with water and hung up to dry. The respirator should not be used until it has been dried thoroughly.

e. The filters, felt screens, and elastic headbands should be removed, if detachable, before washing or sterilization of the respirator, unless it is evident that washing and sterilization will not harm these parts.

12.2  The National Safety Council has issued an Industrial Data Sheet No. D-Gen. 16, "Cleaning and Sterilizing Goggles and Respiratory Equipment."

**H-13. A Guide for Prevention of Industrial Disease in Shipyards.**

13.1  Eight common types of disease and methods for their prevention are given in the following sections. Help in applying these methods will be given by the local Safety Department and by safety and medical consultants of the Navy Department and the Maritime Commission.

13.2  *Flashburns and foreign bodies in the eye.*—

a. Effects on workers: "Flash" is a surface eye burn resulting from even momentary unprotected exposure to the welding arc. In this condition the eye is painful and sensitive, especially to light. An eye flash shall be treated only by the doctor or by methods he has prescribed.

b. Foreign bodies in the eye shall be removed only under the doctor's orders or by methods he has prescribed. Like flashburns, they are preventable.

c. For safe practice:

All workers:

1. Whenever near welding areas wear antiflash goggles which have been approved by the Safety Department.

2. Wear safety goggles when grinding, chipping, buffing, scratch-brushing, or forging.

8

7





**Welders:**

3. Wear approved antiflash goggles even when helmet is being worn.

4. Use portable screens to protect the eyes of fellow workers.

13.3 *Lead poisoning.—*

a. Sources: In general, any job in which dust, fume, or smoke from any substance containing lead is breathed daily.

b. For example:

| JOB: | WHEN MATERIAL IS: |
|---|---|
| Welding | Metal, coated with paint containing lead. |
| Cutting | |
| Burning | Lead. |
| Shrinking | Lead pigments. |
| Grinding | |
| Buffing | |
| Spray painting | |
| Mixing paint pigments | |



c. Job can be done safely with:

1. (a) Special ventilation: Use a local exhaust hood approximately 8 inches from the job and drawing at least 200 c. f. m. into the hood with filtration of the discharge, or discharge, to a place where the contaminated air will not be breathed, or

(b) Wearing of fume respirators, or

(c) Wearing of supplied air respirator.

2. Periodic medical examination which includes blood and urinalyses.



13.4 *Solvent vapors.—*

a. Sources: In general, any job in which solvent vapors are breathed.  For example:



Spray painting.
Painting.
Using paint remover.
Applying cements.
Paint brush and spray gun cleaning.

b. Job can be safely done with:

1. Segregation of such work, and

2. (a) Special ventilation as may be required.

(b) Provision of spray booths with exhaust system.





8



    (c) Wearing of special respirators:
        (1) For spray painting: Supplied air respirators or air line hoods.
        (2) For other jobs: Chemical cartridge respirators.
        (See H–10 on respiratory protective equipment.)

13.5 *Zinc fume fever (zinc chills or shakes).*—
  a. Sources: In general, any job in which the fumes from heated zinc are breathed. For example:



| JOB: | WHEN MATERIAL IS: |
|---|---|
| Welding | Galvanized metal |
| Cutting | Zinc |
| Shrinking | Zinc alloy |
| Pouring zinc alloys | Brass |

  b. Job can be safely done with:
    1. Special ventilation: Local exhaust hoses or hoods located close enough to operation at all times to remove smoke completely.
    2. Wearing of special respirators.
  NOTE.—There are no known cumulative effects from zinc chills.

13.6 *Fiberglas.*—



  a. Effects on workers: Men working with Fiberglas may develop a dermatitis or conjunctivitis which are skin and eye conditions. It is best to transfer to another job those who continue to be sensitive.
    1. Both experimental and practical evidence show conclusively that the inhalation of Fiberglas causes no lung damage.
    2. The cement used with Fiberglas may contain a toxic solvent such as carbon tetrachloride ($CCl_4$) which can cause severe illness or even death if the cement is used indoors with inadequate ventilation.



  b. For safe practice:
    1. Clothing: Supply loose coveralls with collars and sleeves buttoned over cheesecloth.
    2. Goggles: Should be worn.
    3. Shower: Should be taken rather than bath, at end of shift.
Respirators are usually not necessary, but if a cement containing a toxic solvent is used, proper protection either by ventilation or by a respirator must be supplied and used.





